IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Charlottesville Division

NATALIE LUNDBERG,

    Plaintiff,

v.                             Case No. 3:23-cv-00042

DELTA RESPONSE TEAM, LLC AND
THOMAS WALTON,

    Defendants.

**BRIEF IN SUPPORT OF MOTION TO DISMISS**

## I.      INTRODUCTION

After nearly five years of work with Delta Response Team ("DRT"), Natalie Lundberg ("Lundberg") decided to convert to part-time employment in April 2022. Even though the last shift Lundberg worked was June 6, 2022, DRT granted Lundberg's request for a leave of absence in September 2022. Despite this accommodation, Lundberg never returned to work. Therefore, on May 8, 2023—eleven months after Lundberg's last shift—DRT removed her agency affiliation with DRT with the Virginia Department of Health Office of Emergency Medical Services.

Lundberg now claims that she was discriminated against on the basis of her sex and sexual orientation, retaliated against, had her rights under the Family and Medical Leave Act ("FMLA") interfered with, was denied payment for Paid Time Off ("PTO") hours accrued, and has lost job opportunities and suffered severe emotional distress. Lundberg's decision to "quiet quit" her employment with DRT does not create a cause of action against DRT or Thomas Walton ("Walton").

In short, the Amended Complaint does not state a claim for sex discrimination based on theories of hostile work environment, constructive discharge, or disparate treatment under either

Title VII of the Civil Rights Act of 1964 ("Title VII") or the Virginia Human Rights Act ("VHRA"). The VHRA claims against Walton must also be dismissed because he is not an employer under that statute. Furthermore, the Amended Complaint does not state a claim for violation of the Virginia Wage Payment Act ("VWPA") for failure to pay out accrued PTO nor does it state a claim for interference under the FMLA. Finally, the Amended Complaint does not allege facts to plausibly state a claim for tortious interference with business expectancy or intentional infliction of emotional distress. The Motion to Dismiss should be granted and the Court should dismiss the Amended Complaint against Walton with prejudice and dismiss with prejudice Counts I and IV—to the extent they purport to allege sex discrimination based on hostile work environment, constructive discharge, or disparate treatment—as well as Counts III, VI, VII, and VIII, against DRT.[1]

## II.    ALLEGATIONS

Lundberg began working for DRT as an Emergency Medical Technician ("EMT") in 2017. (ECF Doc. 2, at ¶ 11.) In August 2021, DRT promoted Lundberg to the position of Captain. (*Id.* at ¶ 17.) Lundberg alleges that in October 2021, a "heterosexual coworker, Erica Wood ("Wood"), began harassing [her] and failed to follow protocol while on shift with Lundberg as Captain." (*Id.* at ¶ 27.) Lundberg alleges that she complained about "Wood's harassment and insubordination to DRT HR and Walton," that nothing was done to remedy the "harassment" and DRT continued to schedule her to work with Wood "even after long-documented harassment and insubordination." (*Id.* at ¶¶ 27, 29.)

In November 2021, Lundberg began applying—with Walton's knowledge—for positions at local Fire and EMS agencies. (*Id.* at ¶¶ 38-39.) On November 16, 2021, Lundberg applied for

---

[1] DRT is not moving to dismiss the retaliation claims against it in Counts II and V.

a position with the City of Lynchburg Fire Department.  (*Id.* at ¶ 40.)  The following day, Lynchburg scheduled an interview for November 19, 2021, and informed Lundberg that it would check her references.  (*Id.* at ¶ 41.)  Lundberg informed Walton that he would get a call from Lynchburg for a reference.  (*Id.*)  Lundberg provided Walton's cell phone number to the investigator on January 3, 2022, and Walton spoke with the investigator.  (*Id.* at ¶¶ 42-43.)  On January 21, 2022, Lundberg received a call from Lynchburg stating that she would not be proceeding with the interview process.  (*Id.* at ¶ 44.)

On January 31, 2022, Lundberg applied for a position with Bedford County Fire and Rescue.  (*Id.* at ¶ 45.)  On February 11, 2022, Lundberg participated in an interview, written test, and skills drills as part of the Bedford interview process.  (*Id.* at ¶ 46.)  On February 16, 2022, Bedford extended a conditional offer of employment, which Lundberg accepted.  (*Id.* at ¶ 47.)  On February 23, 2022, Bedford's investigator requested Walton's cell phone number.  (*Id.* at ¶ 49.)  On February 25, 2022, Walton spoke with the investigator and then texted Lundberg.  (*Id.* at ¶ 50.)



(*Id.*; Exhibit 1.)  On March 7, 2022, Lundberg learned via email that Bedford was rescinding its conditional offer of employment.  (ECF Doc. 2, at ¶ 52.)

Lundberg issued requests to Lynchburg and Bedford pursuant to the Virginia Freedom of Information Act ("VFOIA") and alleges that she learned that Walton had disclosed that she is

openly bisexual, that he questioned her "lifestyle choices" and said she was an "odd duck." (*Id.* at ¶¶ 53-54.) She also alleges that Walton did not recommend her as an employee to Lynchburg or Bedford. (*Id.* at ¶ 55.)

On March 10, 2022, Lundburg contacted Human Resources ("HR") for DRT regarding Walton's conduct.



