**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
CHARLOTTESVILLE DIVISION**

| | | |
|---|---|---|
| **NATALIE LUNDBERG,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **Civil Action No. 3:23cv00042** |
| **v.** | ) | |
| | ) | |
| **DELTA RESPONSE TEAM, LLC,** | ) | **By: Hon. Robert S. Ballou** |
| | ) | **United States District Judge** |
| **and** | ) | |
| | ) | |
| **THOMAS WALTON** | ) | |
| | ) | |
| **Defendants.** | ) | |

## MEMORANDUM OPINION

Plaintiff, Natalie Lundberg ("Lundberg") brings this case against defendants Delta Response Team, LLC ("Delta Response") and Thomas Walton ("Walton"). Lundberg's Amended Complaint brings claims under Title VII of the Civil Rights Act of 1964, the Virginia Human Rights Act, the Family and Medical Leave Act, and the Virginia Wage Payment Act, as well as claims for tortious interference with a business expectancy and intentional infliction of emotional distress. Currently before the court is the defendants' partial motion to dismiss[1] the Amended Complaint, which I will grant in part and deny in part. Dkt. 6. Specifically, the motion is **DENIED** as to Lundberg's Title VII and VHRA claims for sexual orientation discrimination based on disparate treatment and **GRANTED** as to Lundberg's Title VII and VHRA claims for a hostile work environment, constructive discharge, and constructive demotion. As I find there is no individual liability under the VHRA, the motion is **GRANTED** as to claims for individual liability under the VHRA against Walton. The motion is **DENIED** as to claims for tortious

---

[1] Defendants are not moving to dismiss the retaliation claims under Title VII or the VHRA against Delta Response (Count II and Count V). However, defendants are moving to dismiss the retaliation count under the VHRA (Count V) against Walton only, arguing that there is no individual liability under the VHRA.

interference with a business expectancy and **GRANTED** as to Lundberg's FMLA and VWPA claims, as well as Lundberg's claims for intentional infliction of emotional distress. With the exception of the claims for individual liability under the VHRA and the VWPA claims, which are dismissed with prejudice, all other claims are dismissed without prejudice and with leave to amend.

## I.     Background[2]

Lundberg began her employment with Delta Response in 2017 as an Emergency Medical Technician. She received excellent performance evaluations and was promoted to Captain in August 2021. Am. Compl. ¶¶ 11, 16, 17, Dkt. 2. Delta Response provides emergency and non-emergency services in Virginia. It is a limited liability company and Walton is a "member, manager or director, officer, and employee." *Id.* ¶¶ 7, 10.[3]

Lundberg is "openly bisexual" and defendants and her coworkers are aware of her sexual orientation. *Id.* ¶ 24. Lundberg alleges that Delta Response and Walton "had a problem" with her sexual orientation and created an environment where employees "felt free to harass Lundberg and did so." *Id.* ¶ 26. In October 2021, "heterosexual coworker, Erica Wood, began harassing Lundberg and failed to follow protocol while on shift with Lundberg as Captain," but Delta Response took no steps address the harassment and continued to schedule them to work together. *Id.* ¶ 27-29. Delta Response also failed to award Lundberg a prize in an employer-sponsored weight loss contest, recognizing only the male winner with a cash prize, despite having promised a cash award to both the female and male winners. *Id.* ¶ 32-34.

---

[2] The Court accepts as true the facts alleged in the Amended Complaint when reviewing a motion to dismiss. *See Aziz v. Alcolac, Inc.*, 658 F.3d 388, 390 (4th Cir. 2011).

[3] The Amended Complaint also states that "Walton represented that he was Delta Response's Vice President and Co-owner." Am. Compl. ¶ 10. As discussed at the hearing, because Delta Response is an LLC, Walton is legally considered a "member" and not an "owner."

Beginning in November 2021, Lundberg, with Walton's knowledge, applied for positions at other local Fire and EMS agencies. *Id.* ¶ 38-39. Lundberg interviewed with both the City of Lynchburg Fire Department and Bedford County Fire and Rescue and accepted a conditional offer of employment from Bedford on February 16, 2022. Bedford County later rescinded its offer after speaking with Walton as her reference. Similarly, the City of Lynchburg informed Lundberg it "would no longer proceed with her interview process" after speaking with Walton. *Id.*¶¶ 41, 43-47, 50-51. Lundberg filed Freedom of Information Act ("FOIA") requests with Bedford and Lynchburg connected to her application and interview processes. *Id.* ¶ 53. Through these, she discovered that when Bedford and Lynchburg contacted Walton as a reference, he "disclosed, unprompted, that Lundberg is openly Bisexual . . . questioned Lundberg's 'lifestyle choices' and called her an 'odd duck'" and did not recommend her as an employee. *Id.* ¶¶ 53–55.

On March 10, 2022, Lundberg contacted Human Resources about Walton's conduct. She also complained to Walton directly the same day and again on April 4, 2022. *Id.*¶ 57–60. Walton did not deny he made the statements to Bedford and Lynchburg, but instead stated to Lundberg generally, "[w]ell if they didn't hire you for that, would you still want to work with them" and indicated if he had known that his statement would curtail her employment opportunity, he "never would have said it." *Id.* ¶ 58–60. "As a result of the conversation [with Walton], Lundberg resigned as Captain" and requested a part-time position. *Id.* ¶ 61. Lundberg alleges that after complaining to Walton, "[Delta Response] retaliated[4] against [her] by treating her differently than it customarily treats its heterosexual employees." *Id.* ¶ 62-65.

