IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Charlottesville Division

NATALIE LUNDBERG,

    Plaintiff,

v.                                                            Case No. 3:23-cv-00042

DELTA RESPONSE TEAM, LLC AND
THOMAS WALTON,

    Defendants.

## BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

### I.       INTRODUCTION

Natalie Lundberg ("Lundberg") last worked for Delta Response Team ("DRT") as an Emergency Medical Technician ("EMT") on June 6, 2022. She then stopped signing up for shifts and did not fulfill the requirements to remain a part-time employee. Nevertheless, DRT granted her request for an accommodation of time off to address her purported depression and anxiety, even though Lundberg was working two other jobs. Hearing nothing from Lundberg for over seven months, DRT removed her agency affiliation.

Lundberg now accuses DRT of discriminating against her based on her bisexual orientation and weaponizing her bisexual orientation during background investigations for jobs with the City of Lynchburg and County of Bedford. The record is clear, however, that DRT did not discriminate against Lundberg and, not only did Thomas Walton ("Walton") not disclose Lundberg's sexual orientation, but his comments played no role in Lundberg's failure to obtain employment with those agencies. DRT and Walton are entitled to judgment as a matter of law.

## II.    STATEMENT OF MATERIAL UNDISPUTED FACTS

1.    DRT provides personnel to staff ambulances for calls for emergency services in Cumberland County and previously provided those services to the counties of Buckingham, Fluvanna, and Pittsylvania.  (Walton dep. 9:11-10:25.)   DRT also provides nonemergency transport services from stations in Lynchburg, Appomattox, Farmville, Richmond, and Charlottesville. (*Id.* at 11:1-16.) Walton is DRT's Vice President.  (*Id.* at 4:19-22.)

2.    Lundberg began working full-time at DRT as an EMT in 2017.  (Lundberg dep. 23:18-25:5.)  She was assigned to work at the Appomattox station, where she typically worked twelve-hour shifts, and then eventually moved to Buckingham, where she worked twenty-four-hour shifts.  (*Id.* at 25:12-26:17.)  In 2021, Lundberg moved to the Fluvanna station.  (*Id.* at 26:25-28:4.)

3.    Lundberg identifies as bisexual and has identified that way since a young age. (Lundberg dep. 7:16-8:2.)  According to Lundberg, there was no way anyone would know that she is bisexual unless she told them.  (*Id.* at 9:10-13.)  Lundberg is married to a man and has been in a relationship with him since 2009.  (*Id.* at 6:21-8:12.)

4.    In August 2021, Lundberg proposed the creation of a captain's position at the Fluvanna station, a role which she would fill.  (Lundberg dep. 34:23-35:16; Ex. 3.)  Walton named Lundberg captain of the Fluvanna station on August 5, 2021.  (*Id.* at 37:7-38:22; Ex. 4.)

5.    Lundberg worked with another DRT employee, Erica Wood ("Wood"), in both Buckingham and Fluvanna.  (Lundberg dep. 28:15-23, 29:1-7.)  While Lundberg and Wood were friends when Lundberg transferred to Fluvanna, their relationship deteriorated after Lundberg became Captain.  (*Id.* at 29:20-30:21, 38:20-25.)  Lundberg never told Wood that she was bisexual.  (*Id.* at 44:6-45:9.)

6.      Lundberg was assigned to work with Wood because no one else would do so. (Lundberg dep. 29:8-11.)  Wood was "a narcissist and extremely abusive" to both male and female employees, "she would always be about herself, everything revolved around her . . . she had no capacity or empathy for other providers and oftentimes patients", and "she would be verbally and mentally abusive to everyone around her."  (*Id.* at 29:8-16, 30:22-31:6.)  Wood "screamed" and "would ignore direct directions."  (*Id.* at 31:7-11.)

7.      Walton was aware of and investigated reports regarding Wood's conduct. (Lundberg dep. 41:13-42:8; Walton dep. 104:7-23.)  In response to concerns about Wood's behavior, Lundberg, Walton, and Wood met in October 2021.  (Lundberg dep. 42:9-43:5; Walton dep. 104:24-105:14, 135:17-20.)

8.      Wood remained an employee of DRT because her advanced life support skills were required to maintain the contract with Fluvanna County.  (Walton dep. 105:22-106:20; Lundberg dep. 50:25-51:8, 68:22-71:23; Ex. 10.)

9.      Lundberg recorded encounters between her and Wood that occurred on Thanksgiving Day 2021 (November 25, 2021), and March 8, 2022.  (Lundberg dep. 53:1-56:9, 58:6-59:4, 63:18-65:1, 68:6-14; Ex. 6; Ex. 7; Ex. 8; Ex. 9.)

10.      DRT hired another provider, Rich Frakes, who was assigned to work with Wood, although Lundberg continued to work at the Fluvanna station on a different shift from Wood. (Lundberg dep. 59:15-61:3.)  Eventually Walton directed Lundberg to stop communicating with Wood.  (Lundberg dep. 61:4-63:14; Ex. 10.)

11.      Lundberg applied for the position of Firefighter – Basic Life Support with the City of Lynchburg Fire Department on November 15, 2021.  (Ex. 11, at ¶ 4.)  The position to

which she applied was for an experienced lateral provider who would attend an accelerated training process. (*Id.* at ¶¶ 4, 7-8; Lundberg dep. 110:21-111:9.)

12.    On January 21, 2022, the City of Lynchburg advised Lundberg that she would not be advancing through the recruitment process because "it was not the right fit at the right time." (Ex. 11, at ¶ 6; Lundberg dep. 102:1-4, 104:6-11.)

13.    The City of Lynchburg was unaware of Lundberg's sexual orientation at the time of this decision, and its decision was not based on her sexual orientation. (Ex. 11, at ¶ 12.)

14.    Lundberg exchanged text messages with Walton inquiring as to whether the investigator for the City of Lynchburg had been in contact and letting Walton know that she was not selected for the position. (Lundberg dep. 102:15-105:14; Ex. 12.)

