**In the United States District Court**
**For the Western District of Virginia**
CHARLOTTESVILLE DIVISION

NATALIE LUNDBERG,
    Plaintiff,

v.                                 Civil Action No. 3:23-cv-42

DELTA RESPONSE TEAM, LLC,
and
THOMAS WALTON,
                  Defendants.

**PLAINTIFF'S MEMORANDUM IN OPPOSITION**
**TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Plaintiff Natalie Lundberg ("Lundberg"), by counsel, Pursuant to Fed. R. Civ. P. 56 respectfully states the following in opposition to Defendants Delta Response Team ("DRT") and Thomas Walton's ("Walton") Motion for Summary Judgment (ECF No. 52).

## I.    INTRODUCTION

DRT's Vice President Walton spread a humiliating, false rumor, stated as fact and without remorse, that Plaintiff Natalie Lundberg is a sexually promiscuous "swinger."[1] Walton spread the false rumor to two different professional background investigators who were gathering information about Lundberg for prospective government employers in the firefighter/EMS field. Walton admits he called her a "swinger" in the interviews and this was the only time he has ever discussed a subordinate's sex life in a professional background investigation. The "swinger" rumor was among several other inappropriate things Walton said to the background investigators, including that Lundberg is "open" about her "lifestyle," she might not fit in with "the right people" because "I know how firemen can be… you know, the guys will be the guys and that sort of thing." He also

---

[1] A swinger is "one who engages freely in sex." *Swinger*, MERRIAM-WEBSTER DICTIONARY (2024) *available at* https://www.merriam-webster.com/dictionary/swinger (last accessed Jan. 9, 2025).

called her "emotional" and said that she has hair of different colors. He stated she is "different," an "odd duck," and her "lifestyle could be a distraction and might not fit in with every group of people." All of this was documented by the background investigators in formal reports, which they turned into the two prospective employers.

Lundberg did not receive either job for which she applied. One of the positions, for Bedford County Fire & EMS ("Bedford"), had already been offered to Lundberg. Bedford revoked its offer after receiving the background investigation. Walton was the only professional reference. The other position, for Lynchburg Fire Department ("Lynchburg"), was progressing swiftly and positively through the pre-employment process before it ended abruptly after Lynchburg received the background investigation. Lundberg received the investigators' notes in response to Freedom of Information Act ("FOIA") requests and confronted Walton. He admitted what he had said but did not apologize or take actions to fix what he had done. Lundberg reported Walton's discriminatory actions to DRT, but their HR Manager, Sheika McCoy ("McCoy"), conveyed Lundberg's report to Walton and took no further action to investigate and did not prepare a formal report, notwithstanding that was her normal procedure.

Lundberg is not a swinger. She is a Bisexual Female. Walton knew Lundberg was a Bisexual Female because Lundberg had said this to Walton. Their conversation occurred while they were on duty together in an ambulance one night, when they were talking about Lundberg's plans to marry her male fiancé and have children. Lundberg said she was Bisexual. Walton responded to Lundberg's telling him that she was Bisexual by saying "so you're a swinger?" Lundberg said she was not a swinger. Walton apparently concluded, incorrectly, that Lundberg's decision to marry a man even though she was also attracted to women was Lundberg's being a "swinger." When he

communicated "swinger" to the background investigators, Walton was also commenting on Lundberg's Bisexuality.

These facts, if proven true, give a reasonable jury a sufficient factual basis to find that Walton and DRT discriminated and retaliated against Lundberg on the basis of sex, both her gender and her sexual orientation, in violation of Title VII of the Civil Rights Act of 1964 ("Title VII") and the Virginia Human Rights Act ("VHRA"). Such slut-shaming by a manger is unacceptable, humiliating, an invasion of the Lundberg's privacy, and illegal. *Parker v. Reema Consulting Servs.*, 915 F.3d 297 (4th Cir. 2019) (Rumors about a female's sex life invoke "a deeply rooted perception — one that unfortunately still persists — that generally women, not men…are susceptible to being labelled as 'sluts'"). The facts also support a cause of action for intentional interference with business expectancy. And because DRT failed to provide Lundberg any FMLA paperwork when she presented with emotional distress, paperwork McCoy admits she would have given if she could do it over, DRT interfered with Lundberg's FMLA rights.

Walton and DRT defend the case by presenting an alternate version of the facts. They contend that Walton did not know Lundberg's sexuality and that because they largely do not remember conversations connected to Lundberg's complaints of discrimination, it did not happen. They argue the background investigation reports do not mention Lundberg's sexuality, there is no harassment at DRT, and the reports labeling Lundberg as a "swinger" were not considered by the employers as part of the employment decision even though they had the reports. All of these facts are material and disputed, and summary judgment should be denied.

## II.    STANDARD OF REVIEW

Summary Judgment should not be granted as long as there are material facts in dispute. Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Celotex Corp. v. Catrett*,

3

477 U.S. 317, 322 (1986). "The party seeking summary judgment carries the burden of showing that there is no genuine issue as to any material fact in the case." *Pulliam Inv. Co. v. Cameo Properties*, 810 F.2d 1282, 1286 (4th Cir. 1987). When ruling on a motion for summary judgment, the court must draw all reasonable inferences in favor of and construe the facts in the light most favorable to the non-moving party. *Matsushita Elec. Indust. Co. v Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986). Courts must take special care when considering a motion for summary judgment in a discrimination or retaliation case because motive is often the critical issue. *Id.* "Summary judgment is not appropriate when there is an issue of fact for a jury to determine at trial, which is the case when there is sufficient evidence favoring the non-moving party upon which a jury can return a verdict for that party." *Shealy v. Winston*, 929 F.2d 1009, 1012 (4th Cir. 1991).

