CLERKS OFFICE U.S. DIST. COURT
AT CHARLOTTESVILLE, VA
FILED
January 31, 2025
LAURA A. AUSTIN, CLERK
BY: s/ D. AUDIA
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
CHARLOTTESVILLE DIVISION

| | | |
|---|---|---|
| Natalie Lundberg, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 3:23-cv-00042 |
| | ) | |
| Delta Response Team, LLC | ) | |
| | ) | |
| and | ) | |
| | ) | |
| Thomas Walton, | ) | |
| | ) | |
| Defendants. | ) | |

## **MEMORANDUM OPINION**

Plaintiff Natalie Lundberg, who identifies as bisexual, previously worked as an Emergency Medical Technician ("EMT") for Delta Response Team, LLC ("DRT"). Lundberg alleges that she was not selected for positions with two municipal fire departments after DRT Vice President Tom Walton told the prospective employers she was a "swinger." Lundberg submitted complaints about Walton's comments, later moved to part-time status with DRT, and eventually stopped picking up shifts. When the company inquired about her status, Lundberg complained about unfair treatment by DRT, said she was experiencing anxiety and depression because of that treatment, and requested time off. DRT agreed to that request but later removed her as an affiliated employee.

Lundberg then brought this action against DRT and Walton. She alleges sex discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964 and

the Virginia Human Rights Act ("VHRA"), interference with her rights under the Family and Medical Leave Act ("FMLA"), and tortious interference with a business expectancy. This matter is before the court on Defendants' motion for summary judgment (Dkt. 52). For the reasons outlined below, Defendants' motion will be granted.

## I.    Background

### A. Factual History

The following material facts are taken from the summary judgment record and, unless otherwise stated, are undisputed.

DRT is a company that provides personnel to staff ambulances in counties and cities around central and southern Virginia. (Pl.'s Ex. 1, Dep. of Thomas Walton, Nov. 14, 2024, at 9:11–10:25 (Dkt. 57-1) [hereinafter "Walton Dep."].) Walton is DRT's Vice President. (*Id.* at 4:19–22.) Lundberg began working as an EMT for DRT in August 2017. (Pl.'s Ex. 3, Dep. of Natalie Lundberg, Nov. 13, 2024, at 129:21–25 (Dkt. 57-3) [hereinafter "Lundberg Dep."].) She initially worked at a station in Appomattox County, later moved to one in Buckingham County, and, in 2021, moved again to work at a Fluvanna County station. (*Id.* at 25:21–27:4.) In August 2021, Lundberg proposed creating the position of captain for the Fluvanna station. (Defs.' Ex. 3 (Dkt. 53-3).) Walton agreed with her proposal and named her captain of the station that month. (Defs.' Ex. 4 (Dkt. 53-4).)

Lundberg has identified as bisexual since a young age. (Lundberg Dep. at 7:16–23.) She is open about her sexual orientation with people she believes she can trust. (*Id.* at 8:19–21, 9:7–9.) She began dating her now-husband in 2009 and married him approximately two years ago. (*Id.* at 6:21–7:1, 8:6–12.)

Lundberg states that she told Walton about her bisexuality during a conversation about their families.  (*Id.* at 45:8–20; Pl.'s Ex. 5, Decl. of Natalie Lundberg ¶ 9 (Dkt. 57-5) [hereinafter "Lundberg Decl."].)  According to Lundberg, Walton replied: "oh, so you're a swinger."  (Lundberg Dep. at 45:25–46:2.)  Lundberg understands the word "swingers" to refer to people who "have group sex with each other and in other places"; she does not consider herself to be one.  (*Id.* at 46:4–9.)  Lundberg says she told Walton that she is not a swinger and is "just bisexual."  (*Id.* at 46:3.)  She believes this conversation with Lundberg occurred on October 20, 2021.  (Lundberg Decl. ¶ 8.)

Walton, by contrast, states that he does not recall having such a conversation with Lundberg and says he was unaware of Lundberg's bisexual identity during the time she worked at DRT.  (*Id.* at 63:8–9, 77:7–19, 144:18–145:14.)  He recalls hearing rumors that Lundberg and her now-husband had an "open relationship" and attended "swinger parties" that involved "heterosexual partner swapping stuff."  (*Id.* at 77:7–78:23.)  But Walton admits he never heard Lundberg herself talk about being a "swinger" or attending "swinger parties."  (*Id.* at 78:6–13, 108:4–5, 113:10–21, 118:1–4.)

Lundberg applied to two positions with municipal fire departments in late 2021 and early 2022.  In November 2021, she applied to work as a firefighter for the City of Lynchburg Fire Department ("City of Lynchburg").  (*See* Defs.' Ex. 11, Decl. of Jonathan Wright ¶ 4 (Dkt. 53-11) [hereinafter "Wright Decl."]; Lundberg Dep. at 99:15–22.)  She interviewed for the position and a review board recommended her for employment.  (*See* Pl.'s Ex. 6, Decl. of Randy Campbell, Ex. A at 6 (Dkt. 57-6) [hereinafter "Campbell Decl."].)  The City of Lynchburg conducted a background investigation, which included interviews

with Walton and several other professional references.  (Lundberg Dep. at 99:23–100:18,
102:23–103:18;  *see* Campbell Decl. ¶ 10.)    Following the background check, the City of
Lynchburg informed Lundberg that she had not been selected for the position.  (Lundberg
Dep. at 102:1–6.)  It informed her only that "now wasn't the right time" to hire her.  (*Id.* at
104:10–11.)

Lundberg next applied for a position with Bedford County Fire and Rescue
("Bedford County").  (*Id.* at 125:12–16.)  On February 16, 2022, she received and accepted a
conditional offer of employment, which was contingent on a background investigation and
physical and psychological examinations.  (*See id.* at 125:17–23; Lundberg Decl., Ex. C at 79.)
Bedford County's background investigator spoke to Lundberg, Walton, and a couple
personal references.  (Decl. of T.R. Langhorne, Ex. A (Dkt. 57-7) [hereinafter "Langhorne
Decl."].)  On March 7, 2022, Bedford County informed Lundberg that it was rescinding her
conditional offer of employment "[b]ased on the information obtained during the pre-
employment process."  (Lundberg Decl., Ex. C at 83.)

Lundberg submitted Freedom of Information Act ("FOIA") requests to the City of
Lynchburg and Bedford County to find out the reasons she had not been hired.  (*See*
Lundberg Dep. at 105:17–25, 128:18–129:8, 133:9–15.)  In response, she received redacted
copies of the background investigation reports prepared for the City of Lynchburg and
Bedford County.  (*See id.* at 106:5–11, 128:18–129:8.)  The reports included notes from the
investigators' interviews with Walton and other references.

The investigator's notes showed that Walton provided some positive feedback on
Lundberg's job performance.  (*See* Campbell Decl., Ex. A at 11–12.)  For example, Walton

said that Lundberg "does a great job" for the most part and that he had no "complaints or issues professionally." (*Id.*)  He said he believed her to be "trustworthy and honest" and that he "would rehire [Lundberg] if she reapplied to Delta Response Team." (*Id.* at 12.)  But Walton also shared some details about Lundberg's personal life and qualified that he did not believe those impacted her work. (*Id.*)  The investigator attributed the following comments to him:

> Personally, she has a very different view on her private life.  She's pretty open about her private life and the things she's involved in, it's definitely a little strange in my opinion.  I know the world is a different place and everybody is very open nowadays, but her and her fiancé are open swingers and partiers and so forth.  Her lifestyle hasn't impacted her job in any way; she hasn't brought it into work that I'm aware of other than speaking openly about it with others.  We've never had complaints from coworkers about it or anything like that, like she's recruiting, but her and her fiancé [] definitely are some odd ducks.