> Mar 10, 2022 at 10:39 AM
>
> Wow. Im pretty appalled at the reccomendation Tom gave me...

> Comments about personal appearance and hardly anything about my work ethics. Pretty upsetting and almost defamatory.

(Exhibit 2.)

Lundberg alleges that she complained to Walton about disclosing her sexual orientation during the reference check and he did not deny making the statements, instead saying something to the effect of, "Well if they didn't hire you for that, would you still want to work for them?" (ECF Doc. 2, at ¶¶ 58-59.) Lundberg alleges that she spoke to Walton again about his comments on April 4, 2022, and he told her that if he had known her employment opportunities would have been impacted by his statements he "never would have said it." (*Id.* at ¶ 60.) At this time, Lundberg resigned as Captain and requested that she be assigned to a part-time position. (*Id.* at ¶ 61.)

Lundberg alleges that she was then denied part-time work hours, denied use of her accumulated PTO leave, and denied payout of her PTO leave. (*Id.* at ¶ 63.) She alleges that DRT penalized her and threatened termination if she did not work two shifts per month, although she alleges that heterosexual employees and/or employees who did not complain about discrimination

only had to work one shift per month to remain employed part-time. (*Id.* at ¶ 64.) In June 2022, Lundberg did not work a shift because of a COVID-19 diagnosis. (*Id.* at ¶ 65.) She alleges that DRT did not respond to her and did not allow her to use PTO for her missed shift. (*Id.*)

On September 29, 2022, Lundberg alleges that she "requested a leave of absence to allow her to seek therapy and mentally recover from what had happened." (*Id.* at ¶ 68.) She informed DRT that she wanted to remain employed and return to work when she was able to do so. (*Id.* at ¶ 69.) In response, DRT informed Lundberg that even though it had been almost four months since she last worked, it would accept her request for further time off. (Exhibit 3.) DRT did inform Lundberg that

> [B]ased on the amount of time you have been off and with an unknown return date, we feel it would be best for you to return all Delta Response Team issued uniforms and property until you feel you are fit to return to work and meet the requirements of 2 shifts each month to maintain employment.

(*Id.*; ECF Doc. 2, at ¶ 74.) Lundberg responded, via counsel, that she was "happy to return the uniforms and all DRT property" and that "as soon as [she] knows when she can return to work, she will let you know." (Exhibit 3.)

Despite the arrangement that Lundberg would let DRT know when she was able to return to work, Lundberg alleges that "DRT did not schedule Lundberg to work from then on" and "began the process of quietly firing her instead of protecting her job." (ECF Doc. 2, at ¶ 73.) Lundberg alleges that, on May 8, 2023, the Virginia Department of Health Office of Emergency Medical Services ("OEMS") notified her that DRT had removed her agency affiliation from their list of affiliated employees. (*Id.* at ¶ 77; Exhibit 4.)

5

### III.    ARGUMENT

**A.    Standard of review.**

Rule 12(b)(6) of the Federal Rules of Civil Procedure allows a court to dismiss an action if the Complaint fails to state a claim upon which relief can be granted. *Mylan Laboratories, Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir. 1993). In reviewing a defendant's motion under Rule 12(b)(6), a plaintiff's well-pleaded allegations are taken as true and the complaint is viewed in the light most favorable to the plaintiff. Legal conclusions, however, enjoy no such deference. *Ashcroft v. Iqbal*, 556 U.S. 662 (2009). As the court pointed out in *Iqbal,* "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Id.* at 678 (emphasis added) (internal quotations omitted).

A court should grant a motion to dismiss, however, where the allegations are nothing more than legal conclusions, or where the allegations permit a court to infer no more than a possibility of misconduct. *See Iqbal,* 556 U.S. at 678–79. Where a complaint pleads facts that are "merely consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility of 'entitlement to relief.'" *See id.* at 678.

To state a plausible claim for relief, the Supreme Court has held that a complaint must contain "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 555 (2007). To discount such unadorned conclusory allegations "a court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." *Iqbal,* 556 U.S. at 679. This approach recognizes that "'naked assertions' of wrongdoing necessitate some 'factual enhancement' within the complaint to cross 'the line

between possibility and plausibility of entitlement to relief.'" *Francis v. Giacomelli,* 588 F.3d 186, 193 (4th Cir. 2009) (quoting *Twombly,* 550 U.S. at 557).

The law is clear that "in reviewing a Rule 12(b)(6) dismissal, [courts] are not confined to the four corners of the Complaint." *U.S. ex. rel. Oberg v. Pa. Higher Educ. Assistance Agency*, 745 F.3d 131, 136 (4th Cir. 2014). Documents that are explicitly incorporated into the Complaint by reference and those attached to the Complaint as exhibits may be considered. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007); Fed. R. Civ. P. 10. The Court may also consider documents integral to the Complaint. *Goines v. Valley Community Servs. Bd.*, 822 F.3d 159, 166 (4th Cir. 2016). A document is integral to a complaint when the claims "turn on, []or are . . . otherwise based" on the document. *Id.*