---

[4] This alleged retaliation included denying her part-time work hours, denying her the use of her accumulated PTO leave including when she was sick with COVID-19, denying payout of her PTO leave, and penalizing her and threatening termination if she did not work two shifts per month. As stated, defendants are not moving to dismiss the retaliation counts, except as to Walton individually.

On September 29, 2022, Lundberg requested a leave of absence to seek therapy and "mentally recover" from what happened, stating that she "wished to remain employed by [Delta Response] and planned to return to work when she was able." *Id.* ¶ 68-69.[5] Lundberg sent an e-mail to Delta Response on September 29, 2022, stating that she has been unable to work shifts because of COVID-19 and unfair treatment, causing emotional stress. Lundberg stated "I request an accommodation of time off until such time as I feel emotionally secure enough to return." *Id.* ¶ 71. Lundberg alleges that it was "around that time" when defendants received notification of [her] EEOC charge.[6] *Id.* ¶ 72. Lundberg alleges that Delta Response then "began the process of quietly firing her instead of protecting her job, in retaliation" for her protected activity. *Id.* at 73. She claims that Delta Response requested its uniforms and other property be returned, the Principal 401k plan wrote her a letter referring to her as a former employee and informing her she would no longer receive retirement contributions from Delta Response, and on May 8, 2023 Delta Response removed her agency affiliation from its list of affiliated employees with the Virginia Department of Health, Office of Emergency Medical Services. *Id.* ¶ 73-75, 77. However, Delta Response never informed Lundberg she had been terminated, and she continues to accrue vacation leave time in the system. *Id.* ¶ 76. In the Amended Complaint, Lundberg equivocates on whether she claims that Delta Response discharged her or that the work

---

[5] Defendants include several e-mails and text messages as exhibits to their brief in support of the motion to dismiss. However, the court cannot consider these documents without converting this motion to a motion for summary judgment, which defendants specifically state they do not want. "Generally, when a defendant moves to dismiss a complaint under Rule 12(b)(6), courts are limited to considering the sufficiency of the allegations set forth in the complaint and the 'documents attached or incorporated into the complaint.' " *Zak v. Chelsea Therapeutics Int'l Ltd.*, 780 F.3d 597, 606 (4th Cir. 2015) (quoting *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 448 (4th Cir. 2011)). The court can consider a document attached to a motion to dismiss only when the document is "integral to and explicitly relied on in the complaint," and when "the plaintiffs do not challenge [the document's] authenticity." *Id. (quoting Phillips v. LCI Int'l Inc.,* 190 F.3d 609, 618 (4th Cir.1999). A document is integral to the complaint when the complaint "relies heavily upon its terms and effect." *Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 166 (4th Cir. 2016) (citation omitted) (a). As the documents do not meet this standard, I will not consider them at this stage.

[6] Lundberg filed the EEOC Charge of Discrimination on June 2, 2022. Am. Comp. ¶ 78.

4

environment, including Walton's comments, resulted in her constructive discharge – stating in the disjunctive that she was "discharged or constructively discharged." See e.g. *Id.* ¶¶ 73, 87. Lundberg alleges the following eight counts under federal and state law:  (1) under Title VII for discrimination on the basis of sex (Count I) and retaliation (Count II); (2) under the FMLA for interference (Count III); (3) under the VHRA for discrimination on the basis of sex (Count IV) and retaliation (Count V); (4) violations of the VWPA (Count VI); (5)  tortious interference with a business expectancy (Count VII); (6) and intentional infliction of emotional distress (Count VIII).

## II.    Law & Analysis

### A.  Motion to Dismiss

"A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007). However, a complaint does not satisfy this standard with only "labels and conclusions" or a "formulaic recitation of the elements of a cause of action." *Id.* (citations omitted). The complaint must assert facts that "nudge[] their claims across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570. "In the context of a Title VII case, an employment discrimination plaintiff need not plead a *prima facie* case of discrimination' to survive a motion to dismiss." *Bing v. Brivo Sys., LLC*, 959 F.3d 605, 616 (4th Cir. 2020) (quoting *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 515 (2002)). But, the factual allegations must "raise a right to relief above the speculative level." *Coleman v. Md. Ct of Appeals*, 626 F.3d 187, 190 (4th Cir. 2010) (citations omitted). Plaintiffs meet this burden when they "allege facts to satisfy the elements of a

cause of action created by that statute." *McCleary-Evans v. Md. Dep't of Transp., State Highway Admin.*, 780 F.3d 582, 584-85 (4th Cir. 2015).

**B. Title VII and the Virginia Human Rights Act ("VHRA") (Counts I, IV, and V[7])**

Under Title VII, an employer may not "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Lundberg's sexual orientation discrimination claim proceeds under theories of both disparate treatment and a hostile work environment and Lundberg contends that she was constructively discharged or demoted because of the discrimination she suffered. The VHRA likewise makes it unlawful for an employer to discriminate on the grounds of sexual orientation[8] and the parties agree that the VHRA sexual orientation discrimination claim should be analyzed under the same framework as the Title VII claim. *See Brackney-Wheelock v. City of Charlottesville*, 652 F. Supp. 3d 603, 633 (W.D. Va. 2023) (on appeal) (indicating that the claims are identical and holding that "since [plaintiff's] Title VII discrimination claims will be dismissed, so too will her VHRA claim"). Defendants move to dismiss Counts IV and V against Walton, arguing there is no individual liability under the VHRA. Defendants also move to dismiss Lundberg's claims under Title VII and the VHRA to the extent they allege sex discrimination based on disparate treatment, constructive discharge or demotion, or a hostile work environment.