15.    Lundberg submitted a request to the City of Lynchburg pursuant to the Virginia Freedom of Information Act ("FOIA") to determine why she was not hired. (Lundberg dep. 105:17-25.) In response, she received a redacted copy of the background investigation report. (Lundberg dep. 106:5-11.) The report attributed the following statements to Walton:

> Personally, she has a very different view on her private life. She's pretty open about her private life and the things she's involved in, it's definitely a little strange in my opinion. I know the world is a different place and everybody is very open nowadays, but her and her fiancé are open swingers and partiers and so forth. Her lifestyle hasn't impacted her job in anyway; she has not brought it into work that I'm aware of other than speaking openly about it with others. We've never had complaints from her coworkers about it or anything like that, like she's recruiting, but her and her fiancé are definitely some odd ducks.
>
> ***
>
> She's very honest about everything you know, which was kind of goes back to the lifestyle stuff I mentioned. She doesn't cover that up, like she's very honest about who she is and what she is and where she's coming from.
>
> ***
>
> I really can't recommend her or not recommend her right now.

(Ex. 11, at Ex. A pp. 8-9.)

16.    Lundberg applied for the position of Basic Life Support/Firefighter with the County of Beford on January 30, 2022.  (Ex. 13, at ¶ 4.)  Bedford County extended an offer of employment on February 16, 2022, conditioned upon successful completion of the background investigation, physical, and psychological evaluation.  (*Id.* at ¶ 5; Lundberg dep. 125:17-126:1.)

17.    On February 25, 2022, Walton texted Lundberg to tell her that he had spoken to the Bedford investigator and to joke that he did not tell the investigator about her heroin habit. (Lundberg dep. 143:15-144:18; Walton dep. 146:4-147:8; Ex. 14.)

18.    On March 7, 2022, Bedford County rescinded the conditional offer of employment based on Lundberg's psychological health evaluation.  (Ex. 13, at ¶¶ 6-7.)

19.    Bedford County was not aware of Lundberg's sexual orientation at the time of this decision and its decision was not based on her sexual orientation.  (*Id.* at ¶ 9.)

20.    Lundberg submitted a FOIA request to the County of Bedford and received a redacted version of the background investigation report.  (Lundberg dep. 128:18-129:8.)  That report attributed the following statements to Walton:

> She struggles with supervision and can cry and become emotional when dealing with employees.
>
> ***
>
> She is very open with a lifestyle of being a swinger.  Her hair may be of different colors.  No complaints have surfaced yet on the applicant but it could easily be seen that her lifestyle could be a distraction and might not fit in with every group of people.
>
> ***
>
> It is her personal swinger lifestyle that she is very open that appears to not allow the employees she supervises to respect her.
>
> ***
>
> No recommendation either way was given.

(Ex. 13, at Ex. A, pp. 1-2.)

21.    On March 10, 2022, after receiving the FOIA documents, Lundberg met with Walton regarding the statements he made to the investigators for the City of Lynchburg and

Bedford County.  (Walton dep. 149:5-152:19.)  Lundberg also contacted Sheika McCoy, DRT

Human Resources Officer, to express her discontent about what Walton said to the investigators.

(Lundberg dep. 144:19-146:17; McCoy dep. 21:21-22:7, 24:9-25:3, 38:6-14; Ex. 16.)

22.    In April 2022, Lundberg stepped down from her position as station captain.

(Lundberg dep. 74:11-75:23; Ex. 17.)  She then requested to work the day shift in Appomattox or

Lynchburg.  (Lundberg dep. 76:7-78:11; Ex. 18.)  On April 14, 2022, Lundberg was hired as a

full-time physician substitute at Octapharma Plasma.  (Lundberg dep. 14:4-15:13; Ex. 19, at No.

3.)  On that same day, Lundberg submitted two-weeks' notice to DRT that she would be

transitioning from full-time to part-time status.  (Lundberg dep. 78:15-79:16; Ex. 20.)  Then, on

May 19, 2022, Lundberg was hired as a part-time EMT with Amherst County.  (Lundberg dep.

16:22-18:4; Ex. 19, at No. 3.)

23.    Lundberg's decision to resign as station captain and move to part-time was based

on her decision to attend paramedic school, what she read in the FOIA documents, and because

she "no longer trusted management team to abide by their own SOPs and rules in their own

handbook."  (Lundberg dep. 74:11-78:11.)

24.    McCoy informed Lundberg that because she did not give 28 days' notice, she was

not entitled to receive a payout of her remaining PTO.  (Lundberg dep. 82:3-11; Ex. 21; Ex. 22,

at 20.)  Despite knowing that this was the policy, Lundberg requested that DRT make an

exception, claiming that it had been done for other employees, who she could not identify.

(Lundberg dep. 82:12-83:4.)

25.    Ultimately, Lundberg and DRT reached an agreement whereby DRT would pay

out eight hours of PTO per pay period provided Lundberg worked at least one shift.  (Lundberg

dep. 83:5-21; Ex. 21.)

26.    Effective November 2021, part-time employees of DRT were required to work two shifts per month to maintain part-time status.  (Lundberg dep. 83:22-86:24; Ex. 23; Ex. 24.)

27.    In April 2022, Lundberg filed a complaint with the Virginia Department of Health Office of EMS ("OEMS").  (Lundberg dep. 158:11-159:2.)  DRT was advised of this complaint on August 9, 2022, and the case was closed for lack of jurisdiction.  (Ex. 25.)

28.    Lundberg filed a Charge of Discrimination ("Charge") with the EEOC on June 2, 2022.  (Lundberg dep. 158:11-17; Ex. 26.)

29.    June 6, 2022, was the last shift that Lundberg worked for DRT.  (Lundberg dep. 156:19-21.)

30.    On September 22, 2022, McCoy emailed Lundberg to determine whether she intended to maintain her part-time status, as she had not worked in over three months.  (Lundberg dep. 88:19-21; Ex. 27.) When Lundberg did not respond, McCoy emailed again on September 29, 2022.  (Ex. 27.)

31.    Lundberg responded on September 29, 2022, stating that she would like to continue working part-time at DRT, she was experiencing depression and anxiety because of DRT's actions toward her, and requesting "an accommodation of time off until such time as I feel emotionally secure enough to return."  (*Id.*; Lundberg 88:22-89:21.)  DRT accepted Lundberg's request for further time off.  (Ex. 27.)

32.    Despite her accommodation request of time off from DRT, Lundberg continued to attend paramedic school and continued working at Octapharma Plasma, Amherst County, and Virginia International Raceway.  (Lundberg dep. 19:20-21:15, 89:22-90:5.)

33.    On May 8, 2023, OEMS notified Lundberg that DRT had removed her from their list of affiliated employees.  (Lundberg dep. 157:11-158:1; Ex. 28.)