### III.    DISPUTES OF MATERIAL FACT PRECLUDE SUMMARY JUDGMENT

**A. Disputes of material fact exist as to what Walton knew about Lundberg's sexuality, whether Walton knew what it meant to be Bisexual, and whether Walton brought up Lundberg's sexuality during the background interviews.**

Lundberg is Bisexual. (Lundberg dep., attached hereto as Ex. 3, at 7:16-17). Lundberg testified that to be Bisexual is to "be attracted to people of multiple genders." (*Id*. at 8:18). Lundberg said she did not hide her sexuality and shares it with people she trusts. (*Id*. at 8:19-21, 9:7-9, 45:12). Lundberg is clear that she told Walton during an overnight shift they worked together that she was Bisexual. (*Id.* at 45:10-56:3; Lundberg decl., attached hereto as Ex. 5, at ¶¶ 8-9). Lundberg made the disclosure when Walton questioned her future plans to marry and have children. (Lundberg dep. at 45:10-56:3, Lundberg decl. at ¶ 9). Walton replied to Lundberg's telling him that she was Bisexual by saying, "So, you're a swinger?" (*Id.*). Lundberg testified she told Walton in response to his question that she is not a swinger. (*Id.*).

Defendants have asserted a different version of these facts, which Lundberg disputes. For example, Walton testified that during her employment he did not know Lundberg was Bisexual.

4

(Walton dep., attached hereto as Ex. 1, at 63:8-9, 77:18-19, 144:18-24, 145:12-14). Walton testified

he had understood only that Lundberg was a swinger for years but never asked her about it or heard

it from Lundberg. (*Id.* at 78:9-23, 79:19-23, 101:1-4, 108:4-5, 113:10-21, 117:24-118:7, 125:15-19,

128:11-17, 150:20-23).[2] Susan Walton testified her husband could not ask about it because it would

be illegal. (S. Walton dep., attached hereto as Ex. 4).

Another dispute of material fact exists about whether Walton brought up Lundberg's sexuality

during the interview, or whether he only responded to questions about Lundberg's "being a swinger"

from the investigators. Walton stated that both investigators initiated a conversation about Lundberg's

being a swinger and he did not start it. (*Id.* at 82:4-8, 90:19-25). Walton also testified that the

investigators misstated in their reports what he said on numerous occasions. (*Id.* at 82:4-8, 90:19-25).

Both investigators for Bedford and Lynchburg intend to testify that Walton's testimony is false, that

Walton brought up Lundberg's sexuality, and that their written account of their conversations with

Walton are accurate. (Campbell decl., attached hereto as Ex. 6, at ¶¶ 15, 17, Langhorne decl., attached

hereto as decl. as Ex. 7, at ¶¶ 13,15).

**B. Disputes of material fact exist regarding whether Walton's actions played "no role" in
Lynchburg's or Bedford's decision not to hire Lundberg, as Defendants contend.**

Lundberg asserts as a fact that Lynchburg's and Bedford's decision not to hire Lundberg was

caused by, in whole or in part, the negative statements Walton made to the investigators. Numerous

---

[2] Walton's deposition testimony that he did not know about Lundberg's being Bisexual and that
"swinger" is not a commentary on Lundberg's sexuality is not credible and contrary to other of his
deposition testimony. When asked in his deposition what he believed Lundberg's sexuality to be, he
responded that "swinger" was his "understanding of her relationship status, sexual orientation" and
said that one's sex life and sexuality are related. (Walton Dep. at 77:7-19; 78:1-5). Walton further
testified that he understood that Bisexual is different, but his testimony suggests he lacks a full
understanding. For example, Walton testified this his understanding of Bisexual is "[t]hat you have
sexual interest in two gender types which could be lots of things, I guess, now. I mean I'm not exactly
sure if there is a specific definition of -- and there probably is. I don't know if it limit to specific
things. I don't know whether having interest in animals includes bisexual. I have no idea." (*Id.* at
120:17-24; 121:21-122:1, 123:1-12).

pieces of circumstantial evidence would enable a reasonable jury to find this fact true. First, Walton

testified that local Fire and EMS departments needed more employees after COVID:

> Traditionally, pre-COVID, most cities and counties would not hire brand new EMS
> providers without experience. You could not get those jobs because the—you know,
> the need wasn't there, ratio of employees to open positions and so forth. Since COVID,
> that's changed drastically. You know, every—everyone is hiring. Everyone is short.
> Everyone needs all the help they can get. So we've definitely seen a change in that in
> the last four years where now the counties and these places will hire you with zero
> experience and hope for the best, I guess.

(Walton dep. at 52:21-53:6). Indeed, Walton was "surprised" that Lundberg was not hired. (*Id.* at

128:12-16 ("I mean it was during the time where employees are hard to come by and I know

Lynchburg City needed employees.")). He also testified that counties "love to hire my employees."

(*Id.* at 89:18-23).

Second, Walton agrees his words hold significant weight. DRT is a medical transportation

company with "stations in Charlottesville, Richmond, Lynchburg, Appomattox and Farmville. (2nd

Am. Compl., ECF No. 25, at ¶ 9), (Answer, ECF No. 26, at ¶ 9). Walton was born in Lynchburg,

Virginia, met his wife of 30 years in Lynchburg, is on the Blue Ridge EMS council (a regional council

of EMS chiefs for Lynchburg and surrounding counties), and testified that he knows "most" or "a lot"

of the people who work at fire and EMS stations in the region because he has been working in the

region for 18 years. (Walton dep. at 12:7-25 13:1-4, 15:6-10, 21:20-21). When asked his

understanding of the power his words hold as Vice President of DRT, Walton responded " I -- I don't

know what my understanding of it is. I can follow that it would be significant." (*Id.* at 130:9-13).

Nonetheless, Walton testified he "didn't give any thought" to what his words would do to Lundberg

personally. (*Id.* at 118:8-12).

Third, Lundberg's employment paths for Lynchburg and Bedford were positive before

Walton's negative reference. On the same day Lundberg applied for a position with Lynchburg, she

heard back that she would progress to the next steps, including interviews and references. (Lundberg

Decl., attached hereto as Ex. 5, at Ex. A). The next day, Lynchburg scheduled her interview. (*Id.*)
Lynchburg sent emails to Lundberg entitled "onboarding" and [the boss] stated to Lundberg in
anticipation of her possible hire that he knew Lundberg wanted to give DRT notice before she left.
(*Id.*) Lynchburg's investigator, Randy Campbell, spoke with Walton before interviewing Lundberg.
(2nd Am. Compl. at ¶ 41), (Answer at ¶ 41), *see* (Campbell Decl. at ¶ 10).