(*Id.*)

Walton also expressed doubts about Lundberg's ability to "fit in" at the fire department. (*Id.* at 13.)  He remarked: "I know how firemen can be, it can be kind of a rough environment you know?  I mean it's just like law enforcement in a way.  You know, the guys will be the guys and that sort of thing, and so I just don't know about Natalie." (*Id.*)  Walton concluded the interview with a neutral recommendation that he "really [couldn't] recommend her or not recommend her right now." (*Id.*)

The background investigation report provided to the City of Lynchburg also summarized interviews with five other professional references.  Some of those references had positive things to say about Lundberg's prior growth as an EMT and her ability to develop the skills needed to perform as a firefighter.  Troy Nelson, a

former co-worker at a rescue squad, described Lundberg as "easily offended and emotional" but said she had "really grown and matured in the last couple of years" and "might do well" as a firefighter for the City of Lynchburg. (*Id.* at 8.) Nelson did not make a clear recommendation on whether to hire her, but he stated that she "would be a benefit" to the department if she completed the department's training program for "rookie" firefighters and improved her skills "to the [Lynchburg Fire Department] level." (*Id.* at 9.)

The other references gave less favorable reviews. Jodi Shirey, a Lynchburg firefighter and Lundberg's former rescue squad colleague, claimed that Lundberg always had an "excuse" for not performing duties and recommended against hiring her. (*Id.* at 7–8.) Patrick Dukes, a Lynchburg firefighter who had worked with Lundberg at DRT, said he did not know if she had "the will to perform or the ability to perform" and questioned whether "she would do what she needed to be able to do her job." (*Id.* at 9.) In Dukes's opinion, Lundberg's "skillset or knowledge base didn't really seem to advance as her tenure did," and he recommended against hiring her. (*Id.* at 9–10.) Jerome Johnson, another Lynchburg firefighter and former co-worker, said he did not believe Lundberg "would be right for the accelerated program" (the position for which Lundberg had applied) because she had little experience as a firefighter and might "be more of a liability" if placed in the position. (*Id.* at 10–11.) Matt Millner, a captain for the City of Lynchburg Fire Department and Lundberg's past supervisor at DRT, also recommended against hiring her, at least for the accelerated program, because she "need[ed] an opportunity to continue to grow and

- 6 -

develop and mature some more." (*Id.* at 14–15.) Millner, like Walton, also commented on Lundberg's rumored "personal extracurricular activities," which he said involved "multiple sexual partners" and "being openly filmed having sex." (*Id.* at 14.) Millner said he thought that behavior would "be a distraction" and "cause problems" if she were hired. (*Id.*) Based on the information the references provided, the City of Lynchburg's background investigator recommended against hiring Lundberg. (*Id.* at 19.)

Walton later made similar comments about Lundberg's rumored personal life in his interview with Bedford County's background investigator. According to the investigator's report, Walton stated:

> [Lundberg] is very open with a lifestyle of being a swinger. Her hair may be of different colors. No complaints have yet surfaced on the applicant but it could easily be seen that her lifestyle could be a distraction and might not fit in with every group of people. When she responds to calls her work is very good when dealing with the public. It is her personal swinger lifestyle that she is very open that appears to not allow the employees she supervises to respect her. No recommendation either way was given [by Walton].

(Langhorne Decl., Ex. A at 4–5.) The Bedford County investigator's report did not make an ultimate recommendation on whether to hire Lundberg. (*See id.* at 5.)

In March and April 2022, after she received the FOIA documents, Lundberg met with Walton to discuss the comments he had made to the investigators. (Walton Dep. at 149:5–152:19; Lundberg Decl. ¶¶ 20–21.) She also contacted Sheika McCoy, DRT's Human Resources Manager, to report Walton's comments. (Lundberg Decl. ¶ 25; Pl.'s Ex. 2, Dep. of Sheika McCoy, Nov. 25, 2024, at 21:6–22:7, 24:9–25:3 (Dkt. 57-2) [hereinafter "McCoy Dep."].) McCoy states that she recalls Lundberg complaining that Walton had "said

something negative to prevent her from getting a job," but says she does not remember whether Lundberg mentioned her bisexuality during their conversation. (McCoy Dep. at 24:22–25:3, 38:6–14.) Lundberg, by contrast, says she told McCoy she was bisexual and asked her "to please do something about [Walton's] using my sexuality against me." (Lundberg Decl. ¶ 26.)

Lundberg stepped down from her position as Fluvanna station captain in April 2022. (Lundberg Dep. at 74:11–75:23; Defs.' Ex. 17 (Dkt. 53-17).) She told DRT she was leaving the position to attend paramedic school and because she "was no longer able to fulfill the . . . commitment of captain at the present time." (Lundberg Dep. at 74:17–75:19.) Later that month, Lundberg gave the company 14 days' notice that she would be moving from full-time to part-time status and asked for a payout of her accrued PTO hours. (*Id.* at 78:15–79:16.) DRT told her she was not entitled to a PTO payout under company policy because she had not given 28 days' notice. (*Id.* at 82:3–11; Defs.' Ex. 21 (Dkt. 53-21).) Lundberg asked DRT to make an exception to the policy and claimed the company had done the same for other employees. (Defs.' Ex. 21.) DRT eventually agreed to pay her eight hours of PTO per pay period on the condition that she worked at least one shift. (*Id.*)

Around the same time, Lundberg accepted offers to work for other employers. On April 14, 2022, she was hired as a full-time physician substitute at Octapharma Plasma. (Defs.' Ex. 19, Pl.'s Resp. to Defs.' Interrogs. at 3 (Dkt. 53-19).) On May 19, she was also hired as a part-time EMT with Amherst County. (*Id.*; Lundberg Dep. at 16:22–18:4.) And starting in the summer of 2022, she worked approximately one shift per month as an EMT for the Virginia International Raceway. (Lundberg Dep. at 19:22–20:13.)

In June 2022, Lundberg filed a Charge of Discrimination with the U.S. Equal Employment Opportunity Commission ("EEOC"). (*Id.* at 158:11–17; Defs.' Ex. 26 (Dkt. 53-26).) The charge alleged (1) that Walton discriminated against her based on her sex and sexual orientation in his interviews with the City of Lynchburg and Bedford County's background investigators, and (2) that DRT retaliated against her for complaining about the discrimination by making her job "more difficult" in certain ways. (Defs.' Ex. 26 at 1–2.) Lundberg previously had filed a separate complaint with the Virginia Department of Health's Office of Emergency Medical Services ("OEMS") in April 2022. (Lundberg Dep. at 158:18–159:2.) Her OEMS complaint focused on alleged harassment and professional misconduct by a co-worker named Erica Wood. (*See id.*) DRT was informed of the OEMS complaint on August 9, 2022, and OEMS ultimately closed the case for lack of jurisdiction. (*See* Defs.' Ex. 25 (Dkt. 53-25).)

Lundberg did not work any shifts for DRT after June 6, 2022. (Lundberg Dep. at 156:19–157:2.) On September 22, 2022, McCoy emailed Lundberg to ask if she intended to continue working part-time and to remind her of a company policy requiring part-time employees to work at least two shifts per month. (Defs.' Ex. 27 (Dkt. 53-27).) Lundberg responded to McCoy on September 29. (*Id.*) She wrote that she "would like very much to continue [her] part-time work for DRT" but had "been unable to work shifts in recent months due to [a] COVID diagnosis and unfair treatment by DRT." (*Id.*) She explained that DRT's actions had caused her "emotional stress" and "made it difficult for [her] to work." (*Id.*) Lundberg complained that DRT had not expressed concern for her well-being when she contracted COVID in late June 2022 and failed to acknowledge her five-year anniversary

with the company in August 2022 "even though others (who are not bi-sexual) have received

accolades, bonuses, or trips." (*Id.*)  She then wrote:

> I feel very upset and very much cast aside.  I believe I am being retaliated
> against for complaining about discrimination because of my sexual orientation
> or that I am still being discriminated against because of my sexual orientation.
> While I am working with my therapist and hope to be able to input availability
> soon, I am experiencing depression and anxiety because of DRT's actions
> towards me.  I request an accommodation of time off until such time as I feel
> emotionally secure enough to return.