Exhibits are subject to the "exhibit-prevails rule." *See So. Walk at Broadlands Homeowner's Ass'n v. Open Band at Broadlands, LLC*, 713 F. 3d 175, 182 (4th Cir. 2013) (citing *Fayetteville In'vrs v. Commercial Builders, Inc.*, 936 F.2d 1462, 1465 (4th Cir. 1991)). Pursuant to that rule, if a plaintiff "attaches documents and relies upon the documents to form the basis for a claim or a part of a claim, dismissal is appropriate if the document negates the claim." *Thompson v. Illinois Dep't of Prof'l Regulation*, 300 F.3d 750, 754 (7th Cir. 2002); *Goines*, 882 F.3d at 16. Finally, where the plaintiff attaches or incorporates a document upon which her claim is based, or when the complaint shows that the plaintiff has adopted the contents of the document, it is proper to accept the contents of the documents over conflicting allegations in the Complaint. *Am. Chiropractic Ass'n v. Trigon Healthcare, Inc.*, 367 F.3d 212, 233-35 (4th Cir. 2004).

The Court may consider the exhibits attached to this Brief, and incorporated into the Motion to Dismiss, without converting it to a Motion for Summary Judgment, as the attached exhibits are referenced in the Amended Complaint.[2]

**B.**    **The Amended Complaint does not state a claim for hostile work environment. constructive discharge, or disparate treatment.**

Count I of the Amended Complaint alleges discrimination on the basis of sex in violation of Title VII.  (ECF Doc. 2 at ¶¶ 82-89.)  It appears that Lundberg is alleging: (1) a hostile work environment; (2) disparate treatment; and (3) actual or constructive discharge.  (*Id.*)  To the extent that the Amended Complaint purports to assert a claim for hostile work environment, constructive discharge, or disparate treatment, it fails to do so.

**1.**    **Count I does not state a claim for hostile work environment.**

A hostile work environment exists "[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment."  *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21 (1993).  To establish a hostile work environment claim, a claimant must show that "there is (1) unwelcome conduct; (2) that is based on the plaintiff's [sex]; (3) which is sufficiently severe or pervasive to alter the plaintiff's conditions of employment and to create an abusive work environment; and (4) which is imputable to the employer."  *Guessous v. Fairview Property Investments, LLC*, 828 F.3d 208, 221 (4th Cir. 2016).

Harassment is severe or pervasive only if the workplace is "pervaded with discriminatory conduct aimed to humiliate, ridicule, or intimidate."  *EEOC v. Sunbelt Rentals, Inc.*, 521 F.3d 306, 316 (4th Cir. 2008).

---

[2] DRT and Walton expressly state they do not intend for their Motion to Dismiss to be construed as a Motion for Summary Judgment.

> [P]laintiffs must clear a high bar in order to satisfy the severe or pervasive test. Workplaces are not always harmonious locales, and even incidents that would objectively give rise to bruised or wounded feelings will not on that account satisfy the severe or pervasive standard . . . . Thus, complaints premised on nothing more than rude treatment by coworkers, callous behavior by one's superiors, or a routine difference of opinion and personality conflict with one's supervisor, are not actionable under Title VII.

*Id.* at 315 (internal citations and quotations omitted). Allegations of "disrespectful treatment, cursing, yelling, and reprimanding" reflect "callous behavior" of a superior and a personality conflict, and are not enough to establish the severe and pervasive element of a hostile work environment claim. *Holleman v. Colonial Heights Sch. Bd.*, 854 F. Supp. 2d 344 (E.D. Va. 2012).

Whether the unwelcome conduct was severe or pervasive and altered the conditions of employment is judged "'by looking at all the circumstances,' which 'may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 277 (4th Cir. 2015) (quoting *Harris*, 510 U.S. at 23). "[I]ncidents must be more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive." *Shields v. Federal Express Corp.*, 120 F. App'x 956, 961 (4th Cir. 2005). Whether conduct is sufficiently severe or pervasive requires a plaintiff to show that the harassment was severe and pervasive as to him personally ***and*** objectively abusive to a reasonable person in the plaintiff's position. *Briggs v. Waters*, 484 F. Supp. 2d 466, 485-86 (E.D. Va. 2007) (citing *Ocheltree v. Scollon Productions, Inc.*, 335 F.3d 325, 331 (4th Cir. 2003)). The Supreme Court has cautioned courts not to "mistake ordinary socializing in the workplace . . . for discriminatory 'conditions of employment.'" *Oncale v. Sundowner Offshore Serv., Inc.*, 523 U.S. 75, 81 (1998).

Lundberg does not identify any conduct that would rise to the level necessary to state a hostile work environment claim. She alleges conclusorily that a coworker "began harassing [her]," that she complained about the "harassment," that "DRT did not take steps to protect [her] or meaningfully follow up or remedy the harassment she experienced," and continued to schedule her to work with the alleged harasser "even after long-documented harassment." (ECF Doc. 2, at ¶¶ 27, 29.) Merely alleging that she was "harassed" is insufficient to state a claim for hostile work environment. "Conclusory statements, without sufficient evidentiary support, cannot support an actionable claim for harassment." *Causey v. Balog*, 162 F.3d 795, 801-02 (4th Cir. 1998). *See also Carter v. Ball*, 33 F.3d 450, 461-62 (4th Cir. 1994) (vague allegations of harassment without specifics is insufficient).

The Amended Complaint does not state a claim for hostile work environment.