(1) <u>No Individual Liability Under the VHRA</u>

---

[7] Defendants move to dismiss the retaliation claim in Count V against Walton only, arguing there is no individual liability under the VHRA. As stated, defendants are not moving to dismiss the retaliation counts against Delta Response (Counts II and V).

[8] The VHRA provides it is unlawful for an employer to discriminate against any individual "because of such individual's race, race, color, religion, sex, sexual orientation, gender identity, marital status, pregnancy, childbirth or related medical conditions including lactation, age, military status, disability, or national origin. Va. Code § 2.2-3905(B)(1)(a).

Lundberg attempts to assert individual liability against Walton under the VHRA (Counts IV and V) because he is a "member, manager or director, officer, and employee of [Delta Response]."[9] Am. Compl. ¶ 10. An individual is liable under Title VII only if he qualifies as an "employer" within the meaning of Title VII and "Title VII does not provide a remedy against individual defendants who do not qualify as employers." *Baird ex rel. Baird v. Rose*, 192 F.3d 462, 472 (4th Cir. 1999. Title VII liability generally does not extend to individual managers and supervisors. *Scott v. Maryland State Dep't of Labor*, 673 F. App'x 299, 308 (4th Cir. 2016). Because I find that it proper to evaluate individual liability using the same standards under both Title VII and VHRA, I find no individual liability for Walton under the circumstances here. Courts in this district have found no individual liability under the VHRA, noting that an interpretation holding individual managers and supervisors personally liable if they engage in discrimination would "dramatically expand the scope of the [statute]." *Saville v. Nw. Reg'l Jail Auth.*, No. 5:22-CV-057, 2024 WL 82737, at *8 (W.D. Va. Jan. 8, 2024); *see also Collins v. Franklin*, 142 F. Supp. 2d 749, 751 (W.D. Va. 2000) (holding there is no claim under the VHRA "since this action is not against the plaintiff's employer, but against an individual alleged to be the harasser").[10]

Both Title VII and the VHRA define[11] employer as a "person" who employs fifteen or more employees and any agent of such a person. Under this this definition of "employer", the

---

[9] While Lundberg also alleges that "Walton is an 'employer' under the VHRA" (Am. Compl. ¶ 9), I need not accept this allegation as true, as it is legal conclusion. Custer v. Sweeney, 89 F.3d 1156, 1163 (4th Cir. 1996) (even on a motion to dismiss, a court need not accept plaintiff's "footless conclusions of law, or sweeping legal conclusions cast in the form of factual allegations") (citation omitted) (cleaned up).

[10] *But see, Cook v. Bob Evans Farms, Inc.*, No. 2:11-CV-01017, 2012 WL 407261, at *3 (S.D.W. Va. Feb. 8, 2012) ("Under the West Virginia Human Rights Act, an individual, including a fellow employee, can be held liable for engaging in discriminatory practices.")

[11] Title VII defines "employer" as a "person engaged in an industry affecting commerce who has fifteen or more employees for each working day . . . and any agent of such a person," while the VHRA nearly identically

Fourth Circuit has made clear there is no individual liability for employees and supervisors under Title VII. *See e.g. Lissau v. S. Food Serv., Inc.*, 159 F.3d 177, 178 (4th Cir. 1998) ("supervisors are not liable in their individual capacities for Title VII violations."). Lundberg's reliance on *Mais v. Albemarle Cnty. Sch. Bd.* is misplaced as the Court in *Mais* did not decide the issue of individual liability under the VHRA, but instead dismissed those claims against the Albemarle County School Board "because the VHRA does not contain an explicit waiver of sovereign immunity for Commonwealth agencies, nor does it create a private cause of action against the School Board." 657 F. Supp. 3d 813, 826 (W.D. Va. 2023). Walton, as a "member, manager or director, officer, and employee of [Delta Response]" does not qualify as an "employer" under either the VHRA or Title VII. Accordingly, Counts IV and V will be dismissed against Walton only, as I find there is no individual liability under the VHRA.

(2) <u>Sexual Orientation Discrimination/Disparate Treatment Theory</u>

Lundberg states a plausible claim for sexual orientation discrimination against Delta Response based on her allegations of disparate treatment in the workplace. Lundberg alleges discrimination based on her sexual orientation when Walton provided a negative job reference, which for purposes of the motion to dismiss, I consider an adverse employment action. Absent direct evidence[12], the elements of a *prima facie* case of disparate treatment under Title VII are

---

defines "employer" as "a person employing (i) 15 or more . . . and any agent of such a person or (ii) one or more domestic workers. *Comp.* 42 U.S.C.A. § 2000e(b) *with* Va. Ann. § 2.2-3905(A). However, the VHRA defines "employer" for the purpose of unlawful discharge claims as "any person employing more than five persons or one or more domestic workers," and for the purpose of age claims as any person "employing more than five but fewer than twenty persons." *Id.*

[12] In her brief, Lundberg does not argue that she has direct evidence of sexual orientation discrimination, instead discussing the elements required absent direct evidence. Dkt. 11 at 5. Accordingly, I will not consider whether Walton's comments to the prospective employers could be considered direct evidence of discrimination. But, in *Alberti v. Rector & Visitors of the Univ. of Virginia*, 65 F.4th 151, 155 (4th Cir. 2023) the Fourth Circuit held that "derogatory comments can constitute direct evidence of discrimination if they are '(1) related to the protected class of persons of which the plaintiff is a member; (2) proximate in time to the complained-of adverse employment decision; (3) made by an individual with authority over the employment decision at issue; and (4) related to the employment decision at issue.'" quoting *Bandy v. City of Salem*, 59 F.4th 705, 711 (4th Cir. 2023).