### III.    STANDARD OF REVIEW

"Summary judgment is warranted 'if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Lashley v. Spartanburg Methodist Coll.*, 66 F.4th 168, 173 (4th Cir. 2023) (quoting Fed. R. Civ. P. 56(a)). Evidence and reasonable inferences are construed "in the light most favorable to the non-moving party." *Id.* (quotation omitted).

### III.    ARGUMENT

### A.    Lundberg was not discriminated against on the basis of sex or sexual orientation.

Count I of the Second Amended Complaint alleges that DRT discriminated against Lundberg on the basis of her sex and sexual orientation under theories of hostile work environment, disparate treatment, and constructive demotion and discharge.  Count IV alleges discrimination on the basis of sex and sexual orientation in violation of the Virginia Human Rights Act ("VHRA") under the same theories.  Claims under the VHRA are analyzed under the Title VII framework.  *See Brackney-Wheelock v. City of Charlottesville*, 652 F. Supp. 3d 603, 633 (W.D. Va. Jan. 20, 2023) (analyzing Title VII and VHRA claims together).

### 1.    Lundberg was not subjected to a hostile work environment.

To prevail on a hostile work environment claim, Lundberg must show that "there is (1) unwelcome conduct; (2) that is based on [her sex]; (3) which is sufficiently severe or pervasive to alter [her] conditions of employment and to create an abusive work environment; and (4) which is imputable to the employer." *Guessous v. Fairview Prop. Inv., LLC,* 828 F.3d 208, 221 (4th Cir. 2016).

### a.     Lundberg failed to exhaust her administrative remedies.

Lundberg's EEOC Charge of Discrimination did not assert a claim for hostile work environment based on the treatment by Wood, which is the basis of that claim in the Second Amended Complaint.  (*Compare* Lundberg dep. 153:22-25, 158:6-8 *with* Ex. 26.)  Instead, the Charge alleged that, between March 7, 2022 and April 1, 2022, Walton made her job more difficult by moving her away from her main station, cutting her hours from 56 to 40, not providing a set schedule, and scheduling her to work with Wood.  (Ex. 26.)  Where a plaintiff asserts a discrimination claim in a charge based on the conduct of a supervisor, but attempts to pursue a harassment claim in litigation based on the conduct of a coworker, her claim is barred based on a failure to exhaust administrative remedies.  *See Chacko v. Patuxent Inst.*, 429 F.3d 505, 512 (4th Cir. 2005); *McCarty v. City of Alexandria*, No. 1:24-cv-600, 2024 WL 5081956, at *8 (E.D. Va. Dec. 11, 2024).  Therefore, the Court need not even reach the merits of the claim.

### b.     There was no unwelcome conduct based on sex or sexual orientation.

To establish sex discrimination under Title VII, Lundberg must prove that the "conduct would not have occurred but for her sex."  *Webster v. Chesterfield Cnty. Sch. Bd.*, 38 F.4th 404, 410 (4th Cir. 2022).  The critical question is "whether members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed."  *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998).

There is no evidence that Lundberg was subject to a hostile work environment because of her sex or sexual orientation.  Lundberg's hostile work environment is premised on the conduct of Wood, a fellow female DRT employee.  (Lundberg dep. 153:22-25, 158:6-8.)  Yet, there is no evidence that Wood knew Lundberg was bisexual.  (Lundberg dep. 44:6-45:9.)  It is axiomatic that Lundberg cannot claim that she faced unwelcome conduct based on her sexual orientation

while simultaneously admitting the alleged perpetrator was unaware of her sexual orientation. *See, e.g. Ellston v. LeHew*, No. 5:24-cv-00045, 2024 WL 4867080, at *5 (W.D. Va. Nov. 21, 2024) (dismissing discrimination claim because defendants did not know about disability).

Moreover, the alleged harassment was not unique to Lundberg, as others at DRT, including both male, female, and heterosexual employees, experienced similar treatment by Wood. (Lundberg dep. 29:8-16, 33:1-19, 43:18-21, 56:7-9, 69:22-70:18, 154:1-3; Ex. 5; Ex. 6.) Walton himself was subject to Wood's poor treatment. (Lundberg dep. 70:3-71:17; Ex. 5.) Title VII is not a civility code and does not provide relief against the "equal opportunity" offender. *EEOC v. Sunbelt Rentals, Inc.*, 521 F.3d 306, 315-16 (4th Cir. 2008); *Holman v. Indiana*, 211 F.3d 399, 402 (7th Cir. 2000). *See also Betz v. Temple Health Sys.*, No. 15-00727, 2015 WL 4713661, at *4 (E.D. Pa. Aug. 7, 2015) ("equal opportunity offenders" who create "an uncouth, unprofessional, and offensive workplace . . . for all . . . regardless of" employees' protected traits do not establish an actionable work environment.).

### c.    There was no severe or pervasive harassment.

Lundberg must also show that the harassment was severe or pervasive to her personally and objectively abusive to a reasonable person in her position. *Ocheltree v. Scollon Productions, Inc.*, 335 F.3d 325, 333 (4th Cir. 2003). Relevant facts to consider include: (1) the frequency of the discriminatory conduct; (2) its severity; (3) whether it is physically threatening or humiliating, or a mere offensive utterance; and (4) whether it unreasonably interferes with an employee's work performance. *Id.* Plaintiffs must "clear a high bar" to satisfy the "severe or pervasive" requirement. *Evans v. Int'l Paper Co.*, 936 F.3d 183, 192 (4th Cir. 2019). Rude treatment from coworkers, callous behavior by one's superiors, or a routine difference of opinion and personality conflict are not actionable under Title VII. *Id.* Incidents that give rise to bruised

10

or wounded feelings will not satisfy the severity requirement. *Sunbelt Rentals, Inc.*, 521 F.3d at 315-16. *See also Ziskie v. Mineta*, 547 F.3d 220, 226 (4th Cir. 2008) ("[H]arassment due to personality conflicts will not suffice."). "Exchanges in the workplace that are merely disrespectful, frustrating, critical, and unpleasant are insufficient to create a hostile work environment." *Coleman v. Kettler Mgmt.*, No. 1:22-CV-84, 2022 WL 17585780, at \*6 (E.D. Va. Dec. 12, 2022) (internal quotation omitted).