Likewise, on January 31, 2022, Lundberg began the application process for a position with
Bedford County Fire and Rescue ("Bedford"). (Mot. Summ. J. at p.5, ¶ 16). Bedford followed up the
very next day scheduling both an interview and a date for a skills assessment. (Lundberg Decl. at Ex.
B). On February 11, 2022, Lundberg went through an interview, written test, and Fire and EMS skills
drills as part of the Bedford interview process. (*Id.*). On February 16, 2022, Department Chief Janet
Blankenship called Lundberg to extend a conditional offer of employment with Bedford, which
Lundberg accepted via email. (Mot. Summ. J. at p.5, ¶ 16). On February 18, 2022, Lundberg received
an agency affiliation request from Bedford through the Virginia Department of Health Office of
Emergency Medical Services ("OEMS"). (Lundberg Decl. at Ex. B). Lundberg completed numerous
other onboarding requirements as well with no issue. (*Id.*). On February 25, 2022, Walton spoke with
Bedford's investigator, T.R. Langhorne, and (2nd Am. Compl. at ¶ 41), (Answer at ¶ 41), (Langhorne
decl. at Ex. A). Walton was the only professional reference for Lundberg's background check.
(Langhorne Decl. at Ex. A). Bedford told Lundberg by phone that they would review her background
check on March 4, 2022. (Lundberg decl. at ¶ 18).

Fourth, Walton testified that if a reference like his about Lundberg were written about him,
he would perceive it as negative, and it would be "disappointing for sure." (Walton dep. at 102:25-
103:13, 118:13-23). Walton testified that it is not common to be a "swinger" in the region and
implicating someone as a swinger would likely stick out. (*Id.* at 90:5-11, 138:7-9).

Finally, Lynchburg and Bedford each produced documents where their respective review

panels each recommended Lundberg for employment. (*See* Lundberg decl. at Exs. A,B).

Defendants dispute these facts and affirmatively state as a fact, in two recently obtained declarations from employees at Lynchburg and Bedford, that the decisions not to hire Lundberg were not based on Walton's statements. (Def. Mot. Summ. J. at Exs. 11, 13). They assert Walton's statements therefore played no role in the hiring decisions. (*Id.*). They assert as a fact that Lundberg lost the Lynchburg job based on a "lack of qualifications" and the Bedford job because of results of a psychological evaluation that Lundberg reported at the time was conducted under invalid testing circumstances. (*Id.* at Ex. 13).[3]

## C. Disputes of material fact exist about whether Lundberg made a report of discrimination on the basis of sex.

Lundberg reported Walton's discrimination against her to Walton and McCoy. (Lundberg decl. at ¶¶ 20-21, 25-26). Lundberg told McCoy she was Bisexual when reporting her belief that Walton used her sexuality against her when talking with the background investigators. (*Id.* at ¶ 25). After Lundberg received the results of her FOIA requests from Bedford and Lynchburg, where she learned that Walton had discussed her sex with the background investigators, and after she reported the discrimination to Walton and DRT, Lundberg resigned from her Captain position. (*Id.* at ¶ 28). Lundberg testified that Walton and McCoy's negative statements and inaction to remedy the discrimination led her to resign as Captain to physically distance herself from Walton. (Lundberg dep. at 74:11-16, 75:17-23, 76:21-23, 79:4-8).

Defendants dispute these facts.    They dispute whether Lundberg made a report of

---

[3] The statements in the declaration are dubious and subject to impeachment. The psychological test results relied upon as the basis for not hiring were anomalous based on the test being interrupted during the test and resumed after a significant delay and remotely, a fact that Lundberg reported at the time of the testing. (*Id.* at ¶ 19, Ex. C).

discrimination constituting protected activity. (*See* Mot. Summ. J. at p. 17).[4]

**D. There are disputes of material fact whether Lundberg qualified for FMLA**

McCoy admitted that she did not even consider FMLA notices for Lundberg, but she would have given them if she could do it over. (McCoy dep. at 52:24-53:25). And, DRT's own testimony is that Lundberg's employment ended shortly thereafter on October 4, 2021. (*Id.* at 21:21). DRT disputes that Lundberg's depression and anxiety did not make her unable to perform the functions of her position. (Mot. Summ. J. at p. 20-21). Lundberg preferred to continue working at DRT and, if she had known what her rights and responsibilities were, she would have worked with her therapist to move forward working for DRT. (Lundberg decl. at ¶¶ 34-35).

**E. There are disputes of material fact whether Lundberg was terminated.**

Lundberg asserts as a fact that DRT terminated her based on the following details. On September 29, 2022, Lundberg requested a leave of absence to allow her to seek therapy and mentally recover from what had occurred with Walton. (2nd Am. Compl. at ¶ 67), (Answer at ¶ 67). Lundberg expressly stated that she wished to remain employed by DRT and planned to return to work when she was able. (*Id.*). Nonetheless, on October 4, 2022, DRT HR emailed Lundberg and

---

[4] DRT's factual assertion that no report of discrimination was made is not credible. Neither Walton nor McCoy remember details now, though they remember having conversations with or about Lundberg. (*See, e.g.* Walton dep. at 144:1-145:14, 149:5-150:25, McCoy dep. at 25:1-17, 34:2-4, 47:8-14). McCoy does not remember if Lundberg's report included sexual orientation. (McCoy dep. at 25:1-3). She testified that she reported what Lundberg said to Walton, but she does not remember specifics except that it took place in his office. (*Id.* at 34:21-35:18). But she then did not complete a full investigation, interview others, take notes, or write a report, notwithstanding the preparing of a report is her standard practice. (*Id.* at 19:19-20:1, 21:13-15, 37:2-12). This is consistent with the low attention that DRT paid to sexual discrimination issues. McCoy testified that the only training DRT gives about sexual orientation discrimination is when a new employee starts at DRT, when McCoy reads the 1-paragraph antidiscrimination policy from the handbook. (*Id.* at 32:2-25). Walton has never had this training or any other regarding workplace civil rights, which to his belief was only added to DRT's orientation training within the last year. (Walton dep. at 36:6-19). McCoy testified that she believes everyone operates from the same working definition of Bisexual, so she does not define it in training. (McCoy dep. at 32:23-25, 33:19-22).