(*Id.*)

McCoy replied to Lundberg on October 4.  (*Id.*)  McCoy did not send Lundberg any

notices under the FMLA but told her that DRT would "accept [her] request for further time

off."  (*Id.*)  But given the amount of time Lundberg had not worked and her "unknown

return date," McCoy explained that DRT felt "it would be best for [her] to return all Delta

Response Team issued uniforms and property until [she felt] fit to return to work and meet

the requirements of 2 shifts each month to maintain employment."  (*Id.*)

Lundberg never returned to work for DRT.  McCoy considers her last date of

employment to be October 4, 2022.  (McCoy Dep. at 21:16–20.)  Lundberg asserts that DRT

discharged her in October 2022, based on a letter she received that month from her 401(k)

plan administrator describing her as a "former" employee of DRT.  (Lundberg Dep. at

157:3–10.)  Several months later, on May 8, 2023, the Virginia Department of Health

notified Lundberg that her agency affiliation with DRT had been removed.  (*Id.* at 157:11–

158:1; Defs.' Ex. 28 (Dkt. 53-28).)  Lundberg states that she would not have been fit to

return to work at DRT until November 2023.  (Pl.'s Resp. to Defs.' Interrogs. at 11–12.)

**B.  Procedural History**

Lundberg filed this lawsuit against DRT and Walton on August 4, 2023, then filed a first amended complaint as a matter of course on August 25, 2023.  (*See* Compl. (Dkt. 1); Am. Compl. (Dkt. 2).)  Her first amended complaint alleged causes of action for sex discrimination and retaliation under Title VII and the VHRA, interference with FMLA rights, violations of the Virginia Wage Payment Act ("VWPA"), tortious interference with a business expectancy, and intentional infliction of emotional distress.  (Am. Compl. ¶¶ 81–132.)

Defendants moved under Federal Rule of Civil Procedure 12(b)(6) to dismiss all counts except for the retaliation claims against DRT.  (Dkt. 6.)  On April 18, 2024, the court granted the motion in part and denied in part.  (Dkts. 19, 20.)  It dismissed Lundberg's VHRA claims for individual liability against Walton and her VWPA claim against DRT with prejudice.  (Dkt. 20.)  The court dismissed several other claims without prejudice and granted her leave to amend.  (*Id.*)

Lundberg then filed a second amended complaint.  (Second Am. Compl. (Dkt. 25).)  It alleges six different causes of action.  Count I is a Title VII claim for sex discrimination based on theories of disparate treatment and constructive demotion.  (*Id.* ¶¶ 87–104.)  Count II alleges Title VII retaliation.  (*Id.* ¶¶ 105–14.)  Count III alleges FMLA interference.  (*Id.* ¶¶ 115–26.)  Counts IV and V allege sex discrimination and retaliation in violation of the VHRA.  (*Id.* ¶¶ 127–32.)  And Count VII[1] alleges tortious interference with a business

---

[1] Lundberg's second amended complaint does not include a Count VI.

expectancy. (*Id.* ¶¶ 133–38.) Counts I through V are alleged against DRT only, and Count VII is alleged against both DRT and Walton.

Defendants filed an answer to the second amended complaint, (Dkt. 26), and the parties conducted discovery. On December 19, 2024, Defendants moved for summary judgment on all counts. (Dkt. 52.) After the parties completed briefing, the court heard argument on the motion on January 27, 2025. (Dkt. 59.)

## II.  Standard of Review

Under Federal Rule of Civil Procedure 56(a), the court shall "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Whether a fact is material depends on the relevant substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If that burden has been met, the nonmoving party must then come forward and establish the specific material facts in dispute to survive summary judgment. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986).

When evaluating a motion for summary judgment, the court considers "the pleadings, depositions, answers to interrogatories, and admissions on file, together with [any] affidavits" filed by the parties. *Celotex*, 477 U.S. at 322 (citation omitted). In determining whether a genuine issue of material fact exists, the court views the facts and draws all reasonable

inferences in the light most favorable to the nonmoving party. *Glynn v. EDO Corp.*, 710 F.3d 209, 213 (4th Cir. 2013). The nonmoving party must, however, "set forth specific facts that go beyond the 'mere existence of a scintilla of evidence.'" *Id.* (quoting *Anderson*, 477 U.S. at 252). It may not rely on beliefs, conjecture, speculation, or conclusory allegations to defeat a motion for summary judgment. *See Baber v. Hosp. Corp. of Am.*, 977 F.2d 872, 874–75 (4th Cir. 1992). To grant summary judgment, "the court must determine that no reasonable jury could find for the nonmoving party on the evidence before it." *Perini Corp. v. Perini Constr., Inc.*, 915 F.2d 121, 124 (4th Cir. 1990) (citing *Anderson*, 477 U.S. at 248).

### III.    Analysis

#### A.  Sex Discrimination

Title VII makes it an unlawful employment practice to "fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of [her] sex." 42 U.S.C. § 2000e-2(a)(1). Title VII's prohibition on discrimination based on "sex" also forbids discrimination based on sexual orientation. *See Bostock v. Clayton Cnty., Ga.*, 590 U.S. 644, 683 (2020). The VHRA similarly prohibits an employer from discriminating against an employee with respect to her "compensation, terms, conditions, or privileges of employment" because of her "sex" or "sexual orientation." Va. Code Ann. § 2.2-3905(B)(1)(a). Here, the parties agree that the court should evaluate Lundberg's VHRA claims under the Title VII standard. *See, e.g.*, *Brackney-Wheelock v. City of Charlottesville*, 652 F. Supp. 3d 603, 633 (W.D. Va. 2023) (analyzing Title VII and VHRA claims together under the Title VII standard).

Lundberg alleges that DRT is liable for two different forms of sex discrimination. She first claims that Walton's comments to the City of Lynchburg and Bedford County background investigators were disparate-treatment discrimination based on her sexual orientation. Second, she alleges that DRT constructively demoted her by creating intolerable working conditions that compelled her to leave her full-time position as captain and move to part-time status.[2]

### 1. Disparate treatment

Disparate-treatment discrimination occurs when "an employer has treated a particular person less favorably than others because of a protected trait." *Ricci v. DeStefano*, 557 U.S. 557, 577 (2009) (cleaned up). A plaintiff can use one of two methods to establish disparate treatment in violation of Title VII: (1) the mixed-motive framework, or (2) the burden-shifting framework the Supreme Court recognized in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Croft v. City of Roanoke*, 862 F. Supp. 2d 487, 493 (W.D. Va. 2012) (citing *Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 354 F.3d 277, 284–85 (4th Cir. 2004)). Regardless of the method of proof a plaintiff chooses, "[t]he ultimate question in every employment discrimination case involving a claim of disparate treatment is whether the plaintiff was the victim of intentional discrimination." *Hill*, 354 F.3d at 286 (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 153 (2000)).