### 2.  <u>Count I does not state a claim for constructive discharge.</u>

To state a claim for constructive discharge under Title VII, "an employee must meet a high standard. [S]he must allege facts demonstrating that [s]he resigned and 'that [s]he was discriminated against by [her] employer to the point where a reasonable person in [her] position would have felt compelled to resign.'" *Ofoche v. Apogee Medical Group, Virginia, P.C.*, 815 F. App'x 690, 692 (4th Cir. 2020) (quoting *Green v. Brennan*, 136 S. Ct. 1769, 1777 (2016)). "Dissatisfaction with work assignments, a feeling of being unfairly criticized, or difficult or unpleasant working conditions are not so intolerable as to compel a reasonable person to resign." *Carter*, 33 F.3d at 459 (citing *Stetson v. NYNEX Serv. Co.*, 995 F.2d 355, 360-61 (2d Cir. 1993)). Additionally, a pattern of discipline does not amount to an objectively intolerable working environment. *Williams v. Giant Food Inc.*, 370 F.3d 423, 434 (4th Cir. 2004); *Taylor v. Patuxent Inst.*, No. CIV. A. CCB-09-1111, 2009 WL 4349092, at *5 (D. Md. Nov. 30, 2009). An employee

is not guaranteed a working environment free of stress. *Bristow v. Daily Press, Inc.*, 770 F.2d
1251, 1255 (4th Cir. 1985).

> Intolerability is not established by showing merely that a reasonable person,
> confronted with the same choices as the employee would have viewed resignation
> as the wisest or best decision, or even that the employee subjectively felt compelled
> to resign. Instead, intolerability is assessed by the objective standard of whether a
> reasonable person in the employee's position would have felt *compelled* to resign .
> . . that is whether he [or she] would have had *no choice* but to resign.

*Perkins v. Int'l Paper Co.*, 936 F.3d 196, 212 (4th Cir. 2019) (emphasis in original) (internal
citations and quotations omitted). The conditions complained of must be more severe than even
the severe or pervasive harassment necessary to state a claim for a hostile work environment. *Id.*
Additionally, the employee must prove that her employer "deliberately ma[de] the working
conditions . . . intolerable in an effort to induce [her] to quit." *Martin v. Cavalier Hotel Corp.*, 48
F.3d 1343, 1353 (4th Cir. 1995) (citing *Bristow*, 770 F.2d at 1255). When "an employee
voluntarily quits under circumstances insufficient to amount to a constructive discharge, there has
been no 'adverse employment action.'" *Hartsell v. Duplex Products, Inc.,* 123 F.3d 766, 775 (4th
Cir. 1997).

Here, the last shift that Lundberg worked was June 6, 2022, and she does not allege facts
that would plausibly show that her working conditions were such that a reasonable person would
be compelled to resign. Indeed, because the Amended Complaint does not allege facts to support
a claim for hostile work environment, it also does not allege facts to state a claim for constructive
discharge—which is a higher standard.

### 3.    Count I does not state a claim for disparate treatment.

To allege disparate treatment, a plaintiff must plead: (1) membership in a protected class;
(2) satisfactory job performance; (3) an adverse employment action; and (4) similarly-situated
employees outside of the protected class who received more favorable treatment. *Tabb v. Bd. of*

*Educ. of Durham Pub. Schs.*, 29 F.4th 148, 157 (4th Cir. 2022). Importantly, the similarly situated employees must have received more favorable treatment with respect to the adverse action complained of. *Hawyood v. Locke*, 387 F. App'x 355, 359 (4th Cir. 2010); *Wilson v. City of Chesapeake*, 290 F. Supp. 3d 444, 457-58 (E.D. Va. 2018).

Lundberg alleges that DRT did not take steps to "protect" her "or meaningfully follow up or remedy the harassment she experienced" while "on information and belief, when heterosexual individuals complained about interpersonal issues they experienced while on the job, DRT attempted to resolve those issues." (ECF Doc. 2, at ¶¶ 29-30.) She also alleges that she was not awarded a cash prize for the "Biggest Loser" weight loss contest while the male winner received a cash prize. (*Id.* at ¶¶ 32-34.) She further alleges that she did not receive recognition for her 5-year anniversary with DRT—which occurred after she reduced her schedule from full-time to part-time and at which time she had not worked in two months—while "heterosexual DRT employees" received "a congratulatory post on their social media, an internal email, and a monetary bonus or a trip in recognition for their years of service." (*Id.* at ¶¶ 36-37, 61; Exhibit 3.) Lundberg alleges that she was required to work two shifts per month to remain part-time, but heterosexual employees only had to work one shift per month to remain part-time. (ECF Doc. 2, at ¶ 64.) She alleges that heterosexual employees did not receive threats of discipline or termination after medical ailments prevented them from working their shifts and they were allowed to use PTO or take paid leave notwithstanding their lack of PTO, while she was denied the same. (*Id.* at ¶¶ 65-66.)

The purported disparate treatment, however, is not related to the adverse action complained of—discharge. (ECF Doc. 2, at ¶ 87.) *See also Wilson*, 290 F. Supp. 3d at 457-58. Therefore, the Amended Complaint does not state a claim for disparate treatment.