(1) membership in a protected class; (2) satisfactory job performance; (3) an adverse employment action; and (4) similarly situated employees outside the protected class who received more favorable treatment. *Tabb v. Bd. Of Educ. Of Durham Pub. Scs*. 29 F.4th 148, 157 (4th Cir. 2022); *Coleman*, 626 F.3d at 190. Disparate treatment requires proof of discriminatory motive "although [that motive] can in some situations be inferred from the mere fact of differences in treatment." *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 335 n.15 (1977).

No doubt exists that Lundberg adequately alleges the first element, being part of a "protected class" as the Supreme Court stated in *Bostock* that sexual discrimination under Title VII encompasses claims based on sexual orientation. *Bostock v. Clayton Cnty., Georgia*, 590 U.S. 664 (2020). Lundberg also adequately alleges the second element, that her job performance was satisfactory. As to the third element, "adverse employment action," a negative job reference can constitute an adverse employment action. S*ee Harris v. Prince George's Cnty. Pub. Sch*., 141 F.3d 1158 (4th Cir. 1998) (holding that "[d]issemination of negative employment references for discriminatory motives can constitute a violation of Title VII" and discussing the elements required to show discriminatory intent); *see also Wandji v. Wilkie*, No. 218CV03036RMGMGB, 2020 WL 7647552, at *17 (D.S.C. Nov. 9, 2020), *report and recommendation adopted,* No. CV 2:18-03036-RMG, 2020 WL 7237922 (D.S.C. Dec. 9, 2020), *aff'd sub nom. Wandji v. McDonough*, 850 F. App'x 851 (4th Cir. 2021). As to the fourth element, Lundberg claims that she was subjected to "different treatment from similarly situated employees outside the protected class." She does not allege any specific comparator[13] although she is not required to do so provided she can establish an inference of unlawful discrimination through other means. *See*

---

[13] Lundberg does allege that "heterosexual individuals with a similar goal [to Lundberg of working as an EMT for a larger agency] have gone on to work for Fire and EMS departments with Walton's assistance, or at least without his interference." Am. Compl. ¶ 15.

*Guirkin v. CMH Physician Servs., LLC*, No. 3:20CV59, 2020 WL 6829769, at *7 (E.D. Va. Nov. 20, 2020) (collecting cases indicating that in the Fourth Circuit, if plaintiff's evidence supports an inference of discrimination by other means, no comparator is required).

Here, Lundberg can establish an inference of unlawful discrimination without a comparator, for the purposes of surviving a motion to dismiss. "Dissemination of negative employment references for discriminatory motives can constitute a violation of Title VII." *Harris*, 141 F.3d 1158. A plaintiff can raise an inference of discriminatory intent by showing (1) that she is a member of a protected class; (2) that she qualified for a favorable job reference because her job performance had been satisfactory; and (3) that she was given negative references in spite of her qualifications and performance. *Id.* Lundberg has alleged that Walton knew her sexual orientation and was uncomfortable with it, and that she had performed her job satisfactorily, including being promoted to Captain in August 2021. (Am. Compl. ¶ 16, 17). Walton gave her a negative job reference not recommending her as an employee to Lynchburg or Bedford and specifically disclosing her bisexuality, questioning her lifestyle choices, and calling her an "odd duck." (Am. Compl. ¶¶ 54, 55). I find that Lundberg has sufficiently alleged an inference of discriminatory intent to withstand the motion to dismiss the Title VII claim for sexual orientation discrimination under a disparate treatment theory.

(3) <u>Sexual Orientation Discrimination/Other Title VII Theories</u>

To the extent that Lundberg brings her claim for sexual orientation discrimination under either a hostile work environment theory, or by alleging constructive discharge or constructive demotion claims, these claims will be dismissed.

(a) Hostile Work Environment

"Since an employee's work environment is a term or condition of employment, Title VII creates a hostile working environment cause of action." *EEOC v. R & R Ventures*, 244 F.3d 334, 338 (4th Cir. 2001). A hostile environment exists "[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Boyer-Liberto v. Fontainebleau Corp.*, 786 F.3d 264, 277 (4th Cir. 2015) quoting *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21 (1993) (internal quotation marks omitted).

To state a hostile work environment claim, a claimant must show that the alleged conduct "(1) was unwelcome, (2) was based on [the claimant's] sex, (3) was sufficiently severe or pervasive to alter the conditions of employment and create an abusive work environment, and (4) was imputable to the employer." *Ocheltree v. Scollon Prods., Inc.*, 335 F.3d 325, 331 (4th Cir. 2003). There are "both subjective and objective components" to the third element. *Ocheltree,* 335 F.3d at 333 (*citing Harris,* 510 U.S. at 21–22). The victim must perceive the environment as hostile or abusive, and that perception must be objectively reasonable. *Harris,* 510 U.S. at 22. Likewise, when analyzing the third element, courts consider all the circumstances at play, including the "frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* at 23. The Supreme Court has established that Title VII is not a "general civility code" and stated that "simple teasing, offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (internal quotations and citations omitted). Likewise, the Fourth Circuit imposes a high bar on plaintiffs regarding this element, describing workplaces as "not always harmonious locales

11

[where] even incidents that would objectively give rise to bruised or wounded feelings will not on that account satisfy the severe or pervasive standard." *E.E.O.C. v. Sunbelt Rentals, Inc.*, 521 F.3d 306, 315 (4th Cir. 2008).