The record demonstrates that the conduct of which Lundberg complains does not satisfy this high bar and was neither severe nor pervasive. Lundberg has identified two specific instances in which she and Wood engaged in a verbal altercation in the workplace—November 25, 2021 and March 8, 2022. Lundberg recorded both of those encounters. (Ex. 6; Ex. 8.) While Lundberg claims that she felt verbally threatened on November 25, 2021 because of Wood's body language, there were no physical interactions or threats made. (Lundberg dep. 31:19-32:6.) Aside from these two events, Lundberg claims that Wood would scream at her, ignore direct directions, and "make life a living hell if it was not revolving around her." (Lundberg dep. 31:7-11.) Lundberg explained that Wood created "toxicity in the workplace" by "flirt[ing] with deputies . . . try[ing] to skip calls . . . rearrang[ing] the truck . . . [and] leav[ing] passive-aggressive notes in the logbook." (Lundberg dep. 33:14-18.) Wood "was just overall very, very mean." (Lundberg dep. 33:18-19.)

While Lundberg's work environment may have been unpleasant, it was not "hostile" or "deeply repugnant" to establish a claim for hostile work environment under Title VII. *See Hopkins v. Baltimore Gas & Elec. Co.*, 77 F.3d 745 (4th Cir. 1996), *abrogated on other grounds by Bostock v. Clayton Cnty.*, 590 U.S. 644 (2020).

11

2.    __Lundberg was not treated differently than similarly-situated employees.__

To prevail on a disparate treatment claim, Lundberg must prove (1) membership in a protected class; (2) satisfactory job performance; (3) an adverse employment action; and (4) similarly-situated employees outside of the protected class who received more favorable treatment. *Tabb v. Bd. of Educ. of Durham Pub. Schs.,* 29 F.4th 148, 157 (4th Cir. 2022). When relying upon a comparator, "the validity of [the plaintiff's] prima facie case depends upon whether that comparator is indeed similarly situated." *Haywood v. Locke*, 387 F. App'x 355, 359 (4th Cir. 2010). Accordingly, Lundberg must show that she is similar in all relevant respects to the heterosexual employees to whom she compares herself. This includes showing that the comparators dealt with the same supervisor, were subject to the same standards, and engaged in the same conduct without differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it. *Id.* "And, of course, the comparator must have been treated more favorably than the Plaintiff with respect to the adverse action complained of." *Wilson v. City of Chesapeake*, 290 F. Supp. 3d 444, 457-58 (E.D. Va. 2018).

Here, the adverse actions of which Lundberg complains are: (1) negative employment references; (2) constructive demotion; and (3) constructive discharge. (ECF Doc. 25, at ¶¶ 95-96, 102.) However, she has identified no similarly-situated heterosexual comparators who were treated more favorably than her with respect to these allegedly adverse actions.

This Court found that the original Complaint survived on a disparate treatment claim because Walton allegedly giving Lundberg "a negative job reference not recommending her as an employee to Lynchburg or Bedford and specifically disclosing her bisexuality, questioning her lifestyle choices, and calling her an 'odd duck' . . . sufficiently alleged an inference of

discriminatory intent to withstand the motion to dismiss the Title VII claim for sexual orientation discrimination under a disparate treatment theory." (ECF Doc. 19, at 10.)

The evidence, however, is that Walton did not disclose Lundberg's bisexuality to the investigators for the City of Lynchburg or Bedford County. (Ex. 11, at ¶ 10, Ex. A; Ex. 13, at ¶ 9, Ex. A.) Moreover, consistent with his practice, Walton did not make a recommendation to hire or not hire Lundberg. (Ex. 11, at Ex. A; Ex. 13, Ex. A; Walton dep. 116:13-117:7.) Here, where there is no evidence as to recommendations Walton provided other employees and no disclosure of Lundberg's sexual orientation, there is no evidence or inference of discrimination.

The other allegations of alleged disparate treatment in the Second Amended Complaint do not relate to the adverse action complained of and, therefore, cannot establish a claim of disparate treatment in violation of Title VII. Nor is there evidence to support the claimed disparate treatment.

First, regarding payout of PTO, DRT's policy is clear that, absent 28 days' notice, an employee is not entitled to a payout of remaining PTO. (Lundberg dep. 82:3-11; Ex. 21; Ex. 22, at 20.) Lundberg has identified no instances in which DRT made an exception to this rule. (Lundberg dep. 82:3-83:4.)

Second, regarding the requirement that part-time employees work two shifts per month to maintain employment, this requirement was changed in November 2021, after a leadership meeting in which Lundberg participated. (Lundberg dep. 83:22-86:24; Ex. 17; Ex. 18.) Moreover, Lundberg has identified no employees who were exempted from this requirement after it took effect. (*See, e.g.,* Ex. 19, at No. 16 (answer is non-responsive and identifies a heterosexual couple that worked on a shift together and were not part-time).)

Third, Lundberg alleges that, because of her sexual orientation, she did not receive a five-year anniversary gift from DRT.  (ECF Doc. 25, at ¶¶ 34-35.)  Lundberg's five-year anniversary with DRT was in August 2022.  (*Id.* at ¶ 35.)  At that time, she had not worked for nearly two months, and had transitioned from a full-time employee to part-time employee.  (Lundberg dep. 90:6-14.)  She did receive a card acknowledging her anniversary.  (Lundberg dep. 90:15-17; Ex. 29.)  Lundberg has no evidence to support her claim that the lack of a gift or public acknowledgement of her anniversary was based on her sex or sexual orientation.  The claim is based only on her opinion.  (Lundberg dep. 92:22-24.)  In fact, DRT has provided five-year anniversary gifts to non-heterosexual employees in the past, and only provides gifts to full-time employees.  (Lundberg dep. 92:25-94:1; McCoy dep. 42:14-43:3; Ex. 30.)

Finally, Lundberg alleges that she did not receive a prize for DRT's "Fit for Duty" weight loss challenge, although a male winner was awarded a cash prize.  (ECF Doc. 25, at ¶¶ 30-33; Lundberg dep. 94:1-95:19.)  The record demonstrates that only two people submitted weights for the final weigh-in.  (Ex. 31.)  However, only one employee submitted a weight each month, and that was employee who was named the male winner of the challenge.  (*Id.*)  Lundberg only provided two weights and did not provide a final weigh-in to complete the challenge.  (*Id.*)  Because no female employee completed the challenge, no female award was given.

### 3.    Lundberg was not constructively discharged.

The Court again need not reach the merits of Lundberg's constructive discharge claim because the Charge does not raise the issue of constructive discharge.  (Ex. 26.)  Nor did Lundberg amend her Charge after any such constructive discharge occurred.  Because this claimed adverse action was not filed with the EEOC, Lundberg is barred from pursuing it in this Court.  *See Simmons v. Marsh*, 917 F.2d 23, 1990 WL 163059, at *4 (4th Cir. Oct. 29, 1990) (no

administrative exhaustion where plaintiff did not amend her EEOC charge); *Knight v. McCarthy*, 439 F. Supp. 3d 744, 755 (E.D. Va. 2020) (holding that because the plaintiff failed to assert a constructive discharge in her EEOC charge, the claims were not administratively exhausted).