requested its property (uniforms, etc.) back from Lundberg. (2nd Am. Compl. at ¶ 79), (Answer at ¶ 79). This is consistent with DRT's "Termination of Employment" policy, which states that "[a]ll DRT issued equipment and uniforms must be returned prior to the employee's last paycheck being issued." DRT Handbook, effective October 2020 (attached hereto as Ex. 8), at Lundberg-0013. McCoy testified that Lundberg's employment ended October 3, 2022. (McCoy dep., attached hereto as Ex. 2, at 21:19-20). And, on October 24, 2022, Lundberg's Principal 401k plan wrote a letter informing her that as a "former" employee of DRT, she could no longer keep her account. (Lundberg decl. at ¶¶ 36-37). Because of the notification that she was a "former" employee, because DRT had taken her uniforms and other equipment, and because DRT had not scheduled her, Lundberg understood and testified to her belief that DRT discharged her. (Lundberg dep. at 157:3-10). DRT disputes that Lundberg was terminated. (Mot. Summ. J. at p. 17).

### IV.    DEFENDANTS ARE NOT ENTITLED TO SUMMARY JUDGMENT AS A MATTER OF LAW

### A.  A reasonable jury could conclude Walton's actions constituted discrimination on the basis of sex in violation of Title VII and the VHRA.[5]

Title VII of the Civil Rights Act of 1964 protects employees from discrimination because of their "race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2. A violation of Title VII occurs when Plaintiff: (i) was discharged or otherwise discriminated against with respect to her compensation, terms, conditions, or privileges of employment, and (2) the employer discriminated "because of... sex." 42 U.S.C. § 2000e- 2(a)(1).

> It doesn't matter if other factors besides the plaintiff's sex contributed to the decision. And it doesn't matter if the employer treated women as a group the same when compared to men as a group. If the employer intentionally relies in part on an individual employee's sex when deciding to discharge the employee – put differently, if changing the employee's sex would have yielded a different choice for the employer – a statutory violation has occurred. Title VII's message is 'simple but momentous':

---

[5] Courts have analyzed VHRA and Title VII claims together and have applied the same standards to both. *See, e.g. Romano v. Verasign, Inc.,* 2023 WL 1797890, Civil Action No. 1:22-cv-00549 (E.D. Va. Feb. 7, 2023) (Considering the claims as identical on the merits for purposes of summary judgment to Title VII claim).

An individual employee's sex is 'not relevant to the selection, evaluation, or compensation of employees.'

*Bostock v. Clayton Cty., Ga.*, 140 S. Ct. 1731, 1741 (2020) (internal citation omitted). "Because of sex" also includes traits that are a function of sex, including non-conformity with gender norms and sexual orientation. *See id.* ("[I]t is impossible to discriminate against a person for being homosexual or transgender without discriminating against that individual based on sex."), *Price Waterhouse v. Hopkins*, 490 U.S. 228, 250-251 (1988)).

> Applying Title VII to traits that are a function of sex is consistent with the Supreme Court's view that Title VII covers not just "the principal evil[s] Congress was concerned with when it enacted" the statute in 1964, but also "reasonably comparable evils" that meet the statutory requirements. *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 79, 118 S. Ct. 998, 140 L. Ed. 2d 201 (1998).

*Zarda v. Altitude Express, Inc.*, 883 F.3d 100, 112 (2d Cir. 2018). The "rankest sort of discrimination could be worked against employees by using traits that are associated with sex as a proxy for sex… sexual orientation discrimination is predicated on assumptions about how persons of a certain sex can or should be, which is an impermissible basis for adverse employment actions." *Id.* (internal quotations omitted).

1. *A reasonable jury could find Walton's actions were "because of sex" under a direct evidence analysis.*

"To establish intentional discrimination, a plaintiff must show 'that the defendant had a discriminatory intent or motive for taking a job-related action.'" *Alberti v. Rector & Visitors of the Univ. of Va.*, 65 F.4th 151, 155 (4th Cir. 2023) (quoting *Ricci v. DeStefano*, 557 U.S. 557, 577 (2009) (internal quotation marks omitted)). "Derogatory comments can constitute direct evidence of discrimination if they are '(1) related to the protected class of persons of which the plaintiff is a member; (2) proximate in time to the complained-of adverse employment decision; (3) made by an individual with authority over the employment decision at issue; and (4) related to the employment decision at issue.'" *Id.* (quoting *Bandy v. City of Salem*, 59 F.4th 705, 711 (4th Cir. 2023)).

Lundberg meets all prongs of the direct evidence test. It is undisputed that Lundberg is a Bisexual female. The adverse employment actions complained of, the unfounded negative job references, are related to Lundberg's protected statuses because they constituted slut-shaming, judged Lundberg's choice of sex partners, spread vicious, untrue, rumors of her private sex life, and used her gender non-conformity against her. The negative job references and derogatory comments are one in the same for purposes of temporal proximity. The derogatory comments at issue here were made by the individual who made the unfounded negative job reference, and the derogatory comments are contained in the documents that constitute the adverse employment actions.

Defendants factually assert that Walton's comments are unrelated to Lundberg's sexuality and Walton did not even know she was bisexual. First, that is a material dispute of fact as discussed above. Taking the facts in the light most favorable to Lundberg, a reasonable jury could find that she told Walton she is Bisexual, which he equated with being a swinger, and he then spread rumors stated as fact about her sex life that he says he had known for years. Additionally, he engaged in sex stereotyping by using Lundberg's gender non-conformity against her regarding her appearance, in calling her "emotional," and in and indicating that "the guys will be the guys" in describing why Lundberg's "lifestyle" would not fit in. "The presence of stereotyping may support the inference that an adverse action was due to a protected characteristic." *See Price Waterhouse*, 490 U.S. at 251 (plurality opinion) (holding that "stereotyped remarks can certainly be evidence that gender played a part" in an adverse action" (emphasis omitted)).