---

[2] Lundberg's second amended complaint also alleges discrimination based on hostile work environment. (Second Am. Compl. ¶ 92.) DRT argues that it is entitled to summary judgment on the hostile work environment claim, and Lundberg did not respond to that argument either in her briefing or at the motion hearing. (*See* Pl.'s Mem. in Opp'n to Defs.' Mot. for Summ. J. at 10–16 (Dkt. 57) [hereinafter "Pl.'s Mem."]; Defs.' Reply Br. in Supp. of Mot. for Summ. J. at 8 (Dkt. 58) [hereinafter "Defs.' Reply"].) The court therefore finds she has conceded that DRT is entitled to summary judgment on that claim. The second amended complaint also appears to allege several additional forms of disparate treatment, but Lundberg has likewise abandoned those claims.

Lundberg relies on the mixed-motive framework to oppose summary judgment on her disparate-treatment claim. That framework requires her to demonstrate through direct or circumstantial evidence that sex discrimination motivated the employer's adverse employment decision. *Id.* at 284. She "need not demonstrate that the prohibited characteristic was the sole motivating factor to prevail, so long as it was a motivating factor." *Id.* Direct evidence refers to "evidence of conduct or statements that both reflect directly the alleged discriminatory attitude and that bear directly on the contested employment decision." *Bandy v. City of Salem*, 59 F.4th 705, 711 (4th Cir. 2023) (citation omitted). The Fourth Circuit has explained that "[d]erogatory comments can constitute direct evidence of discrimination if they are '(1) related to the protected class of persons of which the plaintiff is a member; (2) proximate in time to the complained-of adverse employment decision; (3) made by an individual with authority over the employment decision at issue; and (4) related to the employment decision at issue.'" *Alberti v. Rector & Visitors of the Univ. of Va.*, 65 F.4th 151, 155 (4th Cir. 2023) (quoting *Bandy*, 59 F.4th at 711).

Here, the alleged evidence of discrimination and adverse employment action are one and the same. Lundberg argues that the references Walton provided to the prospective employers qualify as adverse employment actions, and she contends that the specific comments he made about her personal life in the investigative report are direct evidence of discrimination based on her bisexual identity. For the reasons outlined below, the court concludes that Lundberg has not established a triable issue of fact on either issue.

*i.    Adverse employment action*

The parties disagree on whether a negative reference to a prospective employer can constitute an adverse employment action for purposes of a Title VII discrimination claim. Several courts have held that such a reference may qualify as an adverse action in the context of a Title VII *retaliation* claim.  *See, e.g.*, *Hillig v. Rumsfeld*, 381 F.3d 1028, 1033–35 (10th Cir. 2004); *Hall v. Charlotte Mecklenburg Schs.*, No. 3:13-CV-259, 2014 WL 2586889, at *10 (W.D.N.C. June 10, 2014).  But the standard for adverse actions in Title VII retaliation cases is "not coterminous" with the standard in discrimination cases. *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 67 (2006).  The anti-retaliation provision broadly makes it unlawful to "discriminate against" an employee or applicant for employment because she has opposed unlawful practices, 42 U.S.C. §2000e-3(a), whereas the anti-discrimination provision focuses on discrimination with respect to "compensation, terms, conditions, or privileges of employment," *id.* § 2000e-2(a)(1).  To establish Title VII discrimination, a plaintiff must "show some harm respecting an identifiable term or condition of employment," though that injury need not be "significant." *Muldrow v. City of St. Louis, Mo.*, 601 U.S. 346, 354–55 (2024).

DRT argues that Walton's references must have affected the "terms, conditions, or privileges" of Lundberg's employment *with DRT* to support her discrimination claim, and that an effect on her job prospects with other employers does not suffice.  Fourth Circuit precedent provides little guidance on this issue.  In one unpublished decision, the Fourth Circuit held that providing "negative employment references for discriminatory motives can constitute a violation" of Title VII's anti-discrimination provision, but it did not elaborate on

the type of harm, if any, a reference must cause to support a discrimination claim.  *Harris v. Prince George's Cnty. Pub. Schs.*, 141 F.3d 1158 (Table), 1998 WL 183837, at *2 (4th Cir. 1998) (per curiam).  Lundberg also cites a District of South Carolina decision that treated a negative letter of recommendation as an adverse employment action supporting a discrimination claim when the letter "contributed to the rescission" of a job offer.  *Wandji v. Wilkie*, No. 2:18-cv-03036, 2020 WL 7647552, at *17 (D.S.C. Nov. 9, 2020), *report & recommendation adopted*, 2020 WL 7237922 (D.S.C. Dec. 9, 2020), *aff'd sub nom. Wandji v. McDonough*, 850 F. App'x 851 (4th Cir. 2021) (per curiam).  But the court in *Wandji* relied on decisions addressing the standard for adverse actions in Title VII retaliation cases, which does not necessarily mirror the standard in the discrimination context.  *See id.*

Ultimately, the court can resolve Defendants' summary judgment motion without defining the precise circumstances in which an employment reference may support a Title VII discrimination claim.  At the very least, a reference would need to have some negative impact on the plaintiff's employment prospects to qualify as an adverse employment action, *see id.*, and Lundberg has not offered sufficient evidence that Walton's comments to the background investigators had such an effect here.  Starting with the Bedford County application, the undisputed record shows that Walton's comments had no impact on the decision to rescind Lundberg's conditional offer.  The official who made the decision, Bedford County Fire and Rescue Chief Janet Blankenship, affirmatively states that it was not based on the background investigation report or the information Walton provided to the investigator.  (Decl. of Janet Blankenship ¶ 8 (Dkt. 53-13) [hereinafter "Blankenship

Decl."].)   Instead, Blankenship explains that her decision was based on the results of Lundberg's psychological health evaluation.  (*Id.* ¶ 7.)

Lundberg does not identify any facts that cast genuine doubt on Blankenship's account.  She points to evidence that there was high demand for local firefighters and EMTs following the COVID-19 pandemic; that Walton acknowledged his words may carry weight because of his contacts in the region's first-responder community and admitted he would be disappointed if the references he provided for Lundberg were written about him; and that she was on track to be hired prior to Bedford County's background investigation, for which Walton was the only professional reference.  But none of those facts would permit a reasonable juror to discount Blankenship's statement that she rescinded Lundberg's conditional offer because of the psychological exam, not because of the background investigation.  Lundberg also argues that there is a triable dispute whether Blankenship's explanation is "reasonable" because Lundberg reported concerns about the psychological testing process to Bedford County.  (Pl.'s Mem. at 20.)  She did not raise those concerns until after Bedford County rescinded her conditional offer, (*see* Lundberg Decl., Ex. B), and this evidence also fails to create a jury question about Blankenship's explanation for the employment decision.

Unlike Bedford County, the City of Lynchburg did consider information in Lundberg's background investigation report when making the decision not to hire her.  Jonathan Wright, the deputy chief who reviewed her application, explains that the "decision not to move forward with Ms. Lundberg as a candidate for the Lynchburg Fire Department was based on multiple factors, including the information in the Background Investigation

Report." (Wright Decl. ¶ 9.) It appears that Wright considered the comments from the multiple references who expressed doubts that Lundberg had the necessary professional background for the position, which would have required her to complete an accelerated firefighter training program. After reviewing the available information, Wright "concluded that Ms. Lundberg did not have the requisite firefighter experience to join the [Lynchburg Fire Department] as an experienced provider and attend only a six-week accelerated training academy, as opposed to a full 28-week training academy." (*Id.* ¶ 8.)