**C.**  **Count IV does not state a claim against DRT for the same reasons that the Amended Complaint does not state a claim for hostile work environment, constructive discharge, or disparate treatment under Title VII.**

Count IV purports to assert a claim for sex discrimination under the VHRA for the same reasons that Lundberg asserts a sex discrimination claim under Title VII.  (ECF Doc. 2, at ¶¶ 107-08.)  For the reasons stated *supra* in Part III.B., the Amended Complaint does not state a claim for hostile work environment, constructive discharge, or disparate treatment.  To the extent that the claim for sex discrimination in violation of the VHRA has premised on those theories of liability, it should be dismissed with prejudice.  *See Abreu v. N. Am. Partners in Anesthesia, LLP*, No. 1:22-cv-759, 2023 WL 5959430, at *10 n.8 (E.D. Va. Sept. 12, 2023) (citing *Washington v. Offender Aid & Restoration of Charlottesville-Albemarle, Inc.*, --- F. Supp. 3d ---, No. 3:22-cv-00041, 2023 WL 4032875, at *8 (W.D. Va. June 15, 2023)) (analyzing Title VII and VHRA claims together); *Brackney-Wheelock v. City of Charlottesville*, --- F.3d ---, No. 3:22-cv-00035, 2023 WL 346657, at *17-18 (W.D. Va. Jan. 20, 2023) (same).

**D.**  **Walton is not an employer under the VHRA.**

Counts IV and V seek to hold both DRT and Walton liable under the VHRA for sex discrimination and retaliation.  (ECF Doc. 2, at ¶¶ 107-08, 110-11.)  The Amended Complaint does not state a claim against Walton for violation of the VHRA because he is not an employer under the statute.

The VHRA defines employer, in relevant part as:

> **A person employing (i) 15 or more employees** for each working day in each of 20 or more calendar weeks in the current or preceding calendar year, **and any agent of such person** or (ii) one or more domestic workers.  However, (a) for purposes of unlawful discharge under subdivision B1 on the basis of race, color, religion, national origin, military status, sex, sexual orientation, gender identity, marital status, disability, pregnancy, or childbirth or related medical conditions including lactation, "employer" means any person employing more than five persons or one or more domestic workers . . .

Va. Code § 2.2-3905(A) (emphasis added).  This is substantially similar to the definition of employer in Title VII.

> The term "employer" means **a person engaged in an industry affecting commerce who has fifteen or more employees** for each working day in each of twenty or more calendar weeks in the current or preceding calendar year, **and any agent of such a person**  . . .

42 U.S.C. § 2000e(b) (emphasis added).

There is no question that individuals are not subject to liability under Title VII.  *Lissau v. S. Food Serv. Inc.*, 159 F.3d 177, 180-81 (4th Cir. 1998).  The Fourth Circuit has "concluded that the inclusion of 'agent' did not signal a congressional desire to impose liability on individual supervisors.  Instead it simply represented 'an unremarkable expression of respondeat superior— that discriminatory personnel actions taken by an employer's agent may create liability for the employer.'"  *Id.* at 180 (quoting *Birkbeck v. Marvel Lighting Corp.*, 30 F.3d 507, 510 (4th Cir. 1994)).  The Court reasoned that because "Title VII exempts small employers; it would be incongruous to hold that Title VII does not apply to the owner of a five-person company but applies with full force to a person who supervises an identical number of employees in a larger company." *Id.*

VHRA adopts the language of Title VII and, therefore, should be interpreted in the same fashion.  Therefore, Walton is not an employer under the VHRA and Counts IV and V against him should be dismissed with prejudice.

### E.    Count III does not state a claim for interference in violation of the FMLA.

Count III purports to state a claim for interference in violation of the FMLA.  (ECF Doc. 2, at ¶¶ 101-05.)  Specifically, Lundburg asserts that after she communicated a "need to take a leave of absence to work on her mental health crisis," DRT did not offer her FMLA Notices and,

instead, asked for a return of its property and "took the other actions described above to effectuate her termination." (*Id.* at ¶¶ 101-03.)

To state a claim for interference with FMLA rights, the plaintiff must establish that "(1) she was an eligible employee, (2) the defendant was an employer as defined under the FMLA, (3) she was entitled to leave under the FMLA, (4) she gave the employer notice of her intention to take leave, and (5) the employer denied the employee FMLA benefits to which she was entitled." *Ainsworth v. Loudon County Sch. Bd.*, 851 F. Supp. 2d 963, 974 (E.D. Va. 2012).

FMLA grants employees the prescriptive right to take up "to a total of 12 workweeks of leave during any 12–month period" when, inter alia, an employee is burdened with "a serious health condition that makes the employee unable to perform" her job. 29 U.S.C. § 2612(a)(1)(D). A serious health condition is "an illness, injury, impairment, or physical or mental condition that involves in patient care as defined in § 825.114 or continuing treatment by a healthcare provider as defined in § 825.115." 29 C.F.R. § 825.113. An employee must "provide sufficient information for an employer to reasonably determine whether FMLA may apply to the leave request." 29 C.F.R. § 825.303(b). The notice to the employer should include "the anticipated duration of the absence, if known." *Id. See also Peeples v. Coastal Office Prod., Inc.*, 64 F. App'x 860, 863 (4th Cir. 2003).