Lundberg does not identify conduct that states a claim in Count I for a hostile work environment. The specific instances mentioned in the Amended Complaint include (1) Walton taking no disciplinary action against a heterosexual coworker who "on one occasion" used her cell phone while driving an ambulance (a terminable offense), *Id.* ¶ 28; (2) Lundberg winning the female division in a weight loss competition, but not receiving a cash prize, when Delta Response awarded a cash prize to the male winner, *Id.* p 32-34; (3) Lundberg receiving no recognition on her five year service anniversary in August 2022 although other Delta Response employees received service anniversary acknowledgement, *Id.* ¶ 36-37; and (4) Walton giving Lundberg negative professional references to the City of Lynchburg and Bedford County.  *Id.* ¶ 54.  Lundberg has alleged sporadic occurrences, and none are sufficiently severe or pervasive so as to change the terms or conditions of her employment. Nor is it apparent from the allegations in the Amended Complaint that the first three actions were directed toward her because of her sexual orientation. Finally, regarding the negative professional reference, because this telephone call occurred outside of Lundberg's presence, and she only found out about it after the fact, through her FOIA request, it likewise was not directed toward Plaintiff in the workplace sufficient to support a hostile work environment claim.

(b) Constructive Discharge

 "Under the constructive discharge doctrine, an employee's reasonable decision to resign because of unendurable working conditions is assimilated to a formal discharge for remedial purposes." *Penn. State Police v. Suders*, 542 U.S. 129, 141 (2004). To state a constructive

discharge claim, a plaintiff must show (1) her "working conditions became so intolerable that a reasonable person in the employee's position would have felt compelled to resign", and (2) she "must actually resign because of those conditions." *Perkins v. Int'l Paper Co.*, 936 F.3d 196, 211-12 (4th Cir. 2019) (citations omitted).

Whether Lundberg actually resigned from Delta Response remains unclear; the Amended Complaint is confusing. Lundberg alleges that on September 29, 2022, she "requested a leave of absence to allow her to seek therapy and mentally recover from what had happened [and] expressly stated that she wished to remain employed by Delta Response and planned to return to work when she was able." Am. Compl. ¶¶ 68–69. She also refers to Delta Response as "quietly firing her" and writes that she "was discharged or constructively discharged." *Id.* ¶¶ 73, 87. On brief, Lundberg writes "she experienced retaliation and continued to experience emotional distress, all of which led to her ultimate termination or constructive discharge." Dkt. 11 at 11. While Rule 8 permits pleading in the alternative and even inconsistent pleading, Rule 8 still requires allegations of sufficient facts must for each claim to survive a motion to dismiss. A claimant's resignation "is an essential part of his constructive-discharge claim" and the Supreme Court has held that a claimant could not "sue for constructive discharge until he actually resigned." *Green v. Brennan*, 578 U.S. 547, 561 (2016); *see also Clehm v. BAE Sys. Ordnance Sys., Inc.*, 291 F. Supp. 3d 775, 791 (W.D. Va. 2017), *aff'd*, 786 F. App'x 391 (4th Cir. 2019). Because Lundberg fails to clearly allege that she resigned from her job, and resignation from her employment is a required element in a claim for constructive discharge, the motion to dismiss any constructive discharge claim will be granted. To the extent that Lundberg seeks leave to amend her pleadings, I note that for a constructive discharge claim under Title VII, a "plaintiff

must show 'something more than the showing required for a hostile work environment claim."
*Int'l Paper Co.*, 936 F.3d at 193 (quoting *Pa. State Police v. Suders*, 542 U.S. 129, 131 (2004)).

(c)  Constructive Demotion

Lundberg argued during the hearing that she has a claim for constructive demotion.
While the Fourth Circuit has not yet definitively addressed whether it recognizes a claim for
constructive demotion under Title VII, caselaw suggests the claim can exist. In *Laird v. Fairfax
Cnty., Virginia*, involving the ADA, the Fourth Circuit noted in a concurring opinion that "[e]ach
of our sister circuits to have faced the question of whether to recognize claims of constructive
demotion has decided that such claims are cognizable" viewing constructive demotion as a"
natural extension of constructive discharge [and applying] an identical analysis for both
constructive demotion and constructive discharge claims." 978 F.3d 887, 895–96 (4th Cir. 2020)
(collecting cases). Likewise, district courts in the Fourth Circuit, including the Western District
of Virginia, have recognized the claim of constructive demotion. *Salmons v. Com. Driver Servs.,
Inc.*, No. 7:19CV00532, 2019 WL 6833660, at *6 (W.D. Va. Dec. 13, 2019) (collecting cases).
Assuming the Fourth Circuit would recognize a cause of action for constructive demotion, a
plaintiff must prove her employer "deliberately made her working conditions intolerable for the
purpose of forcing her to seek a demotion/transfer to another department." *See Cuffee v.
Tidewater Cmty. Coll.*, 409 F. Supp. 2d 709, 718–19 (E.D. Va.), *aff'd*, 194 F. App'x 127 (4th
Cir. 2006). In the Amended Complaint Lundberg alleges that, as a result of an April 4, 2022
conversation with Walton, discussing the comment he made to Lynchburg and Bedford, she
"resigned as Captain and requested she be assigned to a part-time position in transport
somewhere other than her current location." Am. Compl. ¶ 61. However, Lundberg has not

14

alleged that defendants deliberately made her working conditions intolerable, for the purpose of forcing her to seek a demotion or transfer, as required.