Yet, even reviewing the merits of the claim, DRT is entitled to summary judgment. To prevail on a constructive discharge claim, Lundberg must show (1) that her working conditions became so intolerable that a person in her position would have felt compelled to resign and (2) she actually resigned because of those conditions. *Perkins v. Int'l Paper Co.,* 936 F.3d 196, 211-12 (4th Cir. 2019). Lundberg must demonstrate that DRT deliberately made her working conditions intolerable to induce her to quit. *Matvia v. Bald Head Island Mgmt., Inc.*, 259 F.3d 261 (4th Cir. 2001). A showing of intolerability requires "something more" than the severe or pervasive conduct that suffices for a hostile work environment claim. *Evans,* 936 F.3d at 193. Difficult or unpleasant working conditions, without more, are not so intolerable as to compel a reasonable person to design. *Id.*

First, Lundberg asserts that she was terminated, not that she resigned. (ECF Doc. 25, at ¶¶ 77, 83, 102; Lundberg dep. 157:3-15.) There can be no claim for constructive discharge absent a resignation.

Second, Lundberg has not made a sufficient showing to prove a hostile work environment claim and, therefore, cannot establish a constructive discharge claim. DRT did not take any actions to deliberately make Lundberg's working conditions intolerable to force her to leave. Instead, Lundberg worked her last shift on June 6, 2022, and then stopped scheduling herself for shifts. (Lundberg dep. 86:25-88:18.) Lundberg explained that she needed a break from DRT and the Waltons because she was upset about what Walton had allegedly said during the background

investigations, not because of any conduct in the workplace.  (Lundberg dep. 88:3-18.)  She cannot establish a claim for constructive discharge.

### 4. <u>Lundberg was not constructively demoted.</u>

The Fourth Circuit has noted that "[e]ach of our sister circuits to have faced the question of whether to recognize claims of constructive demotion has decided that such claims are cognizable." *Liard v. Fairfax* County, 978 F.3d 887 (J. Wynn, concurring) (4th Cir. 2020). Those courts have viewed constructive demotion as a natural extension of constructive discharge and have applied an identical analysis for constructive demotion and discharge claims. *Id.* Therefore, Lundberg's claim that she was "constructively demoted" from DRT should be analyzed under the same framework as her constructive discharge claim, and for the reasons explained *supra* in Part III.A.3., there is no evidence to support a constructive demotion claim.

Lundberg voluntarily stepped down from her captain's position and transitioned from full time to part time status in April 2022.  (Lundberg dep. 74:11-14, 156:13-18; Ex. 20.)  She informed DRT that these decisions were necessary because she was going to paramedic school. (Ex. 17; Ex. 18.)  In her deposition, Lundberg cited "what [she] read in the FOIA documents," a lack of trust in management "to abide by their own SOPs and rule sin their own handbook," and her decision to attend paramedic school as the reasons for stepping down. (Lundberg dep. at 74:11-75:23.)   Lundberg also wanted to move from 24-hour shifts to 12-hour shifts to accommodate her school schedule.  (Lundberg dep. 74:2-10, 76:1-78:11; Ex. 18; Ex. 32.)

This Court has already concluded that, because the reference was given "outside of Lundberg's presence, and she only found out about it after the fact, through her FOIA request, it likewise was not directed toward Plaintiff in the workplace sufficient to support a hostile work environment claim."  (ECF Doc. 19, at 12.)  The references, therefore, also cannot support a

claim for constructive demotion.  There is no evidence that Lundberg's decision to step down was due to "intolerable conditions" and her constructive demotion claim must be dismissed.

**B.**    **DRT did not retaliate against Lundberg under Title VII or the VHRA.**

To prevail on a claim for retaliation, Lundberg must show that she "engaged in protected activity" and that DRT "took the adverse action because of the protected activity."  *Bryant v. Aiken Regional Medical Centers, Inc.,* 333 F.3d 536, 543 (4th Cir. 2003).  The protected activity must be the **"but for" cause** of the adverse employment action.  *University of Texas Southwestern Medical Center v. Nassar*, 570 U.S. 338, 362-63 (2013) (emphasis added).  There must be "some degree of temporal proximity to suggest a causal connection" between the protected activity and the adverse action.  *Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 501 (4th Cir. 2005).  If Lundberg establishes a *prima facie* case of retaliation, the burden shifts to DRT to proffer a legitimate nondiscriminatory and nonretaliatory reason for the adverse action, which Lundberg then has the burden of proving was a pretext for intentional retaliation.  *Nnadozie v. ManorCare Health Serv., LLC*, 792 F. App'x 260, 262 (4th Cir. 2019).

Protected activity does not include opposition to "all unlawful practices" or "practices the employee simply thinks are somehow unfair"; the employee must have "actually opposed employment practices made unlawful by Title VII."  *McNair v. Computer Data Sys., Inc.*, No. 98-1110, 1999 WL 30959, at *5 (4th Cir. Jan. 26, 1999).  Title VII only "makes unlawful certain, defined intentional acts of discrimination."  *Darvishian v. Geren*, 404 F. App'x 822, 830 (4th Cir. 2010).  "Merely complaining in general terms of discrimination or harassment without indicating a connection to a protected class or providing facts sufficient to create that inference, is insufficient."  *Young v. HP Enterprise Servs., LLC*, No. 1:10-cv-1096, 2011 WL 3901881, at *5

(E.D. Va. Sept. 6, 2011). The key is "whether the plaintiff's course of conduct as a whole (1) communicates to her employer a belief that the employer has engaged in . . . a form of employment discrimination, and (2) concerns a subject matter that is actually unlawful under Title VII or that the employee reasonably believes to be unlawful." *DeMasters v. Carilion Clinic*, 796 F.3d 409, 418 (4th Cir. 2015) (internal quotations omitted).

While the Second Amended Complaint asserts that "Lundberg engaged in protected activity when she complained to Walton about his discriminatory statements on the basis of her sexuality," (ECF Doc. 25, at ¶ 106), the evidence does not support this allegation. Instead, when asked in her deposition to whom she complained of discrimination or harassment, Lundberg only mentioned the EEOC and OEMS. (Lundberg dep. 158:11-14.) Lundberg denied the existence of any other complaints to support her claim for retaliation. (Lundberg dep. 159:3-7.)