Second, a reasonable jury could conclude that Walton's statements constituted Title VII discrimination on the basis of Lundberg's sex. The Fourth Circuit has recognized that spreading a rumor about a female employee's alleged promiscuity can form the basis of a Title VII sex discrimination claim. In *Parker v. Reema Consulting Servs.*, 915 F.3d 297 (4th Cir. 2019), the court confirmed that a false rumor a female employee slept with her male boss to obtain a promotion could

give rise to employer liability under Title VII for discrimination "because of sex." *Id.* The court concluded that the allegations, where the employer participated in the circulation of the rumor and acted on it by sanctioning the employee, did implicate such liability. The court reversed the district court's order dismissing the hostile work environment claim based on sex and the retaliation claim for complaining about the workplace condition. *Id.*

The Court in *Parker* rejected Defendant's argument that the employer's actions were taken against the Plaintiff solely because of her alleged sexual conduct, not because of her gender. *Id.* at 302-03. Defendant argued that because the rumor "could have been levelled against a man, it is insufficient to support a claim of discrimination based on sex." *Id.* The Court explained that because "'traditional negative stereotypes regarding the relationship between the advancement of women in the workplace and their sexual behavior stubbornly persist in our society,' and 'these stereotypes may cause superiors and coworkers to treat women in the workplace differently from men,'" Plaintiff could proceed on her claim that she suffered harassment because she was a woman in violation of Title VII. *Id.* at 303 (quoting *Spain v. Gallegos*, 26 F.3d 439, 448 (3d Cir. 1994) (concluding that a rumor that a woman gained influence over the head of the office because she was engaged in a sexual relationship with him was sufficient to allow a reasonable jury to conclude the woman suffered the harassment alleged because she was a woman). The Court found that Parker

> invokes a deeply rooted perception — one that unfortunately still persists — that generally women, not men, use sex to achieve success. And with this double standard, women, but not men, are susceptible to being labelled as "sluts" or worse, prostitutes selling their bodies for gain. *See McDonnell v. Cisneros*, 84 F.3d 256, 259-60 (7th Cir. 1996) (concluding that rumors of a woman's "sleeping her way to the top" "could constitute a form of sexual harassment"); *Spain* [], 26 F.3d [at] 448 [] (concluding that a rumor that a woman gained influence over the head of the office because she was engaged in a sexual relationship with him was sufficient to allow a reasonable jury to conclude the a woman suffered the harassment alleged because she was a woman); *see also Price Waterhouse* [], 490 U.S. [at] 250-51, 258, 272-73, [] (plurality and concurring opinions) (noting that gender stereotypes can give rise to sex discrimination in violation of Title VII).

*Parker*, 915 F.3d at 303.

This case offers a clear corollary to *Parker*. If it is a violation of Title VII to discriminate against a woman for her alleged promiscuity to further her career, so too must if violate Title VII to spread rumors that a woman's alleged promiscuity, sexuality, or gender nonconformity makes her less suited for advancement in the workplace. An "employer who intentionally treats a person worse because of sex—such as by firing the person for actions or attributes it would tolerate in an individual of another sex—discriminates against that person in violation of Title VII." *Bostock*, 590 U.S. at 657. An employer who takes an adverse employment action against employee based on her sex "necessarily intentionally discriminates against that individual in part because of sex." *Id.* at 646. "If changing the employee's sex would have yielded a different choice by the employer—a statutory violation has occurred. Title VII's message is 'simple but momentous': An individual employee's sex is 'not relevant to the selection, *evaluation*, or compensation of employees.'" *Id.* at 559-60. (quoting *Price Waterhouse* 490 U. S. at 239 (plurality opinion)) (emphasis added).

Walton conceded he had not discussed any other employee's rumored sex life in a background investigation. Walton also conceded that he could not ever remember calling a male "emotional" in a background investigation previously. He also brought up Lundberg's appearance, stating that her "hair may be of different colors," though it is unclear why he would bring that up except to highlight the ways in which she was different from his "normal," which he stated was heterosexual. A reasonable jury could find that Walton's derogatory comments were related to Lundberg's protected classes.

2. *A reasonable jury could find Walton's actions were "because of sex" under a circumstantial evidence analysis.*

In the alternative, Lundberg may establish discrimination under the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) by demonstrating (1) she is a member in a protected class, (2) she was discharged from employment, (3) she otherwise fulfilled legitimate employment expectations at the time of his discharge and (4) the action was under

14

circumstances that raise a reasonable inference of unlawful discrimination. A reasonable jury could find Lundberg was constructively demoted when her workplace became intolerable after she learned Walton, her boss, spread rumors about her sex life in connection with her being evaluated for advancement. A reasonable jury could find Walton's statements were made under circumstances that raise a reasonable inference of unlawful discrimination, because, among other reasons, Walton's rumormongering did not happen to anyone else. The other elements are not in dispute.

3. *A reasonable jury could find Walton's negative evaluation of Lundberg's employment constituted an adverse employment action.*

Lundberg's receiving an unjustified negative employment reference establishes an adverse employment action:

> [N]egative letters of recommendation can establish adverse employment action for purposes of Title VII to the extent they have a significant detrimental effect on the plaintiff's employment. *See Sancho v. Anderson Sch. Dist. Four*, No. 8:15-cv-1353-HMH-KFM, 2016 U.S. Dist. LEXIS 101542, 2016 WL 4123910, at *4 (D.S.C. Aug. 3, 2016), *aff'd*, 676 F. App'x 204 (4th Cir. 2017); *see also Hall v. Charlotte Mecklenburg Sch.*, No. 3:13-cv-259-GCM, 2014 U.S. Dist. LEXIS 78801, 2014 WL 2586889, at *10 (W.D.N.C. June 10, 2014) (finding that an "an unjustified negative job reference" may constitute adverse employment action in a retaliation context); *Hillig v. Rumsfeld*, 381 F.3d 1028, 1035 (10th Cir. 2004) (explaining that a negative reference can constitute adverse employment action when it causes more than *de minimis* harm to the plaintiff's future employment prospects).