Wright does not say that the information in the background investigation report about Lundberg's rumored personal life played any role in his hiring decision. Based on the facts in the record, however, a reasonable jury could not find that Walton's comments about her alleged "swinger" lifestyle had any discernible effect on that decision. Overall, Walton's comments were *more positive* than those provided by most of Lundberg's other professional references. Of the other five references, four (Jodi Shirey, Patrick Dukes, Jerome Johnson, and Matt Millner) recommended against hiring her for the position. (*See* Campbell Decl., Ex. A at 7–15.) Walton and the remaining reference, Troy Nelson, were the only two who shared a neutral or partly favorable view of Lundberg's qualifications for the role. Neither Walton nor Nelson made a recommendation for or against hiring her. (*Id.* at 8–9, 11–13.) Aside from his comments about Lundberg's personal life, Walton offered some positive feedback on her performance at DRT as the court outlined above. (*Supra* at 4–5.) Specifically, he said that Lundberg took her job as station captain "very seriously," did "a very good job," and that he would re-hire her before ultimately stating that he could not

"recommend her or not recommend her" for the Lynchburg firefighter position.  (Campbell Decl., Ex. A at 11–13.)

With four independent references outright recommending against hiring Lundberg for the position, and one (Millner) sharing even more detailed allegations about her sex life,[3] the record does not support a finding that Walton's comments made the City of Lynchburg less likely to hire her.  While Lundberg suggests that Walton is well-known in the first-responder community, that fact does not create a jury question on this issue, particularly when all four references who recommended against hiring her worked as firefighters for the City of Lynchburg at the time she applied.  (*See id.* at 7–15.)

In sum, even if an employment reference can support a Title VII discrimination claim when it negatively impacts a job application, there is insufficient evidence that Walton's references had such an impact here.  For that reason, the court concludes that Lundberg's disparate-treatment discrimination claims fail as a matter of law.

### ii.  Discriminatory motive

Even if Lundberg could establish that Walton's references affected the terms, conditions, or privileges of her employment, a reasonable jury could not find that her sexual orientation was a motivating factor behind the comments he made about Lundberg's personal life.[4]

Walton's comments to the background investigators did not refer to Lundberg's bisexuality, so they do not provide obvious direct evidence of discrimination.  *See Alberti*, 65

---

[3] Millner alleged that Lundberg had "multiple sexual partners" and had been "openly filmed having sex," and he speculated that Lundberg's private conduct would "be a distraction" and "cause problems" if she were hired.  (Campbell Decl., Ex. A at 14.)

[4] Defendants do not dispute that Title VII prohibits discrimination based on an employee's bisexual identity.

F.4th at 155. When speaking to the City of Lynchburg's investigator, Walton claimed Lundberg had "a very different view on her private life" and that "her and her fiancé are open swingers and partiers and so forth." (Campbell Decl., Ex. A at 12.) He described Lundberg and her fiancé as "odd ducks." (*Id.*) Walton's comments to Bedford County's investigator similarly alleged that Lundberg was "very open with a lifestyle of being a swinger," which "could be a distraction and might not fit in with every group of people." (Langhorne Decl., Ex. A at 4.) He also told the Bedford County investigator that her "hair may be of different colors." (*Id.*) Walton's statements referring to Lundberg as a "swinger" and describing her appearance did not reveal her bisexuality to either prospective employer. The undisputed record shows that both Wright and Blankenship were unaware of Lundberg's sexual orientation when they decided not to hire her. (Wright Decl. ¶ 10; Blankenship Decl. ¶ 9.)

That said, Lundberg's disparate-treatment claim is directed at DRT, so it does not turn on how the prospective employers interpreted Walton's comments. Rather, the question is whether Lundberg's bisexual identity was a "motivating factor" in his decision to comment on her personal life during the two background investigation interviews. *Hill*, 354 F.3d at 284.

Based on the existing record, a reasonable jury could not draw that conclusion. A jury could find that Walton knew Lundberg identifies as bisexual at the time he spoke to the background investigators. Lundberg testifies that she shared that fact with him around October 20, 2021, before she applied to either position. (Lundberg Decl. ¶ 8.) But there is little evidence that her sexual orientation contributed to Walton's decision to share the

rumors about her "swinger" lifestyle during the interviews, the first of which took place in January 2022. (*See* Campbell Decl. ¶ 10; Langhorne Decl. ¶ 9.) On their face, his comments refer to sexual practices that are distinct from bisexuality. Walton's deposition testimony reinforces that point. He explains that he had heard "report[s]" in the first-responder community that Lundberg and her then-fiancé had "an open relationship" and attended "swinger parties," which he described as involving "heterosexual partner swapping stuff." (Walton Dep. at 77:9–23.)

There is evidence that Walton once conflated bisexual persons with "swingers." According to Lundberg, when she told Walton she is bisexual, he replied: "oh, so you're a swinger." (Lundberg Dep. at 45:25–46:3.) Lundberg says she "was clear with him that [she] was not [a "swinger"] and that those two words are not synonymous." (Lundberg Decl. ¶ 9.) If credited, Lundberg's account suggests that Walton persisted in spreading rumors about her sex life even after she told him they were false. Such conduct might well be worthy of condemnation as inappropriate and unprofessional. Ultimately, though, this evidence would not allow a reasonable factfinder to conclude that Walton chose to tell the background investigators about Lundberg's alleged "swinger" lifestyle *because* he knew she is bisexual.[5] At

---

[5] Lundberg argues that Walton's comments also reflected gender stereotyping, which can serve as evidence of unlawful sex discrimination. *See Price Waterhouse v. Hopkins*, 490 U.S. 228, 250–51 (1988); *Parker v. Reema Consulting Servs., Inc.*, 915 F.3d 297, 303 (4th Cir. 2019). But Lundberg's second amended complaint does not allege a sex discrimination claim based on gender stereotyping, and she cannot add one by introducing it in her response to Defendants' motion for summary judgment. This district has declined to "read a gender stereotyping claim" into a sex discrimination claim at the summary judgment stage where it was not alleged in the plaintiff's complaint. *David v. Winchester Med. Ctr.*, No. 5:16-CV-00063, 2018 WL 310140, at *12–13 (W.D. Va. Jan. 5, 2018). The court will take the same approach here. Lundberg obtained copies of the two background investigation reports well before she filed this lawsuit and thus had access to the facts she now cites in support of a gender-stereotyping claim. Because she chose not to include that claim in her complaint, the court will not entertain it at this late stage.

most, it suggests that Walton did not understand her sexual orientation at all, and instead
fixated on the rumors he had heard about her and her then-fiancé's open relationship.

Because Lundberg has not shown that her sexual orientation was a motivating factor
behind Walton's comments or that his comments affected the terms, conditions, or privileges
of employment, the court concludes that DRT is entitled to summary judgment on her
disparate-treatment discrimination claims.[6]

### 2. Constructive Demotion

Lundberg next alleges discrimination based on a theory of constructive demotion.
The Fourth Circuit has not clearly addressed whether a constructive demotion claim is
cognizable under Title VII, but several district courts in the circuit, including this one, have
recognized such a claim. *See Salmons v. Com. Driver Servs., Inc.*, No. 7:19-cv-00532, 2019 WL
6833660, at *6 & n.2 (W.D. Va. Dec. 13, 2019) (collecting cases); *see also Laird v. Fairfax Cnty.,
Va.*, 978 F.3d 887, 895–96 (4th Cir. 2020) (Wynn, J., concurring) ("Each of our sister circuits
to have faced the question of whether to recognize claims for constructive demotion has
decided that such claims are cognizable."). For purposes of resolving Defendants' summary
judgment motion, the court will assume that Lundberg's constructive demotion claim is
cognizable.