Here, Lundberg stated on September 29, 2022, that "the emotional stress resulting from DRT's actions has put continued stress on me and made it difficult for me to work," that she was "experiencing depression and anxiety because of DRT's actions towards [her]," and that that she was "request[ing] an accommodation of time off until such time as a feel emotionally secure enough to return." (ECF Doc. 2, at ¶ 71.) DRT responded, stating, "although it has been almost 4 months since you last worked, we will accept your request for further time off." (Ex 3.) DRT

went on to state that "based on the amount of time you have been off and with an unknown return date, we feel it would be best for you to return all Delta Response Team issued uniforms and property until you feel you are fit to return to work and meet the requirements of 2 shifts each month to maintain employment." (*Id.*)  Lundburg responded by counsel, stating that as soon as she "knows when she can return to work, she will let you know." (*Id.*)

At no point in time was it evident that Lundburg was entitled to FMLA leave or was seeking to take leave pursuant to the FMLA.[3]  While Lundberg had been employed with DRT since 2017, (ECF *Doc. 2, at* ¶ 11), she began working part time in April 2022, (*id.* at ¶ 60-61), and last worked for DRT on June 6, 2022 (Exhibit 3).  There are no allegations that Lundberg worked sufficient hours within the 12 months preceding September 29, 2022 to be eligible for FMLA leave, or that she was experiencing a serious health condition for which the FMLA applies.  Moreover, DRT allowed Lundburg extended leave and it was not until May 8, 2023, that it removed her agency affiliation from its list of affiliated employees with the Virginia Department of Health Office of Emergency Medical Services.  (ECF *Doc. 2, at* ¶ 77; Exhibit 4.)  This was eleven months after the last shift Lundberg worked for DRT.  The Amended Complaint does not state a claim for FMLA interference.  *See, e.g. Capel v. Norfolk Public Schools*, No. 2:19-cv-605, 2022 WL 989391, at *7 (E.D. Va. Feb. 25, 2022).

## F.   Count VI does not state a claim against DRT for violation of the Virginia Wage Payment Act.

Count VI alleges that DRT's purported failure to payout Lundburg's PTO violated the VWPA.  (ECF *Doc. 2, at* ¶¶ 113-19.)

---

[3] At best, Lundberg's request could be construed as a request for an accommodation of extended leave and a waiver of the requirement that she complete two shifts per month to maintain her parttime status, an accommodation that DRT provided.  (Exhibit 3.)  Lundberg then simply never returned to work.

The VWPA provides, in relevant part:

> [I]f an employer fails to pay wages to an employee in accordance with this section, the employee may bring an action, . . . against the employer in a court of competent jurisdiction to recover payment of the wages, and the court shall award the wages owed, an additional equal amount as liquidated damages, plus prejudgment interest thereon as provided in subsection G, and reasonable attorney fees and costs.  If the court finds that the employer knowingly failed to pay wages to an employee in accordance with this section, the court shall award the employee an amount equal to triple the amount of wages due and reasonable attorney fees and costs.

Va. Code § 40.1-29(J).  The purpose of the VWPA is to establish the public policy of the Commonwealth as to the manner in which employers pay wages to employees.  *Mar v. Malveaux*, 732 S.E.2d 733, 738 (Va. App. 2012).  "[T]he Virginia Wage Payment Act does not itself confer a right on employees to receive pay, but instead establishes the public policy of the Commonwealth as *to the manner* in which employers pay wages to employees."  *Briggman v. Nexus Servs. Inc.*, No. 5:18-cv-00047, 2018 WL 6517464, at *6 (W.D. Va. Dec. 11, 2018) (internal quotations and alterations omitted) (citing *Vasquez v. Whole Foods Mkt., Inc.*, 302 F. Supp. 3d 36, 57 (D.D.C. 2018); *Mar*, 732 S.E.2d at 738).  In other words, the VWPA "does not create the right to be paid for work performed; that right exists, if at all, by virtue of other legal theories, including the common law doctrines of contract and quantum meruit."  Rather, the VWPA "prescribes the *manner* in which an employer must pay certain employees."  *Trotman v. AM Retail Grp., Inc.*, No. 4:20-cv-125, 2020 WL 9347968, at *4 (E.D. Va. Nov. 12, 2020) (citing *Pallone v. Marshall Legacy Inst.*, 97 F. Supp. 2d 742, 745 (E.D. Va. 2000)).  In short, the VWPA "only covers 'earned wages.'"  *Racklin v. Zeta Glob. Corp.*, 628 F. Supp. 3d 625, 647 (E.D. Va. 2022).

In an amendment that took effect July 1, 2020, the General Assembly created a private right of action for employees to sue their employers for unpaid wages under the VWPA.  *See* Va. Code 40.1-29(J).

17

> Prior to enacting this new Wage Theft Law (House Bill 123/Senate Bill 838), the
> [VWPA] required employers to pay salaried employees once per month and hourly
> employees at least twice per month, restricted unlawful deductions from wages, and
> required that terminated employees be paid for all work that was due to him or her
> up until the time of termination.