Accordingly, to the extent that Lundberg attempts to allege a claim for a hostile work environment, constructive discharge, or constructive demotion, the motion to dismiss is granted.

### C. Family and Medical Leave Act ("FMLA") (Count III)

To assert an FMLA interference claim, an employee must demonstrate (1) entitlement to an FMLA benefit; (2) that the employer interfered with the provision of that benefit; and (3) that the interference caused harm. *Adams v. Anne Arundel Cnty. Pub. Schs.*, 789 F.3d 422, 427 (4th Cir. 2015). The FMLA "provides no relief unless the employee has been prejudiced by the violation." *Ragsdale v. Wolverine World Wide, Inc.*, 535 U.S. 81, 89 (2002).

Lundberg alleges that on September 29, 2022, she "requested a leave of absence to allow her to seek therapy and mentally recover from what had happened" but that Delta Response never offered Lundberg her FMLA Notices, interfering with her FMLA rights. Am. Compl. ¶¶ 68, 102, 104. Lundberg does not allege that she worked sufficient hours in the 12 months prior to September 29, 2022, or that she experienced a qualifying health condition, to establish her eligibility for FMLA leave.  Because an element of an FMLA interference claim is that the employee demonstrate entitlement to the FMLA benefit, which Lundberg has not done, I find that she fails to state a claim for FMLA interference. *See e.g. Capel v. Norfolk Pub. Sch.*, No. 2:19CV605, 2022 WL 989391, at *7 (E.D. Va. Feb. 25, 2022), *appeal dismissed*, No. 22-1353, 2022 WL 11751748 (4th Cir. Oct. 20, 2022) (granting motion to dismiss and finding "that Plaintiff's factual allegations fail to adequately show that Plaintiff was an eligible employee under the FMLA, that Plaintiff was entitled to FMLA leave, or that Plaintiff was denied his entitled FMLA leave after giving proper notice of his intention to take such leave").

Lundberg relies on *Hannah P. v. Coats,* for the proposition that she was not required to allege eligibility for FMLA leave, but instead was only required to allege she "communicated her depression and need for leave." 916 F.3d 327, 345–46 (4th Cir. 2019). In *Hannah P.* the Fourth Circuit makes clear that while an employee must provide notice to her employer when she requires FMLA leave, proper notice "does not require any magic words" and need not even expressly mention the FMLA. *Hannah P.*, 916 F.3d at 345–46. However, while under *Hannah P.*, an employee need not allege FMLA eligibility when requesting the leave, an employee still must allege sufficient facts to establish eligibility in her lawsuit claiming FMLA interference. Simply put, eligibility for FMLA is an element of an interference claim. *Adams*, 789 F.3d at 427; *see also Babcock v. BellSouth Advert. & Publ'g Corp.*, 348 F.3d 73, 78 n. 5 (4th Cir. 2003) (to engage in protected activity for the purposes of an FMLA claim, a plaintiff must be an "eligible employee"). Accordingly, the motion to dismiss Lundberg's claim for FMLA interference will be granted.

**D**. **Virginia Wage Payment Act ("VWPA") (Count VI)**

The VWPA establishes the manner in which Virginia employers pay wages or salaries to employees, including that, with some exceptions, salaried employees shall be paid at least once a month, hourly employees at least every two weeks or bi-monthly, and an employee who is terminated "shall be paid all wages or salaries due [to] him for work performed prior" to his termination. Va. Code § 40.1-29. The VWPA permits employees to file private actions "if an employer fails to pay wages to an employee in accordance with this section" and instructs the court to award:

> the wages owed, an additional equal amount as liquidated damages, plus prejudgment interest thereon as provided in subsection G, and reasonable attorney fees and costs. If the court finds that the employer knowingly failed to pay wages to an employee in accordance with this section, the court shall award the employee an amount equal to

triple the amount of wages due and reasonable attorney fees and cost

Va. Code § 40.1-29(J). While the VWPA discusses the method for paying both wages and salary, it refers only to wages, not salaries, when allowing employees to file private actions.

Lundberg alleges that Delta Response violated the VWPA by failing to "timely compensate" her promised PTO payout, as well as sick leave PTO hours. Am. Compl. ¶¶ 113-19. Lundberg does not state whether she was paid an hourly wage or a salary. Defendants move to dismiss this claim arguing that the PTO hours Lundberg claims are not considered a wage under the VWPA. While this is a question of limited impression in Virginia and federal courts, I find that the VWPA does not apply to the PTO claimed by Lundberg based on the language in the statute, and specifically the chosen terminology of "wages." The statue permits a private action to recover payment of *wages*, refers to the value of the wages *earned*, and provides that upon termination of employment, the employee shall be paid all wages *due for work performed* prior to termination. Virginia courts have defined wages as "a compensation given to a hired person for his or her services." *Fid. Ins. Tr. & Safe Deposit Co. v. Shenandoah Val. R. Co.*, 86 Va. 1, 8, 9 S.E. 759, 761–62 (1889); *Commonwealth/Dep't of Transp. v. Swiney*, 477 S.E.2d 777, 778 (Va. App. 1996) (noting that "no Virginia Supreme Court decision has changed that definition"). The dictionary defines "wage" as a payment usually of money for labor or services, usually according to contract and on an hourly, daily, or piecework basis. "Wage" *Merriam-Webster*, https/www.merriam-webster.com/dictionary/wage [https://perma.cc/LXJ4-2HLN].[14]  Thus, the