Lundberg filed a complaint with OEMS on April 1, 2022. DRT, however, did not learn of this complaint until August 9, 2022. (Ex. 25.) Even assuming that this report could constitute protected activity, absent knowledge of the activity, there can be no retaliation. *Roberts v. Glenn Indus. Grp., Inc.*, 998 F.3d 111, 124 (4th Cir. 2021).

Lundberg filed her Charge with the EEOC on June 2, 2022, (Ex. 26), **after** she resigned from the captain position and **after** she transitioned from full time to part time, (Lundberg dep. 156:17-18, 158:11-17). Lundberg claims that she was discharged from her employment with DRT and that discharge was retaliatory. (ECF Doc. 25, at ¶¶ 109-12.)[1]

---

[1] In the Second Amended Complaint, Lundberg also claims that the denial of PTO payment and requirement to work two shifts per month were retaliatory. (ECF Doc. 25, at ¶ 107.) As explained herein, these were DRT policies that applied to all employees and there is no evidence in the record of any exceptions that were made.

First, DRT did not discharge Lundberg.  (Walton dep. 162:10-18.)  Lundberg did not believe she had been terminated from her employment with DRT until she received notification from OEMS that her agency affiliation with DRT was removed on May 8, 2023.  (Ex. 28.)

Second, even if the removal of the agency affiliation is sufficient to evidence that Lundberg was terminated, that occurred eleven months after Lundberg filed her Charge and nine months after DRT learned of the OEMS complaint.  While temporal proximity is only sufficient to state a *prima facie* case of retaliation at the pleading stage, here even temporal proximity is lacking.  *See Pascual v. Lowe's Home Ctrs., Inc.*, 193 F. App'x 229, 233 (4th Cir. 2006) (three to four months was too long to establish causal connection).  *But see Silva v. Bowie State Univ.*, 172 F. App'x 476, 478 (4th Cir. 2006) (ten weeks was sufficiently close to state a *prima facie* case).

While Lundberg claims that she received a notification on October 24, 2022, from her 401(k) provider that she was a "former employee" of DRT, this document has not been produced in discovery.  (ECF Doc. 25, at ¶ 80; Lundberg dep. 157:3-10.)  However, even if the Court were to consider October 24, 2022, as a date of termination, a causal connection between Lundberg's June 2, 2022 Charge or DRT's August 9, 2022 knowledge of the OEMS complaint is still lacking.  And, there is no evidence that DRT took any action in retaliation for Lundberg engaging in protected activity under Title VII or the VHRA.  As such, DRT is entitled to judgment as a matter of law for Counts II and V.

**C.**     **DRT did not interfere with potentially FMLA-qualifying leave.**

The FMLA allows eligible employees to take up to 12 weeks of leave during any 12-month period due to a serious health condition that makes the employee unable to perform the functions of her job.  29 U.S.C. § 2612(a)(1)(D).  To prevail on a claim of interference with FMLA rights, a plaintiff must prove that (1) she was an eligible employee, (2) the defendant was

an employer as defined under the FMLA, (3) she was entitled to leave under the FMLA, (4) she gave the employer notice of her intention to take leave, and (5) the employer denied the employee FMLA benefits to which she was entitled. *Ainsworth v. Loudon County Sch. Bd.,* 851 F. Supp. 2d 963, 974 (E.D. Va. 2012).

Lundberg's claim for FMLA interference is premised on the failure to provide her with a FMLA Notice of Eligibility, a Rights and Responsibilities Notice, or a Designation Notice ("FMLA Notices"). (ECF Doc. 25, at ¶ 117.) She claims that she was terminated during the time period in which she should have been provided protected leave.

### 1.    There is no evidence of a serious health condition.

The FMLA provides leave for "a serious health condition that makes the employee unable to perform the functions of the employee's job." 29 C.F.R. § 825.112(a)(4). A "serious health condition" is "an illness, injury, impairment or physical or mental condition that involves inpatient care as defined in § 825.114 or continuing treatment by a health care provider as defined in § 825.115." 29 C.F.R. § 825.113(a).

Lundberg alleges that she had a qualifying health condition of depression and anxiety. (ECF Doc. 25, at ¶ 72.) There is no evidence that Lundberg's condition required inpatient care as defined in 29 C.F.R. § 825.114. Nor is there evidence that Lundberg's conditioned qualified under 29 C.F.R. § 825.115, which requires incapacity and treatment. Incapacity is defined as "inability to work, attend school or perform other regular daily activities due to the serious health condition, treatment therefore, or recovery therefrom." 29 C.F.R. § 825.113(b). To qualify for "continuing treatment by a health care provider" the employee must have "treatment two or more times, within 30 days of the first day of incapacity," or "treatment by a health care provider on at least one occasion, which results in a regimen of continuing treatment under the supervision of

the health care provider." 29 C.F.R. § 825.115(a)(1)-(2). Treatment is defined as "examinations to determine if a serious health condition exists and evaluations of the condition," and a "regimen of continuing treatment includes, for example, a course of prescription medication (e.g., an antibiotic) or therapy requiring special equipment to resolve or alleviate the health condition (e.g., oxygen)." 29 C.F.R. § 825.112(c). If a regimen of continuing treatment includes over-the-counter medications or activities that can be initiated without a visit to a health care provider do not constitute a regimen of continuing treatment for FMLA leave. *Id.*

Lundberg asserts that her September 29, 2022, email was a request for FMLA leave. (Lundberg dep. 97:4-8.) However, after making the request, Lundberg did not return to therapy until November 18, 2022, which was followed by appointments on December 2, 2022, January 13, 2023, March 17, 2023, and April 19, 2023. (Ex. 33.) Moreover, Lundberg was attending school and working for Octapharma Plasma, Amherst County, and Virginia International Raceway during this time period. (Lundberg dep. 14:4-15:13, 16:22-18:4, 19:20-21:15, 89:16-90:5.) She worked as an EMT for Amherst and Virginia International Raceway, the same position she held with DRT.

The evidence does not support the conclusion that Lundberg was experiencing a period of incapacity and receiving treatment that would constitute a significant health condition for which she would be entitled to FMLA leave.

### 2. Lundberg did not provide sufficient notice of her intent to take leave.

An employee must provide sufficient information for an employer to reasonably determine whether FMLA may apply to the leave request and the notice should include the "anticipated duration of the absence, if known." 29 CFR § 825.303(b); *Peeples v. Coastal Office Prod., Inc.,* 64 F. App'x 860, 863 (4th Cir. 2003).