*Wandji v. Wilkie,* No. 2:18-cv-03036, 2020 U.S. Dist. LEXIS 232035, at *50-51 (D.S.C. Nov. 9, 2020); *see also Coles v. Deltaville Boatyard, LLC*, No. 3:10cv491, 2011 U.S. Dist. LEXIS 14304, at *20-21 n.5 (E.D. Va. Feb. 14, 2011) (collecting cases). Where "an act by an employer that does more than *de minimis* harm to a plaintiff's future employment prospects can, when fully considering the unique factors relevant to the situation at hand, be regarded as an adverse employment action, even where plaintiff does not show the act precluded a particular employment prospect." *Hillig*, 381 F.3d at 1033 (internal quotations and citations omitted).

Walton did more than *de minimus* harm to Lundberg's future employment prospects by spreading rumors about her sex life, "open swinger lifestyle," and other commentary to two

prospective employers. Lundberg does not have to show that Walton's words precluded any specific prospect. Given that Walton is well-known in the region, particularly among the fire/EMS community, a reasonable jury could find that Walton's dissemination of rumors that Lundberg's sexual promiscuity negatively impacted, or could impact, her ability to fit in and be respected if hired rose above a *de minimus* harm of future prospects.

    4.  *A reasonable jury could find DRT is vicariously liable for Walton's actions.*

      Employers are responsible "for acts of the 'actual decisionmaker' behind an adverse employment action, meaning the individual who 'was the one 'principally responsible' for . . . the action.'" *Bandy v. City of Salem*, 59 F.4th 705, 710 (4th Cir. 2023) (internal citations omitted). The facts that Lundberg asserts, if proved, will give the jury a reasonable basis to find that Walton is principally responsible.

## B.  A reasonable jury could find that Lundberg suffered discriminatory and retaliatory constructive demotion and discharge.

      To survive summary judgment on a Title VII retaliation claim in the Fourth Circuit, Lundberg must establish: (1) that she engaged in a protected activity, (2) that her employer took an adverse employment action against her, and (3) that there was a causal link between the two events. *Salmons v. Commer. Driver Servs.*, No. 7:19cv532, 2019 U.S. Dist. LEXIS 215823, at *15 (W.D. Va. Dec. 13, 2019) (citing *EEOC v. Navy Fed. Credit Union*, 424 F.3d 397, 405-06 (4th Cir. 2005); *Brown v. Va. DOT*, No. 7:07-CV-00282, 2008 U.S. Dist. LEXIS 41152, 2008 WL 2156326, at *4 (W.D. Va. May 22, 2008))

      First, Lundberg engaged in a protected activity by complaining of sex discrimination to Walton and DRT after she received FOIA responses. Protected activity "encompasses utilizing informal grievance procedures as well as staging informal protests and voicing one's opinions in order to bring attention to an employer's discriminatory activities." *Kennedy v. Va. Polytechnic Inst. & State Univ.*, 781 F. Supp. 2d 297, 303 (W.D. Va. 2011) (quoting *Laughlin v. Metro. Wash. Airports*

*Auth.*, 149 F.3d 253, 259 (4th Cir. 1998)). Defendants dispute whether Lundberg engaged in protected activity, as described above. However, it is undisputed that Lundberg spoke with Walton and McCoy after she learned Walton called her a "swinger" when giving two professional references. Lundberg reasonably believed this to be sexual orientation discrimination based on Walton's prior connection of the terms "bisexual" and "swinger." And, while neither Walton nor McCoy remember what Lundberg complained of, Lundberg recalls that she was clear about what she reported. This dispute of material fact about the first element of the Title VII retaliation claim precludes summary judgment.

Second, a reasonable jury could conclude Lundberg suffered an adverse employment action of constructive demotion, which this Court has held constitutes constructive discharge. *Salmons*, 2019 U.S. Dist. LEXIS 215823, at *15 (noting that the same standards apply to a constructive demotion claim as a constructive discharge claim):

> A constructive discharge occurs when 'an employer deliberately makes an employee's working conditions intolerable and thereby forces [her] to quit.'" *Bristow v. Daily Press, Inc.*, 770 F.2d 1251, 1255 (4th Cir. 1985) (citing *Holsey v. Armour & Co.*, 743 F.2d 199, 209 (4th Cir.1984)). "A plaintiff claiming constructive discharge must therefore 'prove two elements: deliberateness of the employer's action, and intolerability of the working conditions.'" *Marmon v. R. A. Lilly & Sons, Inc.*, No. 7:13-CV-00074, 2015 U.S. Dist. LEXIS 89736, 2015 WL 4231303, at *8 (W.D. Va. July 10, 2015) (quoting *Bristow*, 770 F.2d at 1255).

*Salmons*, No. 7:19cv532, 2019 U.S. Dist. LEXIS 215823, at *14. *See Cisneros,* 84 F.3d at 259 ("[U]nfounded accusations that a woman worker is a 'whore,' a siren, carrying on with her coworkers, a Circe, 'sleeping her way to the top,' and so forth are capable of making the workplace unbearable for the woman verbally so harassed.").

A reasonable jury could find DRT's and Walton's actions were deliberate. "Deliberateness" requires "'proof of the employee's specific intent to force an employee to leave," either through direct evidence or circumstantial evidence, which may include 'a failure to act in the face of known intolerable conditions.'" *Id.* (quoting *Bristow*, 770 F.2d at 1255). After Lundberg complained of discrimination to Walton and to DRT's HR, Defendants completely failed to act and remedy the

situation. Instead, Walton made flippant comments to Lundberg such as: "Why would you want to work somewhere that would not hire you for that?" and words to the effect of "If I knew what would happen, I would not have said it." McCoy admitted she did not investigate and later told Lundberg that McCoy believed that Lundberg had been mistreated.