A constructive demotion claim closely resembles a constructive discharge claim. The
latter has "two basic elements": (1) the plaintiff was discriminated against by her employer to

---

[6] Lundberg very briefly argues that she can also establish discrimination through the *McDonnell Douglas* framework. But
the *prima facie* elements she applies relate to an employee's discharge. She suggests she can make out a *prima facie* case by
showing she was constructively demoted from her full-time position at DRT. For the reasons discussed in this opinion,
Lundberg fails to establish constructive demotion as a matter of law. Lundberg does not rely on the *McDonnell Douglas*
framework in relation to her claim that Walton's employment references, standing alone, were actionable discrimination.

the point where the working conditions became "so intolerable that a reasonable person in [her] position would have felt compelled to resign"; and (2) the plaintiff actually resigned in the face of those conditions. *Green v. Brennan*, 578 U.S. 547, 555 (2016) (citation omitted); *see Perkins v. Int'l Paper Co.*, 936 F.3d 196, 211–12 (4th Cir. 2019). The plaintiff also must show that the employer acted deliberately in making her working conditions intolerable. *Bristow v. Daily Press, Inc.*, 770 F.2d 1251, 1255 (4th Cir. 1985). When alleging constructive demotion rather than constructive discharge, the plaintiff must prove that her employer "deliberately made her working conditions intolerable for the purpose of forcing her to seek a demotion/transfer to another department," and that she actually sought that demotion or transfer. *Cuffee v. Tidewater Cmty. Coll.*, 409 F. Supp. 2d 709, 718–19 (E.D. Va.), *aff'd*, 194 F. App'x 127 (4th Cir. 2006).

Lundberg claims she was constructively demoted when her working conditions left her no choice but to resign from her position as captain and transfer to a part-time role with DRT. To prevail on that claim, she must offer evidence that the conditions at DRT became objectively intolerable by the time she moved to part-time status in May 2022. The objective intolerability standard is difficult to meet. It requires "something more" than the severe or pervasive conduct needed to establish a Title VII hostile work environment. *Evans v. Int'l Paper Co.*, 936 F.3d 183, 193 (4th Cir. 2019) (quoting *Pa. State Police v. Suders*, 542 U.S. 129, 147 (2004)). The working conditions must be so intolerable that they would *compel* a reasonable person in the plaintiff's position to seek a demotion or transfer. It is not enough to show that a reasonable person in the plaintiff's position would have viewed demotion or transfer

"as the wisest or best decision," or even that the plaintiff "subjectively felt compelled" to make that change.  *Id.* (citation omitted).

Lundberg has not shown that her working conditions at DRT rose to this level.  As a starting point, this court has already held that the references Walton provided to Lundberg's prospective employers, standing alone, did not support a hostile work environment claim.  *See Lundberg v. Delta Response Team, LLC*, No. 3:23-cv-00042, 2024 WL 1676806, at *5 (W.D. Va. Apr. 18, 2024) (Ballou, J.).  It follows that the references are insufficient to establish constructive demotion.  *See Evans*, 936 F.3d at 193.  Lundberg argues that her working conditions became intolerable once she complained about Walton's comments to both Walton and McCoy and neither took any action to address her concerns.  (Pl.'s Mem. at 17–18.)  In her deposition, she explains that she resigned the captain position because of "what [she] read in the FOIA documents," her lack of trust in management "to abide by their own SOPs and rules" for responding to complaints, and her decision to attend paramedic school. (Lundberg Dep. at 74:11–75:23; *see* Lundberg Decl. ¶¶ 26, 28.)

Under these circumstances, Lundberg's frustration with DRT and discomfort remaining in her position are understandable, but a constructive demotion claim requires more than "difficult or unpleasant working conditions."  *Evans*, 936 F.3d at 193.  Without evidence of more serious, ongoing mistreatment, a reasonable factfinder could not conclude that DRT's apathetic response to Lundberg's complaints would have compelled a reasonable person in her position to leave the captain position and take part-time status.  *See id.* (explaining that "isolated or infrequent" conduct "is less likely to establish the requisite intolerability").  Lundberg suggests she was ignored by DRT leadership, but even

"ostracism" from colleagues does not suffice to create objectively intolerable conditions. *Matvia v. Bald Head Island Mgmt., Inc.*, 259 F.3d 261, 273 (4th Cir. 2001). The Fourth Circuit has held that similar—and more severe—alleged mistreatment by employers falls short of the objective intolerability standard. *See Evans*, 936 F.3d at 189, 194 (holding that evidence of numerous racially inappropriate comments by co-workers and employer's inaction to plaintiff's complaints failed to create a jury question as to constructive discharge); *Williams v. Giant Food Inc.*, 370 F.3d 423, 434 (4th Cir. 2004) (holding that plaintiff failed to state a claim for constructive discharge by alleging that her "supervisors yelled at her, told her she was a poor manager and gave her poor evaluations, chastised her in front of customers, and once required her to work with an injured back"); *see also Auriemma v. Logan's Roadhouse, Inc.*, No. 7:12-cv-00284, 2012 WL 5844967, at *4 (W.D. Va. Nov. 19, 2012) (reaching same conclusion where plaintiff alleged that her employer "subjected her to heightened oversight and scrutiny, threatened to report her for minor infractions, and failed to respond to her complaints, requests, and inquiries").

Because Lundberg has not provided evidence that her working conditions were objectively intolerable, DRT is entitled to summary judgment on her discrimination claims based on constructive demotion.[7]

---

[7] Defendants read Lundberg's second amended complaint to also allege a claim for constructive *discharge*, based on an allegation that "DRT's discharge of Lundberg is an adverse employment action." (*See* Second Am. Compl. ¶ 96.) However, the complaint identifies only two theories of discrimination: disparate treatment and constructive demotion. (Second Am. Compl. ¶ 88.) Even if the court assumes the complaint alleges a separate constructive discharge claim, Lundberg did not exhaust her administrative remedies for that claim, so it fails as a matter of law. Her EEOC charge alludes to a constructive demotion theory of discrimination, but it says nothing about a separate claim based on constructive discharge. (Defs.' Ex. 26); *see Knight v. McCarthy*, 439 F. Supp. 3d 744, 755 (E.D. Va. 2020) (holding that plaintiff failed to exhaust constructive discharge claim that did not appear in her EEOC charge).

**B. Retaliation**

Title VII prohibits an employer from retaliating against an employee because she "has opposed any practice made an unlawful employment practice" or filed a charge of discrimination with the EEOC.  42 U.S.C. § 2000e-3(a).  To establish a *prima facie* case of retaliation, Lundberg must show "(i) that she engaged in protected activity, (ii) that her employer took adverse action against her, and (iii) that a causal relationship existed between the protected activity and the adverse employment activity."  *Foster v. Univ. of Md.-E. Shore*, 787 F.3d 243, 250 (4th Cir. 2015) (cleaned up).  She can demonstrate a causal relationship "by showing that the adverse act bears sufficient temporal proximity to the protected activity," by identifying other "facts that suggest that the adverse action occurred because of the protected activity," or by "a combination of the two."  *Laurent-Workman v. Wormuth*, 54 F.4th 201, 219 (4th Cir. 2022) (cleaned up).  If Lundberg can make a *prima facie* showing of retaliation, the burden shifts to DRT to articulate a legitimate, non-retaliatory reason for taking the adverse employment action.  *Foster*, 787 F.3d at 250.  If DRT clears that hurdle, the burden shifts back to Lundberg to rebut DRT's evidence "by demonstrating that [DRT's] purported nonretaliatory reasons were not its true reasons, but were a pretext for discrimination."  *Id.* (internal quotation marks omitted).

Lundberg argues that she engaged in protected activity by (1) complaining to Walton and McCoy in March and April 2022 about Walton's comments, (2) filing the complaint with OEMS in April 2022, and (3) filing the EEOC charge in June 2022.  DRT does not dispute that all three complaints qualify as protected activities under Title VII, but it argues that Lundberg previously abandoned an argument that her comments to Walton and McCoy so

qualified.  DRT points out that Lundberg, in her deposition, said she was unaware of any "complaints" that support her retaliation claim aside from the ones she filed with OEMS and EEOC.  (*See* Lundberg Dep. at 158:11–159:7.)  But Lundberg's second amended complaint specifically alleges that she engaged in protected activity by complaining to Walton, (Second Am. Compl. ¶ 106), and it appears that Lundberg simply equated "complaints" with formal, written charges in her deposition answer.  The court therefore declines to hold that Lundberg has abandoned a retaliation claim based on her complaints to Walton and McCoy.