D. Paul Holdsworth, *Employment Law*, 55 U. Rich. L. Rev. 113, 139–40 (2020) (citing Va. Code § 40.1-29(A), (C) (Repl. Vol. 2013)). Under the prior statutory scheme, "employees who were allegedly denied wages had no private recourse in suit, but instead were required to file an administrative claim with the Virginia Department of Labor and Industry." *Id.* (citing Va. Code § 40.1-29(F) (Repl. Vol. 2013)). The 2020 amendment provided aggrieved employees with a private right of action to enforce his or her employer's failure to pay wages without proceeding through administrative channels first, or at all. *Id.* Significant remedies were made available to plaintiffs that prevail when proceeding under this private right of action. However, the amendment notably did not expand the scope of prohibited conduct. As such, nothing suggests that the VWPA itself creates a right regarding unearned wages, such as the PTO hours claimed here.

**G.    Count VII does not state a claim for tortious interference with business expectancy.**

Count VII purports to allege a claim for tortious interference with business expectancy. (ECF Doc. 2, at ¶¶ 121-25.) Lundburg alleges that she "had a valid business expectancy when she received an offer of employment from Bedford County Fire and MES and when she was in a final interview with Lynchburg County Fire and EMS," that Walton knew of those business expectancies, and interfered with them by: (1) violating DRT policy regarding information to be shared in professional references; (2) disclosing her sexuality during the references; and (3) refusing to recommend her for employment based on her sexuality. (*Id.* at 121-23.)

In Virginia, there are four necessary elements to establish a *prima facie* case for tortious interference with contract or contract expectancy:

> (1) The existence of a valid contractual relationship or business expectancy; (2) knowledge of the relationship or expectancy on the part of the interferor; (3) intentional interference inducing or causing a breach or termination of the relationship or expectancy; and (4) resultant damage to the party whose relationship or expectancy has been disrupted.

*Chaves v. Johnson*, 230 Va. 112, 120, 335 S.E.2d 97, 102 (1985). When a plaintiff seeks to recover for tortious interference with contact expectancy, a plaintiff must plead and prove an additional element: that the defendant employed improper methods to interfere with the contract. *Duggin v. Adams*, 234 Va. 221, 226-27, 360 S.E.2d 832, 836 (1987); *Maximus, Inc. v. Lockheed Info. Mgmt. Sys. Co.*, 254 Va. 408, 413, 493 S.E.2d 375, 378 (1997). Improper methods include "those means that are illegal or independently tortious, such as violations of statutes, regulations, or recognized common law rules," as well as "violence, threats or intimidation, bribery, unfounded litigation, fraud, misrepresentation or deceit, defamation, duress, undue influence, misuse of inside or confidential information, or breach of a fiduciary relationship." *Duggin*, 234 Va. at 227, 360 S.E.2d at 836. Improper methods do not include "actions solely motivated by spite, ill will and malice" toward the plaintiff. *Dunn, McCormack & MacPherson v. Connolly*, 281 Va. 553, 559, 708 S.E.2d 867, 870-71 (2011).

The Amended Complaint alleges that Walton disclosed in the professional references that "Lundberg is openly bisexual," questioned her "lifestyle choices," and called her an "odd duck." (ECF Doc. 2, at ¶ 54.) It further alleges that Walton did not recommend Lundberg as an employee to Lynchburg or Bedford. (*Id.* at ¶ 55.) Lundberg alleges that this violated DRT's Employment Guide, which states that DRT "will provide only the former and present employee's dates of

19

employment and position(s) held with the company," and that "compensation information may also be verified if written authorization is provided by the employee." (*Id.* at ¶ 56.)[4]

Walton's truthful statements to Lynchburg and Bedford, however, do not constitute improper methods to support a claim of tortious interference. There is nothing illegal or independently tortious about revealing to a potential employer that Lundberg is a member of a protected class. Indeed, the potential employer is prohibited from discriminating against Lundberg based on her protected class status. Nor is there anything illegal or independently tortious about sharing one's opinions of an employee when asked for a reference. Walton's purported violation of DRT's policies is not illegal or tortious, in fact, those policies cannot be used to establish a standard of care. *See e.g., Pullen v. Nickens*, 226 Va. 342, 350-51, 310 S.E.2d 452, 456-57 (1983). Because the Amended Complaint does not contain facts to support an allegation that Walton used improper methods, it does not state a claim for tortious interference with business expectancy.[5]

**H.      Count VIII does not state a claim for intentional infliction of emotional distress.**

Count VIII purports to assert a claim for intentional infliction of emotional distress against DRT and Walton. (ECF Doc. 2, at ¶¶ 127-32.) Lundberg alleges that Walton intentionally made statements about her to Lynchburg and Bedford and that "weaponizing [her] sexuality against her was outrageous and intolerable behavior in that it offends generally accepted standards of decency and morality." (*Id.* at ¶ 128.) She alleges that she has suffered severe emotional distress as a result of these actions. (*Id.* at ¶¶ 129-30.)

---

[4] This conclusory allegation is contradicted by Lundberg's allegation that she informed Walton that he would be contacted to provide her with a reference. (ECF Doc. 2, at ¶ 41.)

[5] Additionally, merely being in the final interview with Lynchburg does not establish a valid business expectancy to support a claim of tortious interference.