---

[14] Lundberg acknowledges that the VWPA does not define wages but emphasizes that wages are defined elsewhere in the Virginia Code. Lundberg points specifically "wages" as defined in "Unemployment Compensation" which includes:

> all remuneration paid, or which should have been paid, for personal services, including commissions, bonuses, tips, back pay, dismissal pay, severance pay and any other payments made by an employer to an employee during his employment and thereafter

language used in the VWPA allows an employee to claim payment for time actually worked, not holiday, sick or other PTO. The Eastern District of Virginia dismissed a claim under the VWPA, finding that the statute only covers "earned wages" and that the employee did not "render any services to [employer] after going on PTO . . . and thus, did not earn any wages." *Racklin v. Zeta Glob. Corp.*, 628 F. Supp. 3d 625, 647 (E.D. Va. 2022), *aff'd*, No. 22-2077, 2023 WL 5165281 (4th Cir. Aug. 11, 2023). The court's ruling was affirmed in an unpublished opinion, however, the VWPA issue was not appealed. Further, the VWPA does not apply if the "failure to pay was because of a bona fide dispute between the employer and its employee." Va. Code § 40.1-29(E). Accordingly, the motion to dismiss Lundberg's claim under the VWPA will be granted and this claim will be dismissed with prejudice.

### E.  Tortious Interference with a Business Expectancy

In Virginia, to establish a claim for tortious interference with a business expectancy, a plaintiff must plead: (1) the existence of a valid contractual relationship or business expectancy, with a probability of future economic benefit to the plaintiff; (2) knowledge of that contractual relationship or business expectancy on the part of the interferor; (3) intentional interference inducing or causing a breach or termination of the relationship or expectancy; and (4) resultant damage to the party whose relationship or expectancy has been disrupted. *See Williams v. Dominion Tech. Partners, L.L.C.*, 576 S.E.2d 752, 757 (Va. 2003); *Chaves v. Johnson,* 335 S.E.2d 97 (Va. 1985). Where the contract was terminable "at will", the plaintiff must also show that "the acts or methods used for the interference [were] themselves 'improper.'" *Maximus, Inc. v. Lockheed Information Management Systems Co.,* 493 S.E.2d 375 (Va.1997). "Methods of interference considered improper are those means that are illegal and independently tortious,

---

Va. Code § 60.2-229.  This definition of wages, used in the context of unemployment compensation, does not change my finding that PTO and sick leave are not considered "wages" under the VWPA.

such as violations of statutes, regulations, or recognized common-law rules." *Duggin v. Adams,* 360 S.E.2d 832 (Va.1987) (also listing as examples of potentially improper methods: violence, threats or intimidation, bribery, unfounded litigation, fraud, misrepresentation or deceit, defamation, duress, undue influence, misuse of inside or confidential information, breach of a fiduciary relationship, and methods that violate an established standard of a trade or profession, involve unethical conduct, sharp dealing, overreaching, or unfair competition).

Lundberg claims a business expectancy in both her offer of employment from Bedford County and her final interview with the City of Lynchburg, and alleges Walton intentionally interfered using "the improper means of violating [Delta Response] policy regarding information to be relayed in professional references," discussing Lundberg's sexuality during a professional reference call with Bedford and Lynchburg, and refusing to recommend Lundberg based on her sexuality. Am. Compl. ¶¶ 121- 23.

Defendants focus primarily on the requirement of improper methods in their motion to dismiss, while also stating in a footnote that "being in the final interview with Lynchburg does not establish a valid business expectancy." Dkt. 7, n. 5. I agree that the mere hope of receiving a job offer from Lynchburg may not be sufficient to show a business expectancy, as a business expectancy requires more than a subjective personal hope or plan. *See e.g. Adnet, Inc. v. Soni*, 66 F.4th 510, 519 (4th Cir. 2023) (holding that "proof of a plaintiff's belief and hope that a business relationship will continue is inadequate" to show a valid business expectancy). However, the actual offer of employment from Bedford, which Lundberg accepted, is sufficient to allege a valid business expectancy on a motion to dismiss, as that goes beyond subjective expectations to the realm of "objective proof that the expectancy would materialize." *X-IT Prod., L.L.C. v. Walter Kidde Portable Equip., Inc.*, 155 F. Supp. 2d 577, 653 (E.D. Va. 2001) (citing *Com. Bus.*

*Sys., Inc. v. Halifax Corp.*, 484 S.E.2d 892, 897 (Va. 1997); *see also Virginia Prosthetics, Inc. v. Fuller*, 90 Va. Cir. 408 (2015) (noting that a "business expectancy is not just a personal expectancy or plan" but a "term of art" and collecting cases defining business expectancy).

Defendants argue that Lundberg has not plead the required "improper methods," as there is nothing "illegal or independently tortious about" Walton, when asked for a reference, sharing his opinions about Lundberg or "revealing to a potential employer that [she] is a member of a protected class." Dkt. 7 at 20. Contrary to Lundberg's allegation that Walton violated Delta Response's policies against discussing such information, defendants argue Lundberg cannot use those policies to establish a standard of care. In support, defendants cite to *Pullen v. Nickens*, a negligence action where the Supreme Court of Virginia held that a company's private safety rules "are inadmissible in evidence either for or against a litigant who is not a party to such rules." 310 S.E.2d 452, 456 (1983).