21

Lundberg did not provide sufficient information to DRT to trigger the requirement to issue FMLA Notices.  On September 29, 2022, Lundberg informed DRT of the following:

> I feel very upset and very much cast aside.  I believe I am being retaliated against for complaining about discrimination because of my sexual orientation or that I am still being discriminated against because of my sexual orientation.  While I am working with my therapist and hope to be able to input availability soon, I am experiencing depression and anxiety because of DRT's actions towards me.  I request an accommodation of time off until such time as I feel emotionally secure enough to return.

(Ex. 27.)

Proper notice "makes the employer aware that the employee needs FMLA-qualifying leave" and includes "the anticipated timing and duration of the leave."  *Rhoads v. F.D.I.C.*, 257 F.3d 373, 382-83 (4th Cir. 2001).  Unlike the plaintiff in *Hannah P. v. Coats*, 916 F.3d 327, 346 (4th Cir. 2019), who explained to her supervisors that her psychiatrist recommended that she take four weeks of medical leave, there is no evidence that a healthcare provider recommended that Lundberg take any amount of leave.  Lundberg, in response to a reminder email that she was required to work two shifts per month to remain a part time employee and had not worked for nearly four months, requested an "accommodation of time off until such time as I feel emotionally secure enough to return."  (Ex. 27.)  Lundberg's accommodation request did not place DRT on notice that she was requesting FMLA leave.

### 3.    Lundberg was not prejudiced by the failure to provide FMLA Notices.

The Fourth Circuit has held that, "[i]n order to establish a FMLA interference claim, Plaintiff has to prove not only interference, but that the violation prejudiced [her]."  *Anderson v. Discovery Commc'ns, LLC*, 517 F. App'x 190, 197 (4th Cir. 2013).  Prejudice can be proven by showing that "an employee loses compensation or benefits by reason of the violation, sustains other monetary losses as a direct result of the violation, or suffers some loss in employment

status remediable through appropriate equitable relief." *Reed v. Buckeye Fire Equip.*, 241 F. App'x 917, 924 (4th 2007) (internal citations and quotation marks omitted).

Even if Lundberg qualified for FMLA leave and provided sufficient information to trigger the FMLA Notices, she was not prejudiced by the failure to give the FMLA Notices or provide protected leave. Instead, DRT did permit Lundberg to take extended leave and she was to inform DRT when she was ready to return. (Ex. 27.) *See Huan Zhou v. Lowe's Home Centers, LLC*, No. 1:20-cv-370, 2021 WL 2666595, at *12 (E.D. Va. June 29, 2021) (where employee took unpaid personal leave instead of FMLA leave there was no prejudice).

Lundberg has stated that she was not fit to return to work until November 2023, over one year after any purported request for FMLA leave, and well after the 12 weeks provided by the FMLA would have expired. (Ex. 19, at No. 18.)[2] It was not until May 2023, after Lundberg had neither worked for, nor communicated an ability to work to, DRT for eleven months, that DRT removed her agency affiliation with OEMS. As such, Lundberg was permitted the leave she would have otherwise been entitled to under the FMLA and suffered no prejudice.

**D.    Lundberg cannot establish a claim for tortious interference with a business expectancy.**

For DRT and Walton to be liable for tortious interference with business expectancy, Lundberg must establish (1) the existence of a valid business expectancy; (2) knowledge of the expectancy on the part of the interferer; (3) intentional interference inducing or causing a breach or termination of the expectancy; and (4) resultant damage to the party whose relationship has been disrupted. *Chaves v. Johnson*, 335 S.E.2d 97, 102 (Va. 1985). A valid business expectancy

---

[2] Additionally, Lundberg testified in her deposition that she did not know what she would have done differently if she had received the FMLA Notices and that she was still not fit to return to work at DRT. (Lundberg dep. 98:6-14.)

requires a "probability of future economic benefit." *L-3 Commc'ns Corp. v. Serco, Inc.*, 926 F.3d 85, 94 (4th Cir. 2019). "Possibility" that a future economic benefit will accrue is insufficient. *Id.*

Recovery for tortious interference with business expectancy also requires proof that the defendant employed improper methods to interfere with the contract. *Duggin v. Adams*, 360 S.E.2d 832, 836 (Va. 1987). Improper methods include "those means that are illegal or independently tortious, such as violations of statutes, regulations, or recognized common law rules," as well as "violence, threats or intimidation, bribery, unfounded litigation, fraud, misrepresentation or deceit, defamation, duress, undue influence, misuse of inside or confidential information, or breach of a fiduciary relationship." *Id.* Improper methods do not include "actions solely motivated by spite, ill will and malice" toward the plaintiff. *Dunn, McCormack & MacPherson v. Connolly*, 708 S.E.2d 867, 870-71 (Va. 2011).

The City of Lynchburg did not offer Lundberg a job; therefore, she did not have a valid business expectancy. The mere possibility of a job offer does not establish a business expectancy, as that requires more than a subjective personal hope or plan. *See, e.g. Adnet, Inc. v. Soni,* 66 F.4th 510, 519 (4th Cir. 2023).

While Lundberg may have had a business expectancy with the County of Bedford based on the conditional offer of employment—and even if Lundberg did have a valid business expectancy with the City of Lynchburg: (1) Walton's comments do not constitute "improper methods" and (2) neither agency refused to hire Lundberg because of Walton's comments. (Ex. 11, at ¶¶ 7-8; Ex. 13, at ¶¶ 7-8.)

Walton did not recommend that either agency hire or not hire Lundberg. (Ex. 11, at Ex. A; Ex. 13, at Ex. A.) Nor did Walton disclose that Lundberg is bisexual. (Ex. 11, at ¶ 10, Ex. A; Ex. 13, at ¶ 9, Ex. A.) There is nothing illegal or independently tortious about Walton's

comments.  While Lundberg claims that Walton violated DRT's employment reference policy by providing more information than her position and dates of employment, (ECF Doc. 25, at ¶ 54), there is a difference between an employment reference and the background investigation in which Walton participated for the City of Lynchburg and County of Bedford.  (Walton dep. 81:5-11; S. Walton dep. 18:1-19:2, 20:13-23, 21:17-22.)  Additionally, Walton's alleged violation of DRT's policies is not illegal or tortious, and those policies cannot be used to establish a standard of care.  *See e.g., Pullen v. Nickens*, 310 S.E.2d 452, 456-57 (1983).