Considering the totality of the circumstances, Lundberg's working conditions became intolerable once she learned of Walton's statements, reported them, and Defendants took no action. Lundberg learned that her boss, whom she trusted, rumormongered after she recently disclosed her Bisexuality to him. Then, she found herself up against a brick wall when she reported the discrimination she suffered and received what amounted to apathy (and now a complete lack of memory). Lundberg could not apply for other positions because of what she now knew would be said about her, though she had always wanted to use her experience at DRT to become a firefighter and advance her career. That Walton spread rumors behind Lundberg's back slut-shaming her and discussing her physical presentation as different is more than "dissatisfaction with work assignments, a feeling of being unfairly criticized, or difficult or unpleasant working conditions" and "a pattern of discipline." Rather, a reasonable person whose protected status was weaponized against them despite their hard work and earned promotion would feel compelled to step down, particularly given DRT's haphazard handling of her good faith complaints.

After Lundberg stepped down from being a Captain, she was largely ignored by Defendants. After she reached out regarding an issue with an account, Walton and McCoy exchanged emails indicating their desire that Lundberg "go fly a kite." After she contracted COVID, they did not even acknowledge it. And, after she filed her EEOC Charge and reported suffering depression and anxiety and asked for leave, DRT asked for her uniforms back and ended her employment. Furthermore, Lundberg's protected activities each occurred directly following her reports of discrimination, both to Walton and McCoy and then to the EEOC and by email.

Defendants deny they took any adverse actions against Lundberg. They place all responsibility for Lundberg's resignation as Captain and later termination solely on Lundberg. Accordingly, they do not offer a nondiscriminatory reason for its adverse employment actions. To the extent pretext is necessary, Defendants' position is unworthy of credence. "Skepticism of the reason given permits the trier of fact ultimately to infer intentional discrimination." *Basham v. Select Specialty Hosp.*, Civil Action No. 2:15-15432, 2017 U.S. Dist. LEXIS 83673, at *27 (S.D. W. Va. June 1, 2017) (citing *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 134 (2000). Throughout their depositions, Defendants engaged in a cover-up by failing to remember most relevant points about this case. They do not deny the conversations Lundberg remembers occurred. Rather, they take a "head in the sand" approach. The credibility determinations necessary to resolve this dispute should be submitted to the jury, which as the trier of fact is entitled to discount Walton's and McCoy's credibility[6] regarding their inability to recall key information in the face of positive testimony of Lundberg. Furthermore, Defendants' deviation from their own standard procedures, prior good employment reviews and Lundberg's promotion, among the other evidence described above, taken as a whole demonstrate an inference of pretext.

**C. A reasonable jury could find that Walton's actions constituted tortious interference with Lundberg's business expectancy with Bedford.**

To establish a claim for tortious interference with a business or contract expectancy, a plaintiff is required to show: (1) the existence of a valid contractual relationship or business expectancy; (2) knowledge of the relationship or expectancy on the part of the interferor; (3) intentional interference inducing or causing a breach or termination of the relationship or expectancy; and (4) resultant damage to the party whose relationship or expectancy has been disrupted. *Taylor v. Republic Servs.*, No. 12-cv-00523, 2013 U.S. Dist. LEXIS 11201, at *8-9 (E.D. Va. Jan. 28, 2013)

---

[6] For example, a jury is entitled to discount Walton's credibility on account of his prior felony conviction. *See Wright v. West*, 505 U.S. 277, 296 (1992). (Walton dep. at 38:20-24).

(citing *DurretteBradshaw, P.C. v. MRC Consulting, L.C.*, 277 Va. 140, 670 S.E.2d 704, 706 (Va. 2009). Where, as here, the contract at issue is an at-will employment contract, the plaintiff must also prove that the acts or methods used were "improper." *Storey v. Patient First Corp.*, 207 F.Supp.2d 431, 447 (E.D. Va. 2002) (citing *Maximus v. Lockheed Info. Management Sys. Co., Inc.*, 254 Va. 408, 493 S.E.2d 375 (1997)).

A reasonable jury could find Walton and DRT tortiously interfered with Lundberg's business expectancy when Bedford County withdrew its conditional offer of employment. First, Bedford's offer of employment created a business expectancy with Lundberg. *See Stultz v. Virginia,* 203 F. Supp. 3d 711, 726, 745-76 (W.D. Va. 2016) (conditional offer of employment from Bedford County Sheriff's Office pending a background investigation formed the business expectancy prong in tortious interference claim). Second, Walton knew of the business expectancy because Lundberg told him. Third, a reasonable jury could find Walton intentionally induced the termination of the expectancy. Walton knows the decision-makers in the region and had previously never spoken about a subordinate's sex in a background investigation. This was the second time he made the same statements about Lundberg to an investigator in a very close period of time after Lundberg shared her sexuality with Walton. And, as explained above, it is a dispute of material fact whether Bedford's statements are reasonable given that Lundberg's psychological evaluation was conducted under irregular conditions as she reported to them. Bedford did not acknowledge the disconnect. "Questions of intent are hard to decide on summary judgment. They are almost always inferential, and best left to the trier of fact who can observe the witnesses and determine whether explanations hold water." *Ferrell v. Harris Ventures, Inc.*, 812 F. Supp. 2d 741, 748 (E.D. Va. 2011).

Lundberg's loss of employment at Bedford caused her harm. She hoped the position would advance her career goal to become a firefighter and give her stable employment with Commonwealth of Virginia benefits. Furthermore, as a result of this loss, Lundberg filed FOIA requests and learned

the rumors her boss spread about her to regional county agencies. This caused her to suffer depression and anxiety.

Finally, Walton used improper methods when he made false statements about Lundberg in the employment context, because they constituted "misrepresentation or deceit." *See Stultz*, 203 F. Supp. 3d at 746 (quoting *Duggin v. Adams*, 234 Va. 221, 226-228, 360 S.E.2d 832, 836 (Va. 1987)) ("If a jury finds that [Defendant] shared allegations with Bedford County that []he knew were false, the jury may also find that []he used improper methods to interfere with [Plaintiff's] efforts to obtain the job for which he applied").

### D.  A reasonable jury could find that DRT interfered with Lundberg's FMLA rights.

To establish a claim of interference under the Family and Medical Leave Act (FMLA) in the 4th Circuit, an employee must demonstrate: (1) they are entitled to an FMLA benefit; (2) their employer interfered with the provision of that benefit; and (3) that interference caused harm. *Shipton v. Balt. Gas & Electric Co.*, 109 F.4th 701, 705-06 (4th Cir. 2024) (citing *Adkins v. CSX Transp., Inc.*, 70 F.4th 785, 796 (4th Cir. 2023)). FMLA interference claims are considered "prescriptive," meaning that the intent of the employer is irrelevant. *Id.* at 706 (citing *Sharif v. United Airlines, Inc.*, 841 F.3d 199, 203 (4th Cir. 2016)).

Lundberg was entitled to FMLA notices. DRT does not dispute the logistical requirements that an employer employs 50 or more employees within a 75-mile radius or that the employee 1,250 hours in the preceding 12 months.[7] Additionally, Lundberg informed DRT that she was suffering depression and anxiety as a result of Walton's actions, and she requested leave. Lundberg did not need to mention the FMLA for the leave to be FMLA-qualifying. *Hannah P. v. Coats*, 916 F.3d 327, 345-46 (4th Cir. 2019) (reversing District Court's grant of summary judgment on

---

[7] McCoy testified Lundberg worked 1,089.58 regular hours and 486.08 hours during that time period and conceded Lundberg had worked sufficient hours. (McCoy dep. at 53:21-54:7).

FMLA interference claim where Plaintiff's disclosure of her depression and request for leave was sufficient to trigger employer's responsibility to inquire further about whether Plaintiff was seeking FMLA leave). And once the employer is on notice of the employee's need to take potentially FMLA-qualifying leave, "the responsibility falls on the employer to inquire further about whether the employee is seeking FMLA leave." *Id.* at 345-46.

DRT's obligation upon learning there was a potentially FMLA-qualifying reason for Lundberg's leave was to offer her an FMLA Notice of Eligibility, Rights and Responsibilities Notice, and a Designation Notice ("FMLA Notices"). *Id.* They did not do so.[8] Those notices would have informed Lundberg what would be required and expected of her if she proceeded with her request. Then DRT could approve her, or not, based on what they learned from Lundberg.

Employers will be found to interfere with the leave if they fail to provide either the "rights and responsibilities notice" required under 29 CFR § 825.300(c) **or** the "designation notice" under § 825.300(d). *Vannoy v. FRB of Richmond*, 827 F.3d 296, 301-03 (4th Cir. 2016) (remanding summary judgment ruling in defendant's favor because there was a dispute over whether the notice requirement clarified that employee's job was protected). The duty is on the employer to "elicit the details required under the FMLA." *Krenzke v. Alexandria Motor Cars, Inc.*, 289 F. App'x 629, 632 (4th Cir. 2008) (*citing Miller v. AT&T Corp.*, 250 F.3d 820, 835 (4th Cir. 2001).

> The purpose of the employer notice requirements "is to ensure that employers allow their employees to make informed decisions about leave." *Conoshenti v. Pub. Serv. Elec. and Gas Co.*, 364 F.3d 135, 144 (3d Cir. 2004). That purpose is thwarted when "the employee has not received the statutory benefit of taking necessary leave with the reassurance that h[is] employment, under proscribed conditions, will be waiting for h[im] when []he is able to return to work." *Id.* Thus, "[a]ny violations of the Act or of these regulations constitute interfering with" the exercise of an employee's rights. 29 C.F.R. § 825.220(b).

---

[8] McCoy testified that she believed Lundberg should have received FMLA notices. (McCoy dep. at 54:11-13).

*Vannoy*, 827 F.3d at 301. Defendants admit they failed to elicit information on Lundberg's condition and similarly failed to provide the requisite notices when Lundberg requested leave in September, 2022. But disputes of material fact exist whether DRT's failure caused prejudice, as discussed above. Prejudice may be gleaned from evidence that had the plaintiff received the required (but omitted) information regarding his FMLA rights, he would have structured his leave differently. *Id.* at 302. Lundberg's declaration makes clear that she wanted to continue working for DRT to keep in on her resume and would have returned but for being terminated. Having to take on two part time jobs to continue being continuously employed was stressful for Lundberg during an already hard time, which adds to the prejudice. Accordingly, Defendants' failure to provide Lundberg with FMLA notices constitutes interference with her rights under the FMLA as a matter of law.

### V. CONCLUSION

The disputes of material fact are significant in this case, and a reasonable jury could find that Walton's actions violated Title VII, VHRA, FMLA, and constituted Tortious Interference with a Business Expectancy. The Court should deny Defendants' motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure.

Dated:  January 9, 2025                    Respectfully submitted,

                                                    */s/*
                                     Sarah Robb, Esq. (VSB No. 76734)
                                     Sarah Robb Law
                                     919 East Main Street, Suite 1000
                                     Richmond, Virginia 23219
                                     Telephone: (804) 482-1536
                                     Facsimile: (804) 988-5464
                                     sarah@sarahrobblaw.com
                                     *Attorney for Plaintiff Natalie Lundberg*

## <u>CERTIFICATE OF SERVICE</u>

      I hereby certify that on the 9th day of January, 2025, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the following:

Melissa Y. York (VSB No. 77493)
Harman, Claytor, Corrigan & Wellman
P.O. Box 70280
Richmond, Virginia 23255
804-747-5200 - Phone
804-747-6085 - Fax
myork@hccw.com

                                        */s/*
                                     Sarah Flynn Robb, Esq. (VSB No. 76734)
                                     Sarah Robb Law
                                     919 East Main Street, Suite 1000
                                     Richmond, Virginia 23227
                                     Telephone: (804) 482-1536
                                     Facsimile: (804) 988-5464
                                     sarah@sarahrobblaw.com
                                     *Attorney for Plaintiff Natalie Lundberg*