Lundberg's second amended complaint alleges that DRT took several adverse actions in retaliation for her protected activity, including denying her PTO payout request, enforcing the two-shifts-per-month policy against her, failing to provide her FMLA notices when she requested leave in September 2022, and ultimately terminating her employment.  (*Id.* ¶¶ 107, 109–10.)  But her response to the summary judgment motion identifies just two: her constructive demotion and her termination.  For the reasons discussed above, Lundberg has failed to establish constructive demotion.  She also has not attempted to establish that the denial of her PTO payout request, the enforcement of DRT's policies for part-time employees, or the decision not to give her FMLA notices were adverse actions that may support a retaliation claim.  At this stage, it is not even clear that she intends to rely on those actions to establish retaliation.

Even if those actions could satisfy the adverse-action element, Lundberg has not shown that any of them were causally connected to her protected activity.  The record does not support a finding that DRT denied Lundberg's PTO payout request or required her to

work two shifts per month because she engaged in protected activity.  Assuming that Lundberg could make a *prima facie* showing of causation, DRT has met its burden to identify a non-retaliatory reason for those actions by asserting that they were consistent with company policy.  Lundberg has not responded with evidence that DRT's proffered reasons were a pretext for retaliation.  Again, her arguments on summary judgment do not address those alleged adverse actions at all.  Thus, her retaliation claims based on them fail as a matter of law.

Nor has Lundberg offered evidence of a causal connection between her protected activity and DRT's failure to provide her with FMLA notices when she requested leave on September 29, 2022.  McCoy explains that she did not provide the FMLA notices to Lundberg because, at the time, she believed they were not necessary for "part time" employees who "did not have a regular schedule."  (McCoy Dep. at 53:12–15.)  Lundberg does not identify any facts that rebut McCoy's explanation for the decision.

That leaves one adverse action: Lundberg's alleged termination in October 2022.  The parties dispute whether DRT terminated Lundberg's employment at that time.  Lundberg states that she received a letter from her 401(k) provider in October 2022 informing her that DRT had classified her as a "former employee."  (Lundberg Dep. at 157:3–10.)  She also notes that McCoy said she was employed "through October 4, 2022," (McCoy Dep. at 21:19–20), and that McCoy asked her to return her uniforms on that date, which typically occurs when an employee is terminated, (*see* Defs.' Ex. 27; Pl.'s Ex. 8 at 13 (Dkt. 57-8)).

Even if DRT terminated her employment on October 4, 2022, Lundberg cannot make a *prima facie* showing that her protected activity caused her termination.  The closest-in-

time protected activity is her OEMS complaint, which DRT first learned about on August 9,
2022.  (*See* Defs.' Ex. 25.)  A reasonable jury could not find that the eleven-week gap
between DRT learning about the OEMS complaint and discharging Lundberg supports an
inference of causation.  The Fourth Circuit has held that "a lapse of two months between
the protected activity and the adverse action is 'sufficiently long so as to weaken significantly
the inference of causation.'"  *Horne v. Reznick Fedder & Silverman*, 154 F. App'x 361, 364 (4th
Cir. 2005) (quoting *King v. Rumsfeld*, 328 F.3d 145, 151 n. 5 (4th Cir. 2003)) (granting summary
judgment to defendant on retaliation claim).  The fact that Lundberg had stopped working
any shifts for DRT two months before the company learned about her OEMS complaint—
and never returned to DRT between August and October 2022—reinforces that a
reasonable factfinder could not infer causation here based on temporal proximity.  And
Lundberg does not point to any other facts that suggest she was terminated in October 2022
because of her protected activity.

For these reasons, the court will grant DRT summary judgment on Lundberg's
retaliation claims.

## C. FMLA Interference

Lundberg alleges that DRT interfered with her FMLA rights by failing to provide her
with an FMLA Notice of Eligibility, a Rights and Responsibilities Notice, or a Designation
Notice when she informed McCoy that she was suffering from anxiety and depression.

The FMLA permits an eligible employee to take up to 12 weeks of leave during any
12-month period "[b]ecause of a serious health condition that makes the employee unable to
perform the functions of" her job.  29 U.S.C. § 2612(a)(1)(D).  Under the FMLA, it is

unlawful for an employer "to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right" provided by the statute.  *Id.* § 2615(a)(1).  An employee who is prejudiced by an employer's interference with FMLA rights may sue to recover damages. *Ragsdale v. Wolverine World Wide, Inc.*, 535 U.S. 81, 89 (2002); *see* 29 U.S.C. § 2617(a)(1)(A).

To establish FMLA interference, a plaintiff must prove (1) she is entitled to an FMLA benefit, (2) her employee interfered with the provision of that benefit, and (3) the employer's interference caused harm.  *Shipton v. Balt. Gas & Elec. Co.*, 109 F.4th 701, 705–06 (4th Cir. 2024).  The FMLA "provides no relief unless the employee has been prejudiced by the violation." *Ragsdale*, 535 U.S. at 89.

DRT argues that Lundberg has not shown she was entitled to FMLA leave. According to DRT, that element requires Lundberg to prove she suffered from a condition that qualifies as a "serious health condition" under the FMLA.  This position is supported by some Fourth Circuit case law.  In a 2001 decision, the Fourth Circuit explained that a plaintiff alleging FMLA interference must "prove that she was afflicted with an FMLA-qualifying condition, because otherwise she did not have any right under the Act with which her employer could have interfered." *Rhoads v. F.D.I.C.*, 257 F.3d 373, 384 (4th Cir. 2001).

But in a more recent decision, the Fourth Circuit held that it would be "premature" to reject a FMLA interference claim on that ground where the employer failed to make "any inquiry into whether [the employee's alleged condition] was an FMLA-qualifying serious health condition." *Hannah P. v. Coats*, 916 F.3d 327, 346 (4th Cir. 2019).  The court explained that relying on the employee's failure to establish a qualifying health condition in that scenario "would allow [the employer] to use its own failure to determine whether leave

should be designated as FMLA-protected to block liability." *Id.* (quoting *Dotson v. Pfizer, Inc.*, 558 F.3d 284, 295 (4th Cir. 2009)).

Instead, when an FMLA interference claim alleges that the employer failed to inquire about whether the employee was requesting FMLA leave, the court in *Hannah P.* explained that the employee can survive summary judgment by demonstrating that she provided notice of "a potentially FMLA-qualifying circumstance" and "inquir[ed] into leave options." *Id.* Such a showing "create[s] a material question of fact regarding whether [the employee] triggered her employer's FMLA obligations." *Id.* Proper notice to the employer "does not require 'any magic words,'" *id.* at 345 (quoting *Dotson*, 558 F.3d at 295), and the employee "need not specifically invoke the FMLA to benefit from its protections," *id.* Notice suffices when it "merely makes the employer aware that the employee needs potentially FMLA-qualifying leave." *Id.* at 345–46 (internal quotation marks omitted). Once the employee provides such notice, "the responsibility falls on the employer to inquire further about whether the employee is seeking FMLA leave." *Id.* at 346 (quoting *Dotson*, 558 F.3d at 295); *see also* 29 C.F.R. § 825.301(a) ("In any circumstance where the employer does not have sufficient information about the reason for an employee's use of leave, the employer should inquire further of the employee . . . to ascertain whether leave is potentially FMLA-qualifying.").

Here, the parties contest whether Lundberg satisfied the FMLA notice requirements when, on September 29, 2022, she told McCoy she was experiencing "depression and anxiety" and requested "an accommodation of time off." (Defs.' Ex. 27.) But even

assuming that her leave request provided proper notice, Lundberg cannot show that DRT's failure to inquire about her request caused her prejudice.

Lundberg herself admits that she was not fit to return to work at DRT until November 2023, long after any FMLA leave period would have ended.  (Pl.'s Resp. to Defs.' Interrogs. at 11–12.)  Additionally, when asked in her deposition when she felt fit to return to work at DRT, she responded "I'm still in therapy, so I'm still waiting to return." (Lundberg Dep. at 98:10–14.)  She then further confirmed that she believes November 2023 to be the date by which she became fit to return to work.  (*Id.* at 99:2–6.)  Several courts have held that an employee cannot show prejudice from an employer's failure to comply with FMLA notice requirements when the employee was unable to return to work until after the FMLA leave period expired.  *See, e.g.*, *Bellone v. Southwick-Tolland Reg'l Sch. Dist.*, 915 F. Supp. 2d 187, 195–96 (D. Mass. 2013); *Wiggins v. DaVita Tidewater, LLC*, 451 F. Supp. 2d 789, 803 (E.D. Va. 2006); *Donahoo v. Master Data Ctr.*, 282 F. Supp. 2d 540, 555–56 (E.D. Mich. 2003).

The court finds the reasoning in those decisions persuasive.  Had DRT inquired into Lundberg's leave request and provided her 12 weeks of FMLA leave, she would have exhausted that leave around the end of the 2022 calendar year.  The undisputed record shows that Lundberg would not have been fit to return to work until eleven months later. At that point, DRT would not have been obligated to reinstate her to her position or an equivalent one.  *See Donahoo*, 282 F. Supp. 2d at 556 (holding that employee could not show prejudice from employer's failure to reinstate her because she was unable to return to work after the 12-week FMLA leave period).  Even viewing the record in the light most favorable

to Lundberg, there is nothing in the record that refutes Lundberg's own statement that she did not feel that she was fit to return to DRT until November 2023.

As Lundberg points out, the Fourth Circuit has held that prejudice also "may be gleaned from evidence that had the plaintiff received the required (but omitted) information regarding [her] FMLA rights, [she] would have structured [her] leave differently." *Hannah P.*, 916 F.3d at 346–47 (quoting *Vannoy v. Fed. Res. Bank of Richmond*, 827 F.3d 296, 302 (4th Cir. 2016)). But Lundberg has not presented sufficient evidence that she would have taken a different approach had DRT inquired about her leave request or provided FMLA notices. In her deposition, she was directly asked what she would have done differently had she received FMLA paperwork. She replied: "I hadn't thought of that question, so I don't know." (Lundberg Dep. at 98:6–9.)

In her later declaration, Lundberg asserts that she "would have spent [the leave period] working with [her] therapist" had she been approved for FMLA leave. (Lundberg Decl. ¶ 34.) The court is skeptical that her declaration statement should carry any weight, as "a party who has been examined at length on deposition [cannot] raise an issue of fact simply by submitting an affidavit contradicting [her] own prior testimony." *Hannah v. United Parcel Serv., Inc.*, 72 F.4th 630, 638 (4th Cir. 2023). Regardless, that statement does not create a genuine dispute as to prejudice. Even if Lundberg had spent additional time with a therapist, it remains undisputed that she was not fit to return to work until November 2023. No facts in the record suggest that additional therapy would have allowed her to return any earlier, let alone before the 12-week FMLA leave period expired. Aside from the additional

therapy sessions, Lundberg does not argue that she would have made any changes to her leave had she received FMLA notices.

Finally, the fact that DRT may have terminated Lundberg's employment in October 2022 does not itself create a jury question on prejudice. At least one court has held that an employee was not prejudiced by the lack of FMLA notice when she undisputedly was not fit to return to work until after the 12-week FMLA period expired, even when the employer terminated her employment in the middle of that 12-week period. *Roberts v. The Health Ass'n*, No. 04-CV-6637T, 2007 WL 2287875, at *5 (W.D.N.Y. Aug. 8, 2007). While Lundberg states that she "intended to return to DRT" when she requested leave, (Lundberg Decl. ¶ 34), nothing in the record indicates that she made any effort to return, or even inquire about her employment status, until well after her FMLA leave would have ended. Given that she was not fit to return to DRT until November 2023, she cannot establish any prejudice stemming from her alleged termination in October 2022.

Because no reasonable jury could find that Lundberg was prejudiced by DRT's failure to inquire about her leave request or notify her of her FMLA rights, the court will grant DRT summary judgment on her FMLA interference claim.

### D. Tortious Interference with Business Expectancy

Lundberg's final claim alleges that both DRT and Walton are liable for tortiously interfering with a business expectancy in the City of Lynchburg and Bedford County positions. To establish tortious interference, a plaintiff must prove "(i) the existence of a valid contractual relationship or business expectancy; (ii) knowledge of the relationship or expectancy on the part of the interferor; (iii) intentional interference inducing or causing a

breach or termination of the relationship or expectancy; and (iv) resultant damage to the party whose relationship or expectancy has been disrupted." *DurretteBradshaw, P.C. v. MRC Consulting, L.C.*, 670 S.E.2d 704, 706 (Va. 2009) (citing *Chaves v. Johnson*, 335 S.E.2d 97, 102 (Va. 1985)). In cases involving alleged interference with a business expectancy or at-will contract, the plaintiff also must show that the defendant used "improper methods" to interfere. *See Duggin v. Adams*, 360 S.E.2d 832, 226–27 (Va. 1987) (citation omitted); *Glass v. Glass*, 321 S.E.2d 69, 76–77 (Va. 1984).

A valid business expectancy requires a "probability of future economic benefit"—a "mere 'possibility' that a future economic benefit will accrue is insufficient." *L-3 Comm'ns Corp. v. Serco, Inc.*, 926 F.3d 85, 94 (4th Cir. 2019) (quoting *Comm. Bus. Sys. v. Halifax Corp.*, 484 S.E.2d 892, 897 (Va. 1997)) (cleaned up). Defendants argue that Lundberg did not have a valid expectancy in the position with the City of Lynchburg because the City did not conditionally offer her a job before rejecting her application. Lundberg fails to respond to this argument in her opposition brief, and the court concludes she has conceded the point. *See, e.g.*, *Gowan v. Winfield*, No. 7:20-cv-00247, 2022 WL 822172, at *3 (W.D. Va. Mar. 18, 2022) (treating an argument as conceded when the plaintiff did not respond to it in his opposition to summary judgment).

Lundberg also cannot establish tortious interference based on Walton's comments during the Bedford County hiring process. Even if Walton's actions involved "improper methods" of interference, Lundberg has not presented evidence that they caused Bedford County to terminate the business expectancy, as required by the fourth element. *See DurretteBradshaw*, 670 S.E.2d at 706. Chief Blankenship, who made the decision to rescind

Bedford County's conditional offer of employment, made clear that her decision was based on Lundberg's psychological health evaluation, not on the background investigation report or Walton's comments therein.  (Blankenship Decl. ¶¶ 7–8.)  As discussed above, Lundberg does not identify any facts that call Blankenship's explanation for the decision into dispute. Thus, DRT and Walton are entitled to summary judgment on her tortious interference claim.

### IV.     Conclusion

For the foregoing reasons, Defendants' motion for summary judgment (Dkt. 52) will be **GRANTED**.  An appropriate Order will accompany this Memorandum Opinion.

ENTERED this 31st day of January, 2025.

/s/ *Jasmine H. Yoon*
_____
HON. JASMINE H. YOON
UNITED STATES DISTRICT JUDGE