A cause of action for intentional infliction of emotional distress has four elements that must be proved: (1) the wrongdoer's conduct was intentional or reckless; (2) the conduct was outrageous or intolerable; (3) there was a causal connection between the conduct and the resulting emotional distress; and (4) the emotional distress was severe. *Almy v. Grisham*, 273 Va. 68, 77, 639 S.E.2d 182, 186 (2007) (citing *Womack v. Eldridge*, 215 Va. 338, 210 S.E.2d 145 (1974)). The defendant must have intended to cause severe emotional distress. It is insufficient for the conduct of the defendant itself to have been intentional. *See Almy,* 273 Va. at 77-78, 639 S.E.2d at 187. "[A] plaintiff must show that 'the wrongdoer had the specific purpose of inflicting emotional distress or where he intended his specific conduct and knew or should have known that emotional distress would likely result.'" *Taylor v. CNA Corp.,* 782 F. Supp. 2d 182, 205 (E.D. Va. 2010) (quoting *Womack,* 215 Va. at 342, 210 S.E.2d at 147).

Lundberg does not allege that Walton intended to inflict emotional distress. (*See* ECF Doc. 2, at ¶¶ 127-32.) Instead, she alleges that "Walton's statements to Lynchburg and Bedford about [her] were intentional." (*Id.* at ¶ 127.) This is insufficient to state a claim for intentional infliction of emotional distress, particularly when Lundberg alleges that Walton told her that had he known her employment opportunities would have been impacted by his statements, he "never would have said it." (*Id.* at ¶ 60.)

Further, only the most extreme conduct will support recovery for the tort of intentional infliction of emotional distress. To support such a claim, "it is insufficient for a defendant to have acted with an intent which is tortious or even criminal." *Russo v. White*, 241 Va. 23, 26, 400 S.E.2d 160, 162 (1991) (internal citations and quotations omitted). "Even if a defendant has intended to inflict emotional distress, or his conduct can be characterized by malice, or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort, the requirement

21

of the second prong has not been satisfied." *Id.* (internal citations and quotations omitted).  Instead, "[l]iability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community."  *Id.* (internal citations and quotations omitted).

The conduct outlined in the Complaint does not rise to the level necessary to state a claim for intentional infliction of emotional distress.  Walton is alleged to have told Lynchburg and Bedford that Lundberg is bisexual—an openly known fact, (ECF Doc. 2, at ¶ 24)—that he questioned her "lifestyle choices," and that she was an "odd duck," (*id.* at ¶ 54).  He is also alleged to not have recommended her as an employee.  (*Id.* at ¶ 55.)  None of these alleged actions are outrageous or intolerable to support a claim for intentional infliction of emotional distress.

Furthermore, "severe" distress, for purposes of an intentional infliction of emotional distress action, is when the emotional distress is "extreme," and "so severe that no reasonable person could be expected to endure it."  *Harris v. Kreutzer*, 271 Va. 188, 205, 624 S.E.2d 24, 34 (2006) (quoting *Russo*, 241 Va. at 27, 400 S.E.2d at 163) (internal quotations omitted).  Mere allegations that a plaintiff was "nervous, could not sleep, experienced stress and 'its physical symptoms,' withdrew from activities, and was unable to concentrate at work" is not sufficient.  *Russo*, 241 Va. at 28, 400 S.E.2d at 163; *see also Harris*, 271 Va. at 205, 624 S.E.2d at 34 (allegations of nightmares, difficulty sleeping, extreme loss of self-esteem and depression requiring psychological treatment and counseling, mortification, humiliation, shame, disgrace, and injury to reputation were not sufficient to allege severe distress for the purposes of a claim of intentional infliction of emotional distress).

The Amended Complaint alleges only that Lundburg suffered "emotional distress" that "has been severe."  (ECF Doc. 2, at ¶¶ 129-30.)  The only other allegation of "emotional distress"

is that Lundberg purportedly experienced "depression and anxiety because of DRT's actions towards" her. (*Id.* at ¶ 71.) These conclusory allegations do not plausibly allege the severe distress resulting from Walton's alleged conduct required to state a claim for intentional infliction of emotional distress.

## IV.     CONCLUSION

For all of the foregoing reasons, Delta Response Team, LLC and Thomas Walton, by counsel, respectfully request that this Court dismiss the Amended Complaint against Walton with prejudice and dismiss with prejudice Counts I and IV—to the extent they purport to allege sex discrimination based on hostile work environment, constructive discharge, or disparate treatment—as well as Counts III, VI, VII, and VIII, against DRT.

**DELTA RESPONSE TEAM, LLC
AND THOMAS WALTON**

By Counsel

 s/Melissa Y. York
Melissa Y. York (VSB No. 77493)
Harman, Claytor, Corrigan & Wellman
P.O. Box 70280
Richmond, Virginia  23255
804-747-5200 - Phone
804-747-6085 - Fax
myork@hccw.com

**C E R T I F I C A T E**

I hereby certify that on the 24th day of October, 2023, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the following:

> Sarah Flynn Robb, Esq.
> Sarah Robb Law
> 919 East Main Street, Suite 1000
> Richmond, VA 23227
> 804-482-1536 - Phone
> 804-988-5464 - Fax
> sarah@sarahrobblaw.com

> s/Melissa Y. York
> Melissa Y. York (VSB No. 77493)
> Harman, Claytor, Corrigan & Wellman
> P.O. Box 70280
> Richmond, Virginia  23255
> 804-747-5200 - Phone
> 804-747-6085 - Fax
> myork@hccw.com