I have already explained why Lundberg's claim for sexual orientation discrimination / disparate treatment, based on the negative job reference as an adverse employment action, survives a motion to dismiss. I also find that these allegations adequately allege the required "improper methods" to survive a motion to dismiss a claim for tortious interference with a business expectancy. Title VII is a federal statute, while the VHRA is a Virginia statute, and violations of statutes can constitute improper methods. Contrary to defendant's claim that there is "nothing illegal" about revealing Lundberg's protected status to a potential employer, that may, in fact, be illegal, if it amounts to sexual orientation discrimination. Accordingly, the motion to dismiss Lundberg's claim for claim for tortious interference with a business expectancy will be denied.

### F.  Intentional Infliction of Emotional Distress

Pleading intentional infliction of emotional distress under Virginia law entails showing that: (1) the wrongdoer's conduct was intentional or reckless; (2) the conduct was outrageous and intolerable; (3) there was a causal connection between the wrongdoer's conduct and the emotional distress; and (4) the emotional distress was severe. *Harris v. Kreutzer*, 624 S.E.2d 24, 33 (Va. 2006) (citation omitted). Requiring outrageous conduct "is aimed at limiting frivolous suits and avoiding litigation in situations where only bad manners and mere hurt feelings are involved." *Womack v. Eldridge*, 210 S.E.2d 145, 148 (1974). Whether the defendant's actions could reasonably be found to meet this definition of "outrageous conduct" is a threshold issue for the court to decide. *Womack,* 210 S.E.2d at 148; *Hailstone v. Veda*, 116 F.3d 472 (4th Cir. 1997) (unpublished). Finally, for liability, the emotional distress suffered must also be extreme and "so severe that no reasonable person could be expected to endure it." *Russo*, 400 S.E.2d at 163.[15]

Lundberg bases this claim on Walton's comments during the negative telephone reference call with Lynchburg and Bedford and then "retaliating against her after she complained about the statements."[16] Am. Compl. ¶ 131. Certainly, Walton's statements about Lundberg during the phone calls were problematic, and I have already found Lundberg states a claim for disparate treatment at the motion to dismiss stage. However, the tort of intentional infliction of emotional distress is disfavored in Virginia and because Lundberg has not alleged actions "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of

---

[15] In *Russo,* the Supreme Court of Virginia held that complaints of "nervousness, sleep deprivation, stress and its physical symptoms, withdrawal from activities, and inability to concentrate at work" did not meet the required level of "extreme emotional distress." *Id.* (the court also noted other examples that might support such a claim, including "objective physical injury caused by the stress," seeking medical attention, being confined at home or in a hospital, or lost income").

[16] While Lundberg was not present during the phone calls, Virginia caselaw does not require the plaintiff to be present during the outrageous conduct to recover for the intentional infliction of emotional distress. *See Morgan v. Foretich*, 846 F.2d 941, 950 (4th Cir. 1988) (noting that "*Womack* does not require, and defendants have pointed to no Virginia case, which would require that a plaintiff . . . be present during the outrageous conduct in order to recover for the intentional infliction of emotional distress").

decency, and to be regarded as atrocious, and utterly intolerable in a civilized community" she

fails to state a claim in Count VIII. *Russo v. White*, 400 S.E.2d 160, 162 (Va. 1991). In an

unpublished decision, the Fourth Circuit has noted, "Rarely will conduct in the employment

context rise to the level of outrageousness necessary to provide a basis for recovery for the tort of

intentional infliction of emotional distress." *Wilson v. S. Nat. Bank of N. Carolina*, 92 F.3d 1184

(4th Cir. 1996) citing *Cox v. Keystone Carbon,* 861 F.2d 390, 395 (3d Cir.1988), *cert. denied,*

498 U.S. 811 (1990). In line with this, courts in this district, emphasizing the "outrageous"

conduct required to state a claim for intentional infliction of emotional distress, have dismissed

many such claims in the employment context. *See e.g. Burnopp v. Carter Bank & Trust*, No.

4:20CV00052, 2020 WL 6875037, at *1–*3 (W.D. Va. Nov. 23, 2020) (collecting cases).

Waltons's negative job reference and his response following her complaints about his statements

fall short of extreme and outrageous conduct required to allege a claim for intentional infliction

of emotional distress.

     I also find the distress claimed by Lundberg not sufficiently severe to withstand a motion

to dismiss. Lundberg alleges that her "emotional distress as a result of Walton's statements has

been severe." Am. Compl. ¶ 130. Lundberg also describes requesting a "leave of absence to

allow her to seek therapy and mentally recover" and refers to a mental health crisis resulting

from Walton's actions. *Id.* ¶¶ 68, 70. These allegations fall short of both the heightened pleading

requirement for cases alleging intentional infliction of emotional distress described by the

Supreme Court of Virginia in *Russo* as well as federal pleading standard in Rule 8. *See Holley v.*

*CVS Caremark Corp.*, No. 4:16-CV-00017, 2016 WL 4132316, at *4 (W.D. Va. Aug. 3, 2016)

(collecting cases) (Rule 8 requires only "relatively simple allegations" and "trumps Virginia's

heightened pleading standards for intentional infliction of emotional distress in federal cases

governed by state law") (citations omitted). Accordingly, I will grant the motion to dismiss this claim.

### III.    Conclusion

Accordingly, defendants' partial motion to dismiss the Amended Complaint is granted in part and denied in part. An appropriate Order accompanies this opinion.

Entered:  April 18, 2024

*Robert S. Ballou*

Robert S. Ballou
United States District Judge

23