Moreover, the City of Lynchburg's decision not to move forward with Lundberg as a candidate was based on the conclusion that she did not have the requisite firefighter experience to join the department as an experienced provider and attend the accelerated training academy. (Ex. 11, at ¶¶ 7-8.)  It was Lundberg's psychological evaluation that led to the County of Bedford rescinding her job offer, not Walton's reference.  (Ex. 13, at ¶¶ 7-8.)  As such, Walton's comments, even if they could constitute "improper methods," did not induce or cause a breach or termination of the expectancies.[3]

## V.  <u>CONCLUSION</u>

For all of the foregoing reasons, Delta Response Team, LLC and Thomas Walton, by counsel, respectfully request that the Court grant their Motion for Summary Judgement and enter judgment in their favor as a matter of law.

---

[3] While Lundberg assigns blame to Walton's statement to the City of Lynchburg investigator that she was a "swinger", another reference stated: "Some of the issues I've heard of was some of her personal extracurricular activities that have come up with multiple sexual partners and so forth, so on.  That has come up in conversation amongst people in the station and that will cause issues if she's hired.  Being with multiple sexual partners, being openly filmed having sex, that has been an issue.  I don't know if you're aware of that, but that's how she's been since I've known her.  I can't hold that against her work abilities to do the job, but I can say it will be a distraction here, and that does cause problems."  (Ex. 11, at Ex. A, p. 10.)

DELTA RESPONSE TEAM, LLC AND
THOMAS WALTON

By Counsel

s/Melissa Y. York
Melissa Y. York (VSB No. 77493)
Counsel for Delta Response Team, LLC and Thomas Walton
Harman, Claytor, Corrigan & Wellman
P.O. Box 70280
Richmond, Virginia  23255
804-747-5200 - Phone
804-747-6085 - Fax
myork@hccw.com

## C E R T I F I C A T E

I hereby certify that on the 19th day of December, 2024, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which well send notification of such filing to the following:

> Sarah Flynn Robb, Esq.
> Sarah Robb Law
> 919 East Main Street, Suite 1000
> Richmond, VA 23227
> 804-482-1536 - Phone
> 804-988-5464 - Fax
> sarah@sarahrobblaw.com

> s/Melissa Y. York
> Melissa Y. York (VSB No. 77493)
> Counsel for Delta Response Team, LLC and
> Thomas Walton
> Harman, Claytor, Corrigan & Wellman
> P.O. Box 70280
> Richmond, Virginia  23255
> 804-747-5200 - Phone
> 804-747-6085 - Fax
> myork@hccw.com

26

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Charlottesville Division

NATALIE LUNDBERG,

    Plaintiff,

v.                             Case No. 3:23-cv-00042

DELTA RESPONSE TEAM, LLC AND
THOMAS WALTON,

    Defendants.

**INDEX OF EXHIBITS
TO DEFENDANTS' BRIEF IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT**

| Exhibit | Description | Deposition Pg. Nos./ Bates No. | Deposition Exhibit No. |
|---|---|---|---|
| 1 | Deposition of Tom Walton | 4, 9-11, 81, 104-106, 116-117, 135, 146-147, 149-152, 162 | |
| 2 | Deposition of Natalie Lundberg | 6-35, 37-38, 41-45, 50-51, 53-56, 58-65, 68-71, 74-79, 82-90, 92-95, 97-98, 102-106, 110-111, 125-126, 128-129, 143-147, 153-154, 156-159 | |
| 3 | August 2, 2021 email from N. Lundberg | DRT_001423 - 001425 | 1 |
| 4 | August 5, 2021 email from T. Walton | DRT_001426 | 2 |
| 5 | March 8, 2022 text messages between T. Walton and N. Lundberg | | 10 |
| 6 | November 25, 2021 Video | | 5 |
| 7 | November 29, 2021 email from N. Lundberg | | 6 |
| 8 | March 8, 2022 Video | | 8 |

| Exhibit | Description | Deposition Pg. Nos./ Bates No. | Deposition Exhibit No. |
|---|---|---|---|
| 9 | March 8, 2022 email from N. Lundberg | | 9 |
| 10 | February 17, 2022 emails from N. Lundberg | | 7 |
| 11 | Jonathan Wright Declaration | | |
| 12 | January 21, 2022 texts between N. Lundberg and T. Walton | | 21 |
| 13 | Janet Blankenship Declaration | | |
| 14 | February 25, 2022 texts between T. Walton and N. Lundberg | | 26 |
| 15 | Deposition of Sheika McCoy | 21-22, 24-25, 38, 42-43 | |
| 16 | March 10, 2022 texts between N. Lundberg and S. McCoy | | 27 |
| 17 | April 4, 2022 email from T. Walton | | 12 |
| 18 | April 5, 2022 emails from N. Lundberg | DRT_001087 | 13 |
| 19 | Plaintiff's Answers to Interrogatories | | 20 |
| 20 | April 14, 2022 email from N. Lundberg, with attached letter | DRT_001411 - 001412 | 14 |
| 21 | April 18 and 19, 2022 emails from T. Walton and S. McCoy | DRT_001448 - 001450 | 16 |
| 22 | Delta Response Team Employment Guide | DRT_001716 - 001738 | |
| 23 | September 9, 2021 email from S. McCoy | | 17 |
| 24 | October 21, 2021 email from R. Sandy | | 18 |
| 25 | May 16, 2022 email to N. Lundberg | Lundberg-0248 - 0250 | |

| Exhibit | Description | Deposition Pg. Nos./ Bates No. | Deposition Exhibit No. |
|---|---|---|---|
| 26 | Charge of Discrimination | Lundberg-0357 - 0359 | |
| 27 | October 4, 2022 email from S. Robb | DRT_001101 - 001102 | 19 |
| 28 | May 8, 2023 email from Virginia Department of Health | Lundberg-0385 - 0386 | |
| 29 | August 23, 2022 anniversary card to N. Lundberg | Lundberg-0418 | |
| 30 | March 15, 2018 5-year anniversary post | DRT_01762 | |
| 31 | Fit For Duty Challenge Weigh Ins | DRT_01711 | |
| 32 | March 22, 2022 email from N. Lundberg | | 11 |
| 33 | April 2022 through April 2024 Billing from Collaborative Counseling and Consulting | Lundberg-0460 - 0461 | |
| 34 | Deposition of Susan Walton | 18-